# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RADIO MUSIC LICENSE COMMITTEE,<br><br>　　　　　　　　　Plaintiff,<br>　　　v.<br><br>SESAC, INC., SESAC, LLC, AND SESAC HOLDINGS, INC.,<br><br>　　　　　　　　　Defendants. | Civil Action<br><br>No. 2:12-cv-05807-CDJ<br><br>Judge C. Darnell Jones, II<br><br>**Electronically Filed** |

## PLAINTIFF RADIO MUSIC LICENSE COMMITTEE'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...............................................................................................................1

BACKGROUND .................................................................................................................2

ARGUMENT ......................................................................................................................4

I.   RMLC HAS PLAUSIBLY ALLEGED THAT SESAC HAS UNLAWFULLY
     MONOPOLIZED A COGNIZABLE RELEVANT MARKET ...........................................5

     A.   RMLC Plausibly Alleged That SESAC Has Monopoly Power .............................5

          1.   RMLC Alleged Direct Evidence Of SESAC's Monopoly Power ..............6

          2.   RMLC Also Alleged That SESAC Has A Dominant Share Of A
               Plausible Relevant Market That Has High Barriers To Entry ....................7

     B.   RMLC Has Plausibly Alleged That SESAC Has Engaged In Exclusionary
          Conduct ................................................................................................................10

          1.   SESAC Has Willfully Acquired Monopoly Power In The Relevant
               Market ........................................................................................................11

          2.   SESAC's Monopoly Power Flows from Extinguishing
               Competition Between Its Copyright-Owner Affiliates, Not Merely
               From The Copyright Laws ..........................................................................13

          3.   SESAC Has Excluded Competition .............................................................14

II.  RMLC'S ALLEGATIONS STATE A VIOLATION OF SECTION 1 OF THE
     SHERMAN ACT ..............................................................................................................15

     A.   RMLC Plausibly Alleges That SESAC Has Engaged In Concerted Action
          With Its Affiliates .................................................................................................15

          1.   The Complaint Alleges The Necessary Agreement ...................................15

          2.   The Conspiracy That RMLC Alleges Is Plausible ....................................17

     B.   RMLC Has Plausibly Alleged That SESAC Is The Hub Of A Rimmed
          Wheel Conspiracy With Its Affiliates ..................................................................18

     C.   RMLC Has Plausibly Alleged A *Per Se* Illegal Conspiracy ...............................21

     D.   Even If SESAC's Conduct Were Not Unlawful *Per Se*, RMLC Has
          Plausibly Alleged That It Is Unreasonable ..........................................................23

i

1.    RMLC Was Not Required To Allege An Output Restriction, But It Did.................................................................................................................24

2.    SESAC's Argument That It Need Not Compete With Its Own Suppliers Is Irrelevant ...............................................................................25

3.    A Firm's Ability To Choose Its Own Products Is Irrelevant To The Issue of Competitive Harm ........................................................................26

4.    SESAC's "Three Percent" Argument Is a Red Herring............................28

CONCLUSION............................................................................................................29

## TABLE OF AUTHORITIES

### CASES

*Alternative Electrodes, LLC v. Empi, Inc.*,
597 F. Supp. 2d 322 (E.D.N.Y. 2009) ................................................................ 10

*Am. Needle, Inc. v. NFL*,
130 S. Ct. 2201 (2010) ........................................................................................ 16

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) .................................................................................. 4

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ......................................................................................... 4, 5

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) ............................................................................ 27

*Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*,
441 U.S. 1 (1979) .......................................................................... 16, 20, 23, 25

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007) ..................................................................... passim

*Chi. Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
95 F.3d 593 (7th Cir. 1996) ................................................................................. 25

*Deborah Heart & Lung Ctr. v. Penn Presbyterian Med. Ctr.*,
No. 11–1290, 2012 WL 1390249 (D.N.J. Apr. 19, 2012) ................................... 21

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) ........................................................................................... 10

*Fashion Originators' Guild of Am. v. FTC*,
312 U.S. 457 (1941) ........................................................................................... 22

*Graboff v. Collern Firm*,
No. 10–1710, 2010 WL 4456923 (E.D. Pa. Nov. 8, 2010) ............................. 4, 12

*Howard Hess Dental Laboratories Inc. v. Dentsply Int'l Inc.*,
602 F.3d 237 (3d Cir. 2010) ............................................................................... 20

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
547 U.S. 28 (2006) ............................................................................................. 13

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010) ...................................................................... passim

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    562 F. Supp. 2d 392 (E.D.N.Y. 2008) ................................... 10

*In re Processed Egg Prods. Antitrust Litig.*,
    2012 WL 4717963 (E.D. Pa. Oct. 4, 2012) ............................ 18

*Interstate Circuit, Inc. v. United States*,
    306 U.S. 208 (1939) ........................................ 18, 21

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
    359 U.S. 207 (1959) ............................................. 22

*LePage's, Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) ................................. 11, 24

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*,
    302 F.3d 1207 (11th Cir. 2002) ................................. 28

*Meredith Corp. v. SESAC LLC*,
    2011 WL 856266 (S.D.N.Y. Mar. 9, 2011) ...................... passim

*Morales v. Sun Constructors, Inc.*,
    541 F.3d 218 (3d Cir. 2008) ................................... 17

*Nynex Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998) ........................................... 21

*SmithKline Corp. v. Eli Lilly & Co.*,
    575 F.2d 1056 (3d Cir. 1978) .............................. 27, 28

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) .................................... 7

*Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*,
    530 F.3d 204 (3d Cir. 2008) ................................... 24

*Toys "R" Us v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ............................... 7, 20

*TruePosition, Inc. v. LM Ericsson Tel. Co.*,
    2012 WL 3584626 (E.D. Pa. Aug. 21, 2012) ..................... 15

*TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*,
    964 F.2d 1022 (10th Cir. 1992) ................................ 12

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ..................... 6, 11, 24, 25

iv

*United States v. E.I. du Pont de Nemours & Co.*,
 351 U.S. 377 (1956) ............................................................................ 7

*United States v. Grinnell Corp.*,
 384 U.S. 563 (1966) ............................................................................ 5

*United States v. Microsoft*,
 253 F.3d 34 (D.C. Cir. 2001) .............................................................. 6

*United States v. Socony-Vacuum Oil Co.*,
 310 U.S. 150 (1940) .......................................................................... 21

*Victaulic Co. v. Tieman*,
 499 F.3d 227 (3d Cir. 2007) .............................................................. 17

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
 627 F.3d 85 (3d Cir. 2010) ........................................................ passim

*ZF Meritor, LLC v. Eaton Corp.*,
 696 F.3d 254 (3d Cir. 2012) ............................................... 11, 20, 24

## OTHER AUTHORITIES

PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW
 ¶ 563d (2012) ................................................................................... 10

U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, ANTITRUST GUIDELINES
 FOR THE LICENSING OF INTELLECTUAL PROPERTY
 §§ 2.2, 3.1 (1995) ............................................................................. 13

## INTRODUCTION

SESAC's business model is ingenious.  It is also illegal.  Virtually all of RMLC's member radio stations have to play music in some form, even if only advertising jingles.  The copyright laws levy enormous fines on stations that play music without a proper license from the copyright holder, and SESAC knows that radio stations cannot afford to pay those fines.  SESAC has amassed a repertory of copyrighted music, and has agreed with the copyright owners of the music (its "affiliates") that SESAC will be the *de facto* exclusive licensor of that material so that radio stations cannot obtain licensing rights from any other source.

SESAC refuses to disclose precisely what is in its repertory, so radio stations can never be confident that they are not infringing.  At the same time, SESAC has ensured that its repertory contains a sufficient amount of must-have material that radio stations typically cannot avoid playing.  For example, almost as soon as its current management took over the company in 1992, SESAC locked up licensing rights to works from iconic composers and publishers Bob Dylan and Neil Diamond by offering to pay them far more than could other performing rights organizations. Since then, SESAC has continued to strategically acquire exclusive rights to the music of a select group of composers and publishers, such as works used in McDonald's advertising.  SESAC knows that when faced with the Hobson's choice of buying a license from SESAC or risking a $150,000 fine every time it accidentally plays a song exclusively in SESAC's repertory, a radio station is going to buy the license.  That gives SESAC enormous power to charge whatever it wants for its licenses, without fear that it will lose business to anyone else.  Under the antitrust laws SESAC is a monopolist, and this lawsuit seeks to stop SESAC's unlawful use of its monopoly power.

By using *de facto* exclusive contracting practices to create an artificial market insulated from competition so that it alone reigns as king, SESAC has violated Section 2 of the Sherman

Act.  By agreeing with and among its affiliates not to compete with each other, and instead to pool copyrighted musical works into a single must-have portfolio offered only as a take-it-or-leave-it bundle, SESAC has violated Section 1 of the Sherman Act.

Knowing that RMLC's lawsuit threatens to undo its highly lucrative, albeit anticompetitive, business model, SESAC has filed a motion to dismiss in an attempt to stave off its inevitable day of reckoning.  Because it lacks any colorable basis for challenging RMLC's actual allegations, however, SESAC can merely take aim at a fictional complaint.  Time and again, its brief misconstrues the complaint, disputes the facts alleged in it, attacks irrelevant straw men, and misstates the law.  The Court should deny SESAC's motion and permit this case to proceed promptly to discovery so that RMLC can move forward to stop the unfettered monopolistic abuse that SESAC has been inflicting on the U.S. commercial radio industry.

## BACKGROUND

Plaintiff Radio Music License Committee (RMLC) represents the interests of the U.S. commercial radio industry, negotiating license fees covering the public performance of copyrighted music for the benefit of commercial radio stations.  (Compl. ¶ 24.)  The radio industry makes prevalent use of copyrighted musical works, whether in broadcasting feature music in order to entertain listeners, introducing talk programs with specific musical themes, airing third-party advertisements, or using sound bites as background material.  (*Id.* ¶ 16.)  In order to publicly perform such music in any of those forms, radio stations must obtain permission from the copyright holders.  (*Id.* ¶ 15.)  If they do not, the station risks copyright infringement fines of up to $150,000 per infringed work for each act of infringement.  (*Id.*)  Performing rights organizations ("PROs") secure licensing authority on behalf of their copyright-holding members and offer "one-stop-shop" licenses to consumers covering the full range of copyrighted works within their repertories.  (*Id.* ¶ 17.)  These are known as blanket licenses.

Three PROs operate in the United States today: ASCAP, BMI, and SESAC.  (*Id.*)  Commercial radio stations need licenses to all three PROs' repertories in order to broadcast free of the risk of copyright infringement.  (*Id.* ¶¶ 32f.)

The unregulated operation of a PRO entails grave risks to consumers and to competition. (*Id.* ¶¶ 25, 53.)  The danger lies in the fact that, by pooling the copyrighted works of different composers, authors, and publishers, PROs suppress the competition in which those licensors would otherwise engage.  (*Id.*)  In order to prevent PROs in the United States from taking advantage of the monopoly power that inherently accrues in combining intellectual property rights into a single licensing source, the U.S. Department of Justice long ago took steps to impose regulatory constraints on ASCAP and BMI.  (Compl. ¶¶ 26-27.)  Today, as a result of enduring DOJ consent decrees, those PROs: (i) must accept all qualified music composers and producers as their affiliates; (ii) must not enter into exclusive contracts with their affiliates; (iii) must not insist that consumers take a blanket license (*i.e.*, must ensure that consumers have a genuine option to directly license from the copyright owners); (iv) must offer consumers a genuine economic choice between a per-program license and a blanket license; (v) must offer consumers who apply in writing for licenses access to their repertories without exposure to copyright infringement, even in the absence of agreement on the license fees; and (vi) must accept the district court's determination of a reasonable fee in the event that they cannot agree upon a fee within 60 days.  (*Id.* ¶ 27.)  The principle underlying these consent decrees is that blanket licensing must not suppress competition among copyright holders and/or between those copyright holders and the relevant PRO.

SESAC is different.  Unlike the other two U.S. PROs, SESAC has managed to avoid all regulatory oversight by strategically maintaining a smaller affiliate base than ASCAP and BMI

in order to fly under the radar, while simultaneously lining its pockets with excessive ill-gotten profits. (*Id.* ¶¶ 22, 33.)  This leaves SESAC free to engage in highly anticompetitive practices. Flouting all of the constraints that the Justice Department has imposed via consent decrees on ASCAP and BMI, SESAC (i) handpicks its affiliates and pays them supracompetitive royalties to ensure their adherence to SESAC's scheme; (ii) enters into *de facto* exclusive contracts with its affiliates; (iii) insists that consumers take only blanket licenses, refusing to offer per-program licenses or carve-out rights; (iv) provides consumers no choice between these licenses; (v) refuses to give consumers access to its repertory unless the parties first reach terms; and (vi) subjects itself to no rate-setting mechanism by a neutral third party. (*Id.* ¶¶ 3, 5, 22, 30-39, 42.)

As a result of these actions, SESAC has ensured that consumers have no option but to pay for a blanket license, no matter what it costs. (*Id.* ¶¶ 2-4, 30, 41, 64.)  It is therefore no surprise that SESAC continues to foist a series of never-ending, supracompetitive price hikes on the U.S. radio industry and other consumers. (*Id.* ¶¶ 1-2, 30, 39, 41-42, 46-47.)

## ARGUMENT

RMLC was required to plead "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In assessing plausibility, the Court must consider RMLC's allegations "as a whole" and not dissect individual allegations.  *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010).  SESAC cannot win its motion merely by proffering "a plausible alternative to [RMLC's] theory," *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 189-90 (2d Cir. 2012), or by disputing RMLC's factual allegations.  *Graboff v. Collern Firm*, No. 10-1710, 2010 WL 4456923, at *10 (E.D. Pa. Nov. 8, 2010).

4

SESAC asks this Court to apply a heightened level of scrutiny to RMLC's complaint because this is an antitrust case.  (Mem. at 5.[1])  That is not the law.  *W. Penn*, 627 F.3d at 98 (specifically rejecting the argument that a court should apply *Twombly*'s plausibility standard with "extra bite" in antitrust cases and observing that *Twombly* "expressly rejected the notion that a ''heightened' pleading standard' applies in antitrust cases" (citation omitted)).  So long as RMLC pled enough facts to "nudge[] [its] claims across the line from conceivable to plausible," the Court must deny SESAC's motion to dismiss.  *Twombly*, 550 U.S. at 570.  RMLC did that and far more.

## I.   RMLC HAS PLAUSIBLY ALLEGED THAT SESAC HAS UNLAWFULLY MONOPOLIZED A COGNIZABLE RELEVANT MARKET

To state a clam for monopolization, RMLC was required to plausibly allege that SESAC (1) possesses monopoly power (2) that it willfully acquired or maintains "as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident."  *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007).  RMLC plausibly alleged every required element.

### A.   RMLC Plausibly Alleged That SESAC Has Monopoly Power

Monopoly power is "the power to control prices or exclude competition."  *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966).  A plaintiff can satisfy its obligation to plead monopoly power by alleging direct evidence of a firm's ability to charge supracompetitive prices and exclude competition or by alleging indirect evidence of "a dominant share in a relevant market, and that significant 'entry barriers' protect that market."  *Broadcom Corp.*, 501 F.3d at 307.  A plaintiff relying on direct evidence of monopoly power is not required to allege a

---

[1]    "Mem." refers to SESAC's Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint (Dckt. No. 23-2), December 17, 2012.

relevant product market.  *Id.* at 307 n.3.  In contrast, a plaintiff relying on indirect evidence must first define a plausible relevant market.  *Id.* at 307.  Here, RMLC alleged both direct evidence of SESAC's monopoly power, as well as indirect evidence of that power in a plausible relevant product market.

### 1.    RMLC Alleged Direct Evidence Of SESAC's Monopoly Power

SESAC does not argue that RMLC did not allege direct evidence of SESAC's monopoly power, probably because the complaint so clearly does so.  RMLC alleged that SESAC has the ability to "profitably and sustainably maintain[] exorbitant prices that are far greater than those charged by ASCAP and BMI . . . without suffering a loss of sales."  (Compl. ¶ 46.)  RMLC alleged that SESAC has "imposed a series of outrageous price increases, which radio stations have had little choice but to pay."  (*Id.* ¶¶ 46-47, 49.)  RMLC's members have been forced to pay SESAC's non-negotiable supracompetitive rate card rates, which at least since 2009, have increased by a compound rate of approximately 8% and 20% every year for analog and website broadcasting, respectively.  (*Id.* ¶ 71.)  None of these increases is tied to growth in the size or popularity of the SESAC repertory; each is based on SESAC's ability to insulate itself from any competition.  (*Id.* ¶¶ 51, 71-72.)   These allegations constitute direct evidence of monopoly power.  *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) (evidence that the defendant "sets prices with little concern for its competitors" established monopoly power because it is "'something a firm without a monopoly would have been unable to do'" (quoting *United States v. Microsoft*, 253 F.3d 34, 58 (D.C. Cir. 2001))).

These allegations are more than sufficient at the motion to dismiss stage to constitute direct evidence of SESAC's monopoly power without allegations that would also support a relevant product market.  *Cf. Broadcom*, 501 F.3d at 307 n.3 ("Because market share and barriers to entry are merely surrogates for determining the existence of monopoly power, direct proof of

monopoly power does not require a definition of the relevant market."); *Toys "R" Us v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (accepting direct evidence of monopoly power, regardless of relevant market definition).

### 2. RMLC Also Alleged That SESAC Has A Dominant Share Of A Plausible Relevant Market That Has High Barriers To Entry

Ignoring RMLC's direct allegations of monopoly power, SESAC only takes aim at the indirect allegations by attacking RMLC's product market definition.[2]  RMLC alleged a relevant product market defined as "licenses to the copyrighted musical compositions and performances in SESAC's repertory."  (Compl. ¶ 44.)

A relevant product market "is composed of products that have reasonable interchangeability for the purposes for which they are produced--price, use and qualities considered."  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956).  Competing products are in the same market only "if they are readily substitutable for one another."  *Broadcom*, 501 F.3d at 307.  Allegations supporting a relevant product market suffice as long as they are plausible and bear a "rational relation to the methodology courts prescribe to define a market."  *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (Sotomayor, J.).  "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."  *Id.* at 199-200.

SESAC does not contest that RMLC has plausibly alleged that there are high barriers to entry to this market or that SESAC controls 100% of it.  (Compl. ¶¶ 47, 49, 51).  Rather, SESAC merely challenges whether this market is plausible at all—the same argument that it previously tried and lost in a case brought against it by the television industry that is currently pending in

---

[2]    RMLC also pled a plausible relevant geographic market, which SESAC does not contest. (Compl. ¶ 48.)

the Southern District of New York (the "*Meredith*" case). *Meredith Corp. v. SESAC LLC*, No. 09-9177, 2011 WL 856266, at *5-10 (S.D.N.Y. Mar. 9, 2011). The *Meredith* court held that this precise product market *was* plausible: "[P]laintiffs have plausibly alleged that, because of the existence of SESAC songs in critical shows and commercials (as well as the alleged difficulty in determining the full contents of the SESAC repertory), they cannot avoid music in the SESAC repertory." *Id.* at *9. The court thus held that plaintiffs there had "adequately alleged that performance rights to songs in the SESAC repertory are not interchangeable with performance rights to songs in the repertories of the other PROs." *Id.* at *10. On that basis, the court correctly approved the complaint's relevant market definition. *Id.*

RMLC made precisely the same allegations in its complaint here. The complaint alleges that SESAC deliberately created a repertory of sufficient breadth and prominence precisely so that radio stations, as a practical matter, cannot avoid playing at least some of those works. (Compl. ¶¶ 3, 22, 32.) SESAC's works include, for example, music that has been used in advertising campaigns for one of radio's largest advertisers, McDonald's. (*Id.* ¶¶ 32d, 33.) SESAC adds an extra layer of security to that indispensability by refusing to disclose precisely what works are in its repertory at any given time, so that radio stations can never determine with any confidence whether particular works are in or out. (*Id.* ¶ 32.) SESAC then uses the threat of heavy infringement fines to ensure that radio stations have no choice but to take a blanket license because SESAC has *de facto* eliminated the possibility of direct licensing from its affiliates. (*Id.*) Because SESAC's affiliates do not grant licensing rights to any other PRO, a license from ASCAP or BMI does not eliminate a station's risk of copyright infringement for works in SESAC's repertory and therefore is not a reasonable substitute for a license from SESAC. (*Id.* ¶¶ 32f, 44-45.) If SESAC raises its price 10% or more above the competitive level (which it

has), consumers cannot respond by obtaining substitute blanket licenses from other PROs or direct licenses from SESAC's affiliates (and they have not).  (*Id.* ¶ 45.)

Although SESAC concedes, as it must, that "[t]he district court in *Meredith* did allow local television broadcasters' antitrust suit to proceed under an essentially identical definition of the proposed relevant market," (Mem. at 18 n.4), SESAC seeks to take another bite at the apple here.  SESAC contends that "[t]he premise of RMLC's antitrust claim is that SESAC has aggregated 'exclusive rights to a critical mass of 'must have' works" and argues that, "[i]f each individual work in this 'critical mass' is a 'must have' work, then, by definition, licenses to perform these works are not 'interchangeable substitute products.'"  (Mem. at 17-18 (emphasis omitted).)  But nowhere does RMLC allege that all, most, or even many of the copyrighted works in SESAC's repertory would be indispensable independent of their inclusion within that larger repertory.  Rather, it is SESAC's practice of creating a repertory that is eclectic, prominent, and voluminous to the point of being indispensable to consumers and as to which SESAC acts as the sole licensor that RMLC challenges under the antitrust laws.  (Compl. ¶¶ 2, 22, 34.)  As RMLC alleges:

> SESAC handpicks its affiliates to ensure that its repertory encompasses both a broad spectrum of prominent music as well as critical mass of exclusive *(i.e.,* non-shared) works, thus ensuring that it has licensing authority over music that radio stations and other consumers, as a practical matter, cannot avoid playing.

(*Id.* ¶ 32a.)  The fact that SESAC has exclusive licensing authority over a critical mass of copyrighted works that radio stations cannot avoid performing means, by definition, that there are no substitute goods to which consumers can turn when SESAC raises its licensing fee to monopoly levels—which it does, continuously.  (*Id.* ¶¶ 32, 71.)

SESAC's argument, at bottom, is that the relevant market cannot be limited to SESAC's own repertory.  But the Supreme Court has expressly held otherwise.  In *Eastman Kodak Co. v.*

*Image Tech. Services, Inc.*, 504 U.S. 451, 481-82 (1992), for example, the Supreme Court remanded for a trial a Section 2 monopolization claim against Kodak in a market limited to Kodak's own products.  The Court observed that "Kodak also contends that, as a matter of law, a single brand of a product or service can never be a relevant market under the Sherman Act.  We disagree.  The relevant market for antitrust purposes is determined by the choices available to Kodak equipment owners. . . .  [O]ne brand of a product can constitute a separate market."  *Id.*; s*ee also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 403 (E.D.N.Y. 2008) (finding allegations of single brand market plausible); *Alternative Electrodes, LLC v. Empi, Inc.*, 597 F. Supp. 2d 322, 334-35 (E.D.N.Y. 2009) (at the motion to dismiss stage, "plaintiff has reasonably alleged that the relevant market" consisted of a single brand because it alleged that there were no reasonable substitutes); PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 563d (2012) (explaining that "[a] single brand" can constitute a separate market when "its maker is the only producer in a relevant category").

RMLC has clearly alleged that SESAC has monopoly power in this market, as the *Meredith* court found.  *Meredith*, 2011 WL 856266, at *15 ("Here, where SESAC holds nearly 100% of the relevant market it is clear that [the plaintiffs] have established monopoly power.").

### B.   RMLC Has Plausibly Alleged That SESAC Has Engaged In Exclusionary Conduct

SESAC is correct that its mere possession of monopoly power alone does not necessarily violate Section 2.   RMLC was also required to allege that SESAC engaged in some anticompetitive conduct to acquire and/or maintain that power.  *Broadcom Corp.*, 501 F.3d at 308.  "Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits.  Conduct that impairs the opportunities of rivals and either does not further

competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive." *Id.* (citation omitted); *see also W. Penn*, 627 F.3d at 108-09.

RMLC alleged that SESAC has engaged in independently sufficient exclusionary conduct, *i.e.*, conduct to willfully obtain or maintain its monopoly power. RMLC alleged that SESAC unlawfully acquired its monopoly power by strategically handpicking its affiliates and paying them greater royalties than the other PROs could afford, given their rate regulation. (Compl. ¶¶ 3, 5, 22, 32(a), 38, 42.) RMLC alleged repeatedly that SESAC has entered into *de facto* exclusive dealing contracts with its affiliates (*id.* ¶¶ 57-59) and has refused to deal with RMLC's members other than on a blanket basis (*id.* ¶ 60). Each of these allegations satisfies RMLC's obligation to allege the necessary element of willful acquisition or maintenance of monopoly power. *Chambers Dev. Co. v. Browning-Ferris Indus., Inc.*, 590 F. Supp. 1528, 1543 (W.D. Pa. 1984) (allegations that defendant engaged in bid-rigging and other conduct to obtain a monopoly sufficient to allege the willful acquisition of monopoly power); *Dentsply*, 399 F.3d at 187 (a monopolist's *de facto* exclusive dealing policy constituted exclusionary conduct); *LePage's, Inc. v. 3M*, 324 F.3d 141, 157-58 (3d Cir. 2003) (same); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 278-79 (3d Cir. 2012) (refusing to deal and exclusive dealing are "long recognized forms of exclusionary conduct").

Ignoring these specific allegations of anticompetitive conduct, and hoping that the Court will draw inferences in its favor rather than RMLC's, SESAC argues that it did nothing wrong in acquiring or maintaining its monopoly power for three supposed reasons. Each fails.

### 1.   SESAC Has Willfully Acquired Monopoly Power In The Relevant Market

Trying to be too clever by half, SESAC first argues that, if the relevant market is the works in its repertory, then it must necessarily have a monopoly share of that market and cannot

therefore willfully acquire or maintain monopoly power.  (Mem. at 25.)  SESAC ignores the crucial allegations that it deliberately and intentionally manufactured an artificial market in which it has a 100% market share through its strategic acquisition of its affiliates, paying them supracompetitive royalties, precisely to be able to obtain and exercise monopoly power.  (Compl. ¶¶ 2-4, 30, 38, 41, 44, 64, 79.)  SESAC created its market by aggregating individual licensing rights, that would otherwise be competitively available, into a collective and indispensable bundle, withdrawing those rights from a market in which direct and other forms of licensing would be available, and positioning itself as the sole gatekeeper to those rights.  (*Id.*)  Absent SESAC's monopolization, the market at issue in this case would include not only the blanket licenses currently available, but also direct licenses from SESAC affiliates and per-program licenses with carve-out rights. (*Id.* ¶¶ 34-35, 66.)  These are the licensing options that exist in the other PRO markets, as the complaint alleges.  (Compl. ¶¶ 27, 36.)

SESAC attempts to avoid the consequences of its actions by arguing that "[a]ny suggestion that modifications to SESAC's licensing practices somehow would dramatically reduce its market share is too speculative to support the monopolization claim."  (Mem. at 26.)  This argument fails because the Court must accept as true all of the complaint's well-pleaded allegations, including those regarding the alternative licensing schemes that are available in other PRO markets and that would be available in the absence of SESAC's conduct.  (Compl. ¶¶ 4, 53, 66); *Graboff*, 2010 WL 4456923, at *10 (refusing to consider an argument based on a factual dispute, as "the Court must accept the facts as alleged in the Complaint as true for the purposes of the motion to dismiss").

SESAC's reliance on *TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992), is misplaced.  The Tenth Circuit's statement that "a

company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product" is irrelevant here because there is nothing "natural" about SESAC's monopoly. SESAC deliberately constructed its monopoly with the specific intent of eliminating competition in the licensing of the constituent musical works from non-SESAC sources.  (Compl. ¶¶  3, 5, 30, 32a, 32f, 33, 37, 42, 46, 62, 65-66.)

> **2.    SESAC's Monopoly Power Flows from Extinguishing Competition Between Its Copyright-Owner Affiliates, Not Merely From The Copyright Laws**

SESAC next commits a fundamental error in arguing that "any market power that SESAC has plainly flows from the fact that copyright law grants a composer a lawful monopoly over performance rights."   (Mem. at 26.)   This fallacy collapses the distinction between intellectual property ownership and the possession of economic monopoly power—a difference that the Supreme Court made plain in 2006, holding that "a patent does not necessarily confer market power upon the patentee."  *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 45-46 (2006).  As RMLC has alleged, SESAC's affiliates are horizontal competitors.  In the absence of an unlawful agreement to the contrary, as horizontal competitors, they ordinarily would be able to limit each other's ability to charge supracompetitive royalty fees.  (Compl. ¶¶ 1, 54, 64-65, 83-84.)  But SESAC and its affiliates have agreed to eliminate that competition, thus permitting SESAC to charge prices higher than what the affiliates would have been able to command without suppressing rivalry between themselves.  (*Id.*)  SESAC's position rests on the discredited notion that owning a copyright necessarily creates an absence of competition.  *See* U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, ANTITRUST GUIDELINES FOR THE LICENSING OF INTELLECTUAL PROPERTY §§ 2.2, 3.1 (1995) ("The Agencies will not presume that a . . . copyright . . . necessarily confers market power upon its owner. . . . While intellectual property licensing arrangements are typically welfare-enhancing and procompetitive, antitrust concerns may

nonetheless arise.   For example, . . . [a]n acquisition of intellectual property may lessen competition in a relevant antitrust market.").

The Third Circuit rejected a similar theory with respect to patents in *Broadcom*.   There, the defendant held patents that were a part of a cellular "standard," which had been adopted by an independent body and was required to allow phones to access the 3G wireless network.   The defendant attempted to avoid antitrust liability by asserting that its market power properly arose from its patent, arguing that not every patent holder could be considered a monopolist. *Broadcom*, 501 F.3d at 315.   The Court of Appeals rejected that argument noting that "[i]t is the incorporation of a patent into a standard—not the mere issuance of a patent—that makes the scope of the relevant market congruent with that of the patent."   *Id.*   The same is true here.   It is not the existence of a copyright that makes SESAC a monopolist, but its deliberate aggregation of these copyrights to create an artificial relevant market insulated from competition, so that SESAC is the only source of the licensing rights.

### 3.      SESAC Has Excluded Competition

SESAC's final argument seems to be that there can be no exclusionary conduct as a matter of law under Section 2 if the excluded party is a supplier.   (Mem. at 26-27.)   In other words, the antitrust laws supposedly cannot hold SESAC accountable for assembling and creating a monopoly bottleneck over an indispensable repertory of copyrighted music because its affiliates grant it permission to license on their behalf.   (*Id.*)   SESAC cites no case law in support of its theory and the *Meredith* court correctly rejected it.   *Meredith*, 2011 WL 856266, at *15 (plaintiffs' allegations regarding SESAC's contracting constitutes the necessary exclusionary conduct).   SESAC's affiliates are not merely vertical suppliers, but horizontal competitors. (Compl. ¶¶ 1, 25, 54, 64-65, 83-84.)   SESAC argues that "[i]t makes no sense to say that the affiliates have been 'excluded' by a distributor that enables them to earn a greater profit."   (Mem.

at 26.)   But it makes perfect sense to characterize SESAC as excluding its affiliates because RMLC has alleged that, but for SESAC's conduct, SESAC's affiliates would have competed with each other, as well as with SESAC.  (Compl. ¶ 53.)  Through a variety of exclusionary practices, such as *de facto* exclusive contracts and refusing to deal, SESAC forecloses that competition, thus securing a monopoly and the associated supracompetitive profits.  (*Id.* ¶¶ 57-60.)

## II.   RMLC'S ALLEGATIONS STATE A VIOLATION OF SECTION 1 OF THE SHERMAN ACT

To state a claim under Section 1 of the Sherman Act, a plaintiff must plausibly allege (1) an agreement (sometimes called "concerted action"), (2) imposing an unreasonable restraint of trade within a relevant product market, and (3) resulting in antitrust injury to the plaintiff. *TruePosition, Inc. v. LM Ericsson Tel. Co.*, No. 11-cv-4574, 2012 WL 3584626, at *3 (E.D. Pa. Aug. 21, 2012).  "Some agreements are so plainly anticompetitive that they are condemned *per se*; that is, they are conclusively presumed to unreasonably restrain trade.  Other agreements are condemned only if evaluation under the fact-intensive rule of reason indicates that they unreasonably restrain trade."  *W. Penn*, 627 F.3d at 99 (citations omitted).  RMLC has plausibly alleged all of the required elements of both *per se* and rule-of-reason violations of Section 1.

### A.   RMLC Plausibly Alleges That SESAC Has Engaged In Concerted Action With Its Affiliates

#### 1.   The Complaint Alleges The Necessary Agreement

SESAC devotes a substantial portion of its brief to arguing that the complaint "inadequately alleges" that its anticompetitive conduct flowed from an agreement between SESAC and its affiliates.  (Mem. at 6-10.)  This argument is without merit.

RMLC's complaint clearly states in non-conclusory allegations that SESAC and its affiliates have agreements.  (Compl. ¶¶ 54-57, 45, 47, 37.)  SESAC itself admits that these

agreements exist:  "SESAC and each affiliate do *agree*, of course, that SESAC may license the affiliate's copyrights."   (Mem. at 7 (emphasis added).)   Indeed, SESAC characterized its contracts with its affiliates as "bilateral agreements" in the *Meredith* litigation.  *Meredith*, 2011 WL 856266, at *13 n.16.   These are the agreements that RMLC contends violate Section 1 because they are *de facto* exclusive dealing arrangements.

Any agreement between two or more entities is sufficient to allege the two-party requirement of Section 1.  *Cf. Am. Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2212 (2010) (holding that the key to finding concerted action is whether the arrangement "joins together separate decisionmakers," such that an agreement among "'separate economic actors pursuing separate economic interests . . . deprives the marketplace'" of competition among them) (citations omitted).  RMLC did not have to plead anything more.

SESAC concedes, as it must, that the Supreme Court recognized in *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979) ("*BMI*"), that the ASCAP and BMI regimes involve concerted action.  *Id.* at 10 ("Both organizations plainly involve concerted action in a large and active line of commerce . . . .").  But SESAC argues that the Supreme Court did not mean what it said because "the question of concerted action was not seriously contested." (Mem. at 13.)  Whatever SESAC means by "seriously," the fact remains that the Supreme Court considered the legality of blanket licenses under Section 1 after noting the presence of concerted action; the Court could not have reached the result that it did without recognizing the predicate agreement.[3]  The *Meredith* court held not only that Section 1 applies to SESAC's operations, but

---

[3]     Improperly appealing to materials outside the pleadings to compare SESAC to ASCAP and BMI, SESAC also argues that the Supreme Court's holding applies to ASCAP and BMI, but not to it.  (*Id.* at 13-14.)  SESAC does not explain why various differences in its operating structure vis-à-vis those of ASCAP and BMI warrant treating the latter's contracts with their affiliates as concerted action under Section 1, but SESAC's agreements as unilateral conduct

that the plaintiffs had stated an antitrust claim against SESAC under that provision.  *Meredith*, 2011 WL 856266, at *10-14.

Given its concession that it has a contract with each and all of its affiliates, SESAC's argument that RMLC has not "pleaded circumstantial evidence of a conspiracy sufficient to make plausible the notion that SESAC's purportedly anticompetitive scheme results from concerted action" is beside the point.  (Mem. at 8.)  RMLC alleged, and SESAC has conceded, that SESAC and each affiliate have an actual agreement.  Where the parties agree that there is an actual agreement between them, there is no need to allege circumstantial evidence of an agreement, and SESAC's argument as to why each separate agreement is not "plausible" is legally irrelevant.  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.23 (3d Cir. 2010) ("[D]irect evidence of a conspiracy . . . obviates the need for . . . a showing [of circumstantial evidence].");  *W. Penn*, 627 F.3d at 100 n.8 (concluding that there were direct allegations of agreement and therefore no need to address circumstantial allegations).

### 2.     The Conspiracy That RMLC Alleges Is Plausible

SESAC also claims that the conspiracy that RMLC has alleged between SESAC and its affiliates is not "plausible" because the allegations "identify SESAC – not its affiliates – as the actor" and therefore the complaint supposedly provides no basis to argue that the anticompetitive conduct that RMLC alleges is not "unilateral action on SESAC's part."   (Mem. at 6-7.) Especially in light of its concessions that it has contracts with its affiliates, this argument borders on frivolous.  In a contract, it does not matter who wanted it or who acceded to it; it is still a contract.  *See, e.g.*, *Morales v. Sun Constructors, Inc.*, 541 F.3d 218, 221-22 (3d Cir. 2008); *cf. In*

---

falling outside the scope of Section 1.   (*Id.*)   In any event, SESAC cites no case justifying judicial notice of these non-party, private websites.  The Third Circuit has taken a strong line against taking notice of such materials on a motion to dismiss.  *See Victaulic Co. v. Tieman*, 499 F.3d 227, 236-37 (3d Cir. 2007).

*re Processed Egg Prods. Antitrust Litig.*, -- F. Supp. 2d --, No. 08-2002, 2012 WL 4717963, at

\*4 (E.D. Pa. Oct. 4, 2012) ("[A]ntitrust law has never required identical motives among

conspirators, and even reluctant participants have been held liable for conspiracy." (internal

quotations and citation omitted)).

But also, as a matter of law, the Third Circuit has specifically rejected this notion.  In *In*

*re Insurance Brokerage*, the plaintiffs alleged (among other things) that Marsh & McLennan

("Marsh") had orchestrated a conspiracy among its insurers to rig bids to customers to avoid

competing on renewal business.  618 F.3d at 312-13.  Defendants argued that this conspiracy was

implausible under *Twombly* because the complaint's allegations suggested that Marsh had

organized the conspiracy.  *Id.* at 337.  The Court held that, although Marsh had created and

"masterminded" the conspiracy, "this fact does not make implausible the inference of a

horizontal agreement among the insurers."  *Id.*

Similarly, SESAC's argument that RMLC did not plausibly allege a conspiracy because

the complaint is "devoid of any specific allegations of communications between SESAC and its

affiliates" concerning SESAC's scheme is wrong as a matter of law.  (Mem. at 7.)  The Third

Circuit rejected that proposition in *Insurance Brokerage* based on decades-old Supreme Court

precedent.  Citing *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939), the Court of

Appeals acknowledged that "actionable horizontal conspiracy does not require direct

communications among the competitors."  *Ins. Brokerage*, 618 F.3d at 331.

### B.       RMLC Has Plausibly Alleged That SESAC Is The Hub Of A Rimmed Wheel Conspiracy With Its Affiliates

SESAC argues that RMLC has not adequately pled a horizontal conspiracy among the

various SESAC affiliates, claiming that the complaint "contains no non-conclusory allegations

that SESAC's affiliates have agreed among themselves about anything at all."  (Mem. at 10.)

According to SESAC, the complaint merely alleges that each affiliate has an independent interest in licensing through SESAC because SESAC can pay higher royalties.  (*Id.* at 11.)  SESAC is wrong because the complaint alleges exactly what the Third Circuit has said is necessary to allege a "rimmed wheel" or "hub and spoke" conspiracy.

As SESAC acknowledges, a "rimmed wheel" or "hub and spoke conspiracy" is one in which a central hub (here, SESAC) enters into similar agreements with several similarly situated entities (in this case, its affiliates).  A plaintiff is not required to allege direct evidence of an actual agreement among the horizontal competitors; allegations that are circumstantial suffice. *Ins. Brokerage*, 618 F.3d at 322.  A plaintiff adequately pleads a hub and spoke conspiracy where it alleges that (1) each spoke's separate agreement is similar; and (2) each spoke's decision to enter into that agreement was against its independent self-interest.  *Id.* at 323 n.22.

In *Insurance Brokerage*, the Third Circuit considered allegations that Marsh, an insurance broker, had orchestrated a horizontal conspiracy among insurance companies (1) to pay Marsh contingent commissions in return for business referrals, and (2) to rig bids to Marsh's customers in aid of an agreement among the insurers not to compete with each other for renewal business.  618 F.3d at 311-12.  The Court held that the complaint failed to allege facts that supported a horizontal conspiracy among the insurance companies and Marsh as to the first conspiracy, because plaintiffs had alleged only that the agreements between Marsh and each insurer were similar.  *Id.* at 374.  But, the Court also held that plaintiffs had sufficiently alleged the hub and spoke conspiracy as to the agreement not to compete, because they had alleged that it was against the independent interest of each insurer to deprive itself of the opportunity to get business by intentionally bidding too high for renewal business.  *Id.* at 340-41 & n.40.

19

RMLC's complaint alleges precisely what the Third Circuit said was necessary. It says that, "[s]ave to eliminate competition and obtain monopoly power, it is against SESAC's affiliates' self-interest to force RMLC's members to enter into blanket licenses with SESAC . . . . [Their] self-interest should be to maintain maximum flexibility to negotiate the best possible license fee for their work, including the ability to negotiate direct licenses with individual RMLC members." (Compl. ¶ 55.) *See also Toys "R" Us*, 221 F.3d at 935-36 (affirming *per se* illegal hub and spoke conspiracy where individual agreements were against spoke's independent self-interest).[4]

SESAC wishes away these allegations by arguing that its "affiliates have not actually surrendered licensing flexibility." (Mem. at 9.) But the literal terms of the agreement are irrelevant; it is the effect of the contracts that matters. *See BMI*, 441 U.S. at 24 (emphasizing the lack of any "practical . . . impediment to CBS's obtaining individual licenses"); *ZF Meritor*, 696 F.3d at 270 (express exclusivity is "not necessary"; "we look past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement 'in the real world'"). SESAC simply ignores the allegations that SESAC "enters into *de facto* exclusive contracts with its members." (Compl. ¶ 37.) This *de facto* exclusivity arises because SESAC agrees with and among its affiliates to refuse to offer non-blanket licenses or carve outs, which

---

[4]      SESAC's argument that the Third Circuit's opinion in *Howard Hess Dental Laboratories Inc. v. Dentsply International, Inc.*, 602 F.3d 237 (3d Cir. 2010), is relevant to this case is completely wrong. There, plaintiffs alleged that Dentsply coerced its dealers to carry only its products. Plaintiffs alleged that the dealers and Dentsply were part of a hub and spoke conspiracy because they had alleged that each dealer knew that Dentsply demanded compliance with its exclusive dealing policy and that each dealer would benefit from that compliance. That is exactly the opposite of RMLC's allegations. Here, RMLC alleges that each affiliate's decision to surrender its rights to SESAC is against its independent self-interest because affiliates would benefit from an unfettered ability to offer licenses directly or in some other form than the blanket license.

means that consumers "necessarily lack any incentive to acquire direct licenses from SESAC affiliates." (Compl. ¶¶ 58, 48.)

In addition to alleging that SESAC's affiliates are acting contrary to their economic interest, RMLC also alleged that SESAC and its affiliates had a motive to enter into the conspiracy: supracompetitive profits. (Compl. ¶¶ 53-56.) Both of these are "plus factors" that support plausible inferences of conspiracy at the pleading stage. *Deborah Heart & Lung Ctr. v. Penn Presbyterian Med. Ctr.*, No. 11-cv-1290, 2012 WL 1390249, at *2-3 (D.N.J. Apr. 19, 2012).

### C.     RMLC Has Plausibly Alleged A *Per Se* Illegal Conspiracy

SESAC argues, apparently in the alternative, that RMLC has not alleged that the agreement between SESAC and its affiliates is *per se* illegal, *i.e.*, illegal regardless of its actual anticompetitive effects. (Mem. at 15-17.) The Supreme Court held decades ago, however, that a hub and spoke conspiracy is *per se* illegal. *Interstate Circuit*, 306 U.S. at 226-27. The Third Circuit recently reiterated that principle. *Ins. Brokerage*, 618 F.3d at 337. Since RMLC has alleged such a conspiracy, SESAC is wrong that it has not alleged a *per se* violation of the Sherman Act.

Moreover, because RMLC has pled that SESAC and its affiliates are potential horizontal competitors, their agreement to eliminate all licensing competition among them, to allow SESAC to act as the exclusive licensor of their intellectual property rights, and to refuse to deal with radio stations on terms other than blanket licenses are *per se* violations of Section 1 of the Sherman Act. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940). Indeed, SESAC's own authority recognizes that concerted refusals to deal (or agreements to deal only on specific terms) among horizontal competitors are *per se* illegal, so its attack on Count II fails. *Nynex Corp. v. Discon, Inc.*, 525 U.S. 128, 134-35 (1998) (cited in Mem. at 16) (citing *Klor's,*

21

*Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212-13 (1959) (agreement among appliance manufacturers and distributors to deal with retailer only on highly unfavorable terms was a *per se* violation of Section 1); *Fashion Originators' Guild of Am. v. FTC*, 312 U.S. 457, 467-68 (1941) (agreement among clothing manufacturers, designers and suppliers only to sell to retailers on specific terms was *per se* unlawful under Section 1)).   SESAC claims that its conduct cannot be *per se* illegal because SESAC refuses to offer anything but blanket licenses to the "entire world," not just RMLC's members.   (Mem. at 17.)   SESAC does not cite any case in support of this claim and for good reason.   An agreement among horizontal competitors not to deal with their customers, except on specific terms, is an actionable group boycott that is per se unlawful. *Cf. Fashion Originators' Guild*, 312 U.S. at 465 (refusing to deal with "all retailers and manufacturers who decline to comply with the Guild's program" is a *per se* unlawful group boycott).

SESAC attempts to evade the well-pleaded allegations of the complaint by means of a classic straw man.   SESAC mischaracterizes the complaint as merely attacking blanket licensing. (Mem. at 15.)   The complaint does not allege that blanket licenses are *per se* illegal.   Rather, it alleges that SESAC and its affiliates have agreed to craft a collectively indispensable body of copyrighted musical works under an arrangement that ensures that SESAC is the *sole licensor* of those works, thus eliminating any competition among SESAC and its affiliates, and taking advantage of the lack of regulatory oversight to exercise the acquired monopoly power.   That constitutes a *per se* violation of the law.   This critical difference between what RMLC actually alleged and what SESAC claims that it alleged explains why SESAC is wrong when it says that "RMLC's per se claims are squarely foreclosed by Supreme Court precedent."   (Mem. at 15.)

In *BMI*, which was decided not at the motion to dismiss stage, but on a full trial record, the Supreme Court concluded that ASCAP and BMI's blanket licenses were not *per se* illegal because antitrust consent decrees constrained ASCAP and BMI, and therefore consumers "had a real choice" between their blanket licenses and other licensing alternatives. *BMI*, 441 U.S. at 24. The Supreme Court emphasized the lack of "practical impediments preventing direct dealing," and observed that "[t]he individual composers" on whose behalf the PROs issue blanket licenses never "agreed not to sell individually." *Id.* at 12, 23.

RMLC alleges precisely the opposite here: SESAC, in agreement with its affiliates, has made itself the exclusive source of all licenses to the works in its repertory. (Compl. ¶¶ 1-3, 22, 30, 34, 37, 42, 44-45, 47, 50, 57-58, 61, 65, 98.) SESAC has eliminated competition with, and between, its copyright-holding affiliates. Thus, consumers have no "real choice."[5]

### D. Even If SESAC's Conduct Were Not Unlawful *Per Se*, RMLC Has Plausibly Alleged That It Is Unreasonable

In the alternative to its specious argument that it has escaped *per se* liability, SESAC also argues that RMLC has not alleged that its agreements are illegal because they are an unreasonable restraint of trade. SESAC is just as wrong on this issue as it is about its *per se* liability. "At the pleading stage, a plaintiff may satisfy the unreasonable-restraint element [of the rule of reason] by alleging that the conspiracy produced anticompetitive effects in the relevant markets." *W. Penn*, 627 F.3d at 100. After trying but failing to scuttle RMLC's product market (*supra* Part I.A.2), SESAC proffers four arguments why it believes that RMLC has not sufficiently alleged harm to competition. None is valid.

---

[5]    As SESAC repeatedly argues, the *Meredith* plaintiffs alleged different theories in their case. (Mem. at 16 n.3.) Thus, the fact that the court there found that the television industry's challenge to blanket licensing was not *per se* unlawful is irrelevant here.

### 1. RMLC Was Not Required To Allege An Output Restriction, But It Did

SESAC argues that RMLC failed to allege harm to competition because it did not allege "any reduction in output as a result of SESAC's supposed anticompetitive conduct." (Mem. at 24.) SESAC is wrong, both as a matter of fact and as a matter of law. First, RMLC *does* allege an output restriction. For instance, the complaint alleges that, "[b]ut for SESAC's exclusionary conduct," SESAC and its affiliates would "compete with one another, [as a result of which] the price of public-performance-right licenses would fall and *the quantity of such licenses sold would increase*." (Compl. ¶ 53 (emphasis added).) RMLC further avers that SESAC's "supracompetitive fees . . . inefficiently distort behavior both in the market for SESAC's repertory of copyrighted music and beyond." (*Id.* ¶ 63.)

In any event, the law does not require RMLC to allege an output restriction to state its claims. Plausibly alleging that the defendant has market power, or that its conduct raises prices, forecloses competition or reduces consumer choice, is sufficient to satisfy the harm to competition requirement. *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 226 (3d Cir. 2008) (plaintiff can prove anticompetitive effect by demonstrating "raised prices," or the defendant's market power, and affirming jury verdict based on evidence of market power); *see also W. Penn*, 627 F.3d at 100 ("Anticompetitive effects include increased prices, reduced output, and reduced quality."); *LePage's*, 324 F.3d at 159-63 (excluding potential competitors harms competition); *Dentsply*, 399 F.3d at 194 (reducing consumer choice is recognized competitive harm); *ZF Meritor*, 696 F.3d at 286 (market foreclosure from *de facto* exclusive dealing harms competition). RMLC not only plausibly alleged direct and indirect evidence of SESAC's market power, *supra* Part I.A, but also that SESAC's conduct has resulted in

supracompetitive prices, has foreclosed competition and has reduced consumer choice.  (Compl.

¶¶ 37-39, 42, 47, 63-66.)

SESAC's reliance on the out-of-circuit decision, *Chicago Professional Sports Ltd.*

*Partnership v. National Basketball Association*, 95 F.3d 593 (7th Cir. 1996), is misplaced.

Unlike here, that case did not involve the conduct of a monopolist, nor was there any evidence of

market power.  *Id.* at 600-01.  "Behavior that otherwise might comply with antitrust law may be

impermissibly exclusionary when practiced by a monopolist."  *Dentsply*, 399 F.3d at 187.

### 2.      SESAC's Argument That It Need Not Compete With Its Own Suppliers Is Irrelevant

SESAC next argues that the complaint fails to allege competitive harm because it

purportedly rests on the premise that SESAC is under an antitrust duty to compete with its own

suppliers.  (Mem. at 18-19.)  SESAC contends that it is in a vertical supplier/distributor

relationship with its affiliates and that none of its affiliates are actual or potential rivals.  (*Id.*)

That is not what the complaint says.  The complaint plausibly alleges that the 23,000 authors,

composers and publishers comprising SESAC's affiliate base are horizontal competitors.

(Compl. ¶¶ 1, 25, 54, 64-65, 83-84.)  Copyright holders of musical works compete on quality and

price for licensing and other opportunities.  (*Id.*)  It is precisely such competition that PROs

threaten to eliminate as an incident of their blanket licensing, which is why the Supreme Court

has deemed it vital that PRO blanket licensing not suppress direct licenses or other forms of

licenses.  *BMI*, 441 U.S. at 23-24.  SESAC's affiliate contracts are not economically

independent, vertical supply agreements.  Rather, the complaint alleges that SESAC and its

affiliates have conspired with the purpose and effect of eliminating direct and other non-blanket

forms of licensing, thus extinguishing competition both between SESAC's affiliates and between

those affiliates and SESAC itself.  (Compl. ¶¶ 53-56.)  Coupled with SESAC's hand-picking

affiliates to craft a collectively indispensable repertory of works, the conspiracy has created a durable monopoly allowing SESAC to charge the U.S. radio industry and other consumers supracompetitive blanket-license fees.

SESAC claims that "it is nonsensical to suppose that there might be price competition between the owner of copyright in one work and the owner of copyright in another." (Mem. at 20.) This assertion flies in the face not only of RMLC's allegations, but of the Supreme Court's opinion in *BMI*. (Compl. ¶¶ 1, 54, 64-65, 83-84.) SESAC's purported basis for its contention is equally mysterious: "SESAC's repertory . . . includes 'a broad spectrum of prominent music' that radio stations 'cannot avoid playing.' And stations . . . 'do not control the non-feature music played in the programs and commercials that they air.'" (Mem. at 20 (quoting Compl. ¶ 32).) This argument ignores RMLC's allegations that, were SESAC and its affiliates to permit carve-out rights and make direct and other non-blanket licenses available, radio stations and other blanket-license consumers would negotiate with individual SESAC affiliates for better deals. (Compl. ¶¶ 18, 29, 32, 34-35, 41, 45, 54, 58-61, 66, 89.) SESAC's concerted behavior eliminates such competition. By contrast, were SESAC to permit carve-out rights, not insist on blanket licenses, and not otherwise hinder direct licensing, competition by SESAC affiliates would at least partially limit the market power accompanying its blanket licensing. (*Id.* ¶¶ 53, 79-81, 84.)

### 3.    A Firm's Ability To Choose Its Own Products Is Irrelevant To The Issue of Competitive Harm

SESAC also argues that RMLC has not alleged harm to competition because "antitrust law generally does not restrict a firm's choice of what products to offer." (Mem. at 20.) Perhaps so. But antitrust law most certainly restricts a firm's right to eliminate competition. In this case, RMLC does not simply take issue with SESAC's choice of product. It challenges SESAC's

concerted and unilateral conduct in eliminating competition between and with its affiliate members.  It is for that reason that SESAC's analogy between its offering only a blanket license and "a car dealer's decision to sell only complete cars" is completely off base.  (Mem. at 20.)  To make the parallel illuminative, one would first have to assume that the car dealer had acquired exclusive sales rights over an entire market of cars, thus cutting off all competition between and with all other car sellers, and divvying up the resulting monopoly profits among its car-selling members as their reward for not competing.  Antitrust law would no more permit such a cartel to endure under the pretense of the dealer's right to choose the products that it offers than it permits SESAC and its affiliates to behave as RMLC has alleged.

Far from being "directly on point," as SESAC claims (Mem. at 22), the Ninth Circuit's decision in *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012), is actually irrelevant.  In that case, the plaintiffs alleged an antitrust "tying" claim based on a vertical agreement between television programmers and distributors to only offer packages of channels to consumers.  *Id.* at 1199-1201.  Unlike here, the plaintiffs in *Brantley* did not allege any horizontal agreements among competitors, a fact that the Ninth Circuit cited repeatedly in support of its conclusion.  *Id.* at 1198, 1201.  Also unlike here, *Brantley* did not involve the conduct of a monopolist.  Perhaps even more importantly, however, RMLC has not alleged that SESAC engages in unlawful tying, nor did RMLC have to in order to state its antitrust claims.[6]

---

[6]    The elements of an antitrust tying claim differ from the Section 1 and 2 claims that RMLC alleges here.  Among other things, to plead an unlawful tie, the plaintiff must allege (1) "'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product'" and (2) that the seller "'has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product.'"  *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1061 n.3 (3d Cir. 1978) (citation omitted).

For example, in *SmithKline Corp. v. Eli Lilly and Co.*, 575 F.2d 1056 (3d Cir. 1978), the Third Circuit held that Eli Lilly violated Section 2 when it launched a bundled rebate plan that was designed to leverage the company's lawful monopoly in two patented drugs in order to eliminate competition for a third, non-patented drug that was coming from SmithKline. *Id.* at 1065. The Third Circuit recognized that Lilly had not engaged in an illegal tie, *id.* at 1061 n.3, but nonetheless concluded that the bundling practice violated Section 2. Lilly's goal was to "associate [its] legal monopolistic practices with an illegal activity." *Id.* at 1065. Lilly willfully acquired and maintained its monopoly power by "linking products on which [it] faced no competition . . . with a competitive product." *Id.* Similarly, here, RMLC challenges SESAC's and its horizontal affiliate-competitors' agreement to bundle together *de facto* exclusive licensing rights to create an artificial market that is insulated from any competition and that therefore allows SESAC to charge supracompetitive prices.

### 4.    SESAC's "Three Percent" Argument Is A Red Herring

In proclaiming an absence of competitive harm, SESAC uses its relatively modest scale to argue that DOJ's enforcement efforts against the other two PROs were motivated by its concern about "competition among composers" only "because these organizations accounted for so much of the overall universe of musical compositions." (Mem. at 22.) SESAC emphasizes that it "accounts for less than three percent of the PRO-affiliated copyright holders." (*Id.* at 23.) First, RMLC has alleged that the relevant market consists solely of the rights to SESAC's copyrights. It is irrelevant that that relevant market is smaller than some other market. *Cf. Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1214-15 (11th Cir. 2002) (observing that market power in a market other than the relevant market for an antitrust claim is irrelevant). Second, SESAC ignores that the complaint alleges that the selectivity of its repertory is a deliberate and important part of its overall anticompetitive scheme. SESAC has carefully and

28

deliberately limited its size to appear small vis-à-vis the heavily regulated PROs, ASCAP and BMI, in an effort (successful to date) to escape antitrust and regulatory scrutiny, and to maximize the stream of ill-gotten profits into SESAC's coffers.  (Compl. ¶¶ 22, 33, 62.)

## CONCLUSION

For the preceding reasons, the Court should deny defendants' motion to dismiss.

Dated:  February 8, 2013               Respectfully submitted,

s/ Margaret M. Zwisler
Margaret M. Zwisler (*pro hac vice*)
Jennifer L. Giordano (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
Email: Margaret.Zwisler@lw.com
Email: Jennifer.Giordano@lw.com

Alfred C. Pfeiffer, Jr. (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
Email: Al.Pfeiffer@lw.com

Peter J. Mooney
WHITE & WILLIAMS LLP
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103-7395
Telephone: (215) 864-7164
Facsimile: (215) 789-7664
Email: mooneyp@whiteandwilliams.com

Attorneys for Plaintiff
Radio Music License Committee

## CERTIFICATE OF SERVICE

The undersigned certifies that, on February 8, 2013, a true and correct copy of the foregoing PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS was served on all counsel of record by the Court's electronic filing system (CM/ECF).

s/ Margaret M. Zwisler
Margaret M. Zwisler (*pro hac vice*)
