## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RADIO MUSIC LICENSE COMMITTEE,<br><br>               Plaintiff,<br>      v.<br><br>SESAC, INC., SESAC, LLC, AND SESAC HOLDINGS, INC.,<br><br>               Defendants. | Civil Action<br><br>No. 2:12-cv-05807-CDJ<br><br>Judge C. Darnell Jones, II<br><br>**Electronically Filed**<br>**Oral Argument Requested** |

## PLAINTIFF RADIO MUSIC LICENSE COMMITTEE'S
## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

I.  RMLC IS LIKELY TO SUCCEED ON THE MERITS OF ITS ANTITRUST
    CLAIMS ...............................................................................................................4

    A.  SESAC's Monopoly Violates Section 2 Of The Sherman Act...............................4

        1.  RMLC Will Show Both Direct And Indirect Evidence Of
            SESAC's Monopoly Power ........................................................................5

        2.  RMLC Can Readily Show That SESAC Engaged In Exclusionary
            Conduct......................................................................................................6

    B.  SESAC Has Violated Section 1 Of The Sherman Act............................................7

        1.  SESAC Has Engaged In A *Per Se* Unlawful Conspiracy...........................7

        2.  RMLC Is Also Likely To Establish A Violation Of Section 1
            Under The Rule Of Reason.........................................................................9

II. RMLC AND ITS MEMBERS WILL SUFFER IRREPARABLE HARM IF
    SESAC IS NOT ENJOINED ...............................................................................9

    A.  SESAC's Imminent Conduct Will Irreparably Harm RMLC's Members.............10

    B.  SESAC's Imminent Conduct Will Also Irreparably Harm RMLC .......................13

III. THE BALANCE OF HARMS CLEARLY WEIGHS IN RMLC'S FAVOR..................14

IV. THE PUBLIC INTEREST FAVORS AN INJUNCTION ...............................................15

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Am. Trucking Ass'ns, Inc. v. City of L.A.*,
  559 F.3d 1046 (9th Cir. 2009) ........................................................................... 13

*B.H. v. Easton Area Sch. Dist.*,
  827 F. Supp. 2d 392 (E.D. Pa. 2011) ................................................................. 4

*Beilowitz v. General Motors Corp.*,
  233 F. Supp. 2d 631 (D.N.J. 2002) ............................................................. 12, 13

*BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*,
  229 F.3d 254 (3d Cir. 2000) ............................................................................. 14

*Broadcom Corp. v. Qualcomm Inc.*,
  501 F.3d 297 (3d Cir. 2007) ........................................................................... 5, 6

*Buttnugget Publishing v. Radio Lake Placid, Inc.*,
  807 F. Supp. 2d 100 (N.D.N.Y. 2011) ............................................................... 5

*Centimark Corp. v. Lavine*,
  2011 WL 3209106 (W.D. Pa. July 28, 2011) ................................................... 16

*EUSA Pharma (US), Inc. v. Innocoll Pharms., Ltd.*,
  594 F. Supp. 2d 570 (E.D. Pa. 2009) ......................................................... 10, 11

*Everett Labs., Inc. v. Breckenridge Pharm., Inc.*,
  573 F. Supp. 2d 855 (D.N.J. 2008) ................................................................... 13

*Fashion Originators' Guild of Am. v. FTC*,
  312 U.S. 457 (1941) ........................................................................................... 8

*Feldman & Pinto, P.C. v. Seithel*,
  2011 U.S. Dist. LEXIS 147655 (E.D. Pa. Dec. 22, 2011) ................................ 14

*Highmark, Inc. v. UPMC Health Plan*,
  276 F.3d 160 (3d Cir. 2001) ............................................................................... 4

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) ............................................................................... 8

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
  359 U.S. 207 (1959) ........................................................................................... 7

*Knology, Inc. v. Insight Communications Co., L.P.*,
  2001 WL 1750839 (W.D. Ky. Mar. 20, 2001) ................................................. 16

*Kos Pharma., Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004) ................................................................ 10, 14, 15

*LePage's, Inc. v. 3M*,
  324 F.3d 141 (3d Cir. 2003) .................................................................... 7, 9

*Meredith Corp. v. SESAC LLC*,
  2011 WL 856266 (S.D.N.Y. Mar. 9, 2011) ................................................... 6

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Pharms. Co.*,
  290 F.3d 578 (3d Cir. 2002) ...................................................................... 14

*Nynex Corp. v. Discon, Inc.*,
  525 U.S. 128 (1998) .................................................................................. 7

*Pierre & Carlo, Inc. v. Premier Salons, Inc.*,
  713 F. Supp. 2d 471 (E.D. Pa. 2010) ......................................................... 11

*SESAC, Inc. v. WPNT, Inc.*,
  327 F. Supp. 2d 531 (W.D. Pa. 2003) .......................................................... 5

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*,
  530 F.3d 204 (3d Cir. 2008) ....................................................................... 9

*Toys "R" Us v. FTC*,
  221 F.3d 928 (7th Cir. 2000) ...................................................................... 8

*TruePosition, Inc. v. LM Ericsson Tel. Co.*,
  2012 WL 3584626 (E.D. Pa. Aug. 21, 2012) ................................................. 7

*United States v. Dentsply Int'l, Inc.*,
  399 F.3d 181 (3d Cir. 2005) ................................................................. 6, 9, 10

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ...................................................................... 6

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940) .................................................................................. 7

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
  627 F.3d 85 (3d Cir. 2010) ..................................................................... 7, 9

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) ................................................................... 7, 9

## INTRODUCTION

Plaintiff Radio Music License Committee (RMLC) seeks a preliminary injunction to maintain the *status quo* and prevent SESAC from imposing unilateral and monopolistic rate increases on RMLC's members for the next five years.  SESAC, a monopolist licensor of copyrighted musical works, is holding the U.S. radio industry hostage.  Radio stations—price gouged and deprived of any choice in licensing—are suffering irreparable harm while this litigation plays out.  SESAC presents them with a Hobson's choice: pay whatever non-negotiable monopoly royalties SESAC demands for a blanket license or face financial ruin from copyright infringement fines.[1]  SESAC refuses to license anything other than its entire repertory of copyrighted musical works, making per-program, adjustable fee, direct, and any limited licenses unavailable.  This state of affairs is unsustainable.  Because of SESAC, radio stations cannot create the programming that they wish; nor can they organize their businesses as they see fit.

As bad as things have been, SESAC is about to make them even worse.  SESAC has made clear that in November 2013, it will subject the radio industry to its largest royalty demands ever, and this time those rates will bind stations for 5 years.  Crippled by lack of choice, radio stations can either pay SESAC the extortionate sums it demands (and be locked in to supracompetitive rates for five years) or run the risk of enterprise-destroying infringement suits. The radio industry cannot afford to wait for this lawsuit to find its way to final completion.  We respectfully request that the Court maintain the *status quo* pending the outcome of this case by preventing SESAC from implementing any price increases, so that the industry does not suffer further harm that no remedy in this case or any other could make right.

---

[1]     SESAC threatens consumers with abandon, stating on its website that, "[i]f you publically perform any copyrighted song without proper authorization you are breaking the law and can be held liable for a minimum of $750 up to a maximum of $150,000 per song played!" http://www.sesac.com/Licensing/FAQsGeneral.aspx.

# BACKGROUND

RMLC represents the U.S. commercial radio industry.  October 7, 2013 Declaration of William Velez ¶ 3 ("RMLC Decl.").  In 2012, RMLC successfully negotiated fees on behalf of U.S. terrestrial radio stations with ASCAP and BMI, two performing-rights organizations ("PROs") that license musical works in the U.S.  *Id.* ¶ 5.  The two PROs that account for the largest volume of copyrighted musical works, ASCAP and BMI, are subject to stringent consent decrees with the U.S. Department of Justice that prevent them from abusing their positions as purveyors of licenses that consumers, including radio stations, must have to operate.  *Id.* ¶ 6.

But there is another PRO, SESAC, that currently operates free of any regulatory constraint.  Even though it is smaller in terms of its overall repertory than ASCAP and BMI, it has successfully created a bottleneck to a collectively indispensable body of works.  That monopoly power has allowed it to violate antitrust rules, price-gouge U.S. radio stations, and dictate the terms on which the radio industry may operate.  The harm that SESAC is doing to the radio industry is not merely financial—it deprives individual stations of the freedom to operate as they choose, to purchase only the licenses that they need, and to make business projections into the future.   October 7, 2013 Declaration of Kenneth H. MacDonald, Jr. ¶¶ 8-10 ("MacDonald Decl."); October 4, 2013 Declaration of Robert Souza ¶¶ 5, 7 ("Souza Decl.").  And, in a further demonstration of its unilateral power, SESAC has steadfastly refused to negotiate on any terms with RMLC.  RMLC Decl. ¶ 7.

Each of the past several years, SESAC has dramatically increased its fee demands.  RMLC Decl. ¶ 8; MacDonald Decl. ¶ 9.  Knowing that the alternative to a license is financial destruction through willful-infringement proceedings, each station is forced to fork over an increasingly onerous share of its revenue to SESAC.  RMLC Decl. ¶ 7; MacDonald Decl. ¶ 6; Souza Decl. ¶ 5.  Each station does so while being deprived of any choice in how to run its

business.  RMLC Decl. ¶ 9; MacDonald Decl. ¶¶ 4-5, 8, 10; Souza Decl. ¶¶ 5, 7.  Despite RMLC's best efforts to avoid litigation, SESAC's monopolistic abuse and refusal even to hold discussions with RMLC made a lawsuit necessary.  On October 11, 2012, RMLC filed this action, seeking not damages, but injunctive relief for SESAC's anticompetitive conduct.

SESAC has eliminated competition by inviting rival owners of copyrighted musical works to abandon competition among themselves and to appoint SESAC as their exclusive selling agent.  In doing so, SESAC makes itself the sole licensor of all the works within its repertory.  To ensure its ability to hold-up the radio industry and other consumers, SESAC invites a critical volume of copyright holders to join its cartel, thus making its blanket license indispensable.  RMLC Decl. ¶ 9; MacDonald Decl. ¶¶ 4-5.  But, to avoid the regulatory decree that befell ASCAP and BMI, SESAC ensures that its total membership—now at 23,000 affiliates—remains significantly smaller than those other two PROs.  To round out the exclusionary power of its repertory, SESAC makes sure that prospective licensees cannot identify all of the musical works to which it has licensing rights, and it refuses to grant anything less than blanket licenses.  RMLC Decl. ¶ 11; MacDonald Decl. ¶ 8; Souza Decl.  5.  The net result is an economic monopoly that the radio industry is powerless to resist.  *Id.*

RMLC brought this lawsuit to stop the increasingly severe anticompetitive abuses to which SESAC is subjecting the radio industry.  Recent events, however, have made the need for protection increasingly urgent.  Two months from now, SESAC will impose a new price schedule on the industry that is the most punitive and enduring that it has ever forced on consumers.  RMLC Decl. ¶ 11; MacDonald Decl. ¶¶ 3, 9; Souza Decl. ¶ 8.  Although the *status quo* is monopoly, in which SESAC will continue to subject radio stations and RMLC to irreparable harm, SESAC is on the cusp of injuring them even more severely.  *Id.*  RMLC brings

this motion for a preliminary injunction, which would freeze the current state of affairs, allowing U.S. radio stations and RMLC to continue business in an imperfect, but nevertheless temporarily survivable, fashion pending the resolution of this lawsuit.

**ARGUMENT**

A preliminary injunction is proper where the movant can show "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *B.H. v. Easton Area Sch. Dist.*, 827 F. Supp. 2d 392, 400 (E.D. Pa. 2011). The moving party need only make a *prima facie* case showing a reasonable probability that it will prevail on the merits. *Highmark, Inc. v. UPMC Health Plan*, 276 F.3d 160, 173 (3d Cir. 2001). RMLC amply meets these requirements.

**I.    RMLC IS LIKELY TO SUCCEED ON THE MERITS OF ITS ANTITRUST CLAIMS**

The parties' briefing on SESAC's pending motion to dismiss is perhaps the simplest evidence that RMLC will likely prevail in this case. SESAC took its best shots in that motion and they all fail, by a wide margin. By using *de facto* exclusive contracting practices to create a market artificially insulated from competition, SESAC has violated Section 2 of the Sherman Act. By agreeing with and among its affiliates not to compete with each other, and instead to pool copyrighted musical works into a single must-have portfolio offered only as a take-it-or-leave-it bundle, SESAC has violated Section 1 of the Sherman Act.

**A.    SESAC's Monopoly Violates Section 2 Of The Sherman Act**

To succeed on its clam for monopolization, RMLC must show that SESAC (1) possesses monopoly power (2) that it willfully acquired or maintains "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."

4

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007).  RMLC will easily be able to show both.

1.     **RMLC Will Show Both Direct And Indirect Evidence Of SESAC's Monopoly Power**

Direct evidence of SESAC's monopoly power – in the form of control over pricing – abounds.  SESAC has and routinely exercises the power to impose and maintain exorbitant prices that are proportionately greater than those charged by the much larger ASCAP and BMI without suffering any loss of sales.  RMLC Decl. ¶ 8; MacDonald Decl. ¶¶ 3, 9; Souza Decl. ¶¶ 4-5.  SESAC has imposed a series of outrageous price increases, which radio stations have had little choice but to pay.  *Id.*  SESAC has forced RMLC's members to pay its non-negotiable supracompetitive rate card rates, which, at least since 2009, have increased by a compound rate of approximately 8% and 20% every year for analog and website broadcasting, respectively.  *Id.*  None of these increases is tied to growth in the size or popularity of the SESAC repertory; each is based on SESAC's ability to insulate itself from any competition.  In fact, despite having a vastly smaller repertory than ASCAP and BMI, SESAC charges small market stations, like Texas-based KCKM, nearly the same amount for a blanket license as the much larger PROs.  Souza Decl. ¶ 3.  SESAC makes plain on its website that "[l]icenses with ASCAP and BMI DO NOT grant . . . authorization to use the copyrighted music of SESAC represented songwriters" so most stations have no choice but to purchase licenses from all three.[2]  And SESAC not only aggressively threatens to prosecute infringers, it has done so successfully.  *E.g.*, *Buttnugget Publishing v. Radio Lake Placid, Inc.*, 807 F. Supp. 2d 100 (N.D.N.Y. 2011); *SESAC, Inc. v. WPNT, Inc.*, 327 F. Supp. 2d 531 (W.D. Pa. 2003).  These facts constitute direct evidence of

---

[2]     SESAC FAQ -- Q: If I have licenses with ASCAP and/or BMI, why do I need a license with SESAC? available at http://www.sesac.com/Licensing/FAQsGeneral.aspx.

monopoly power.  *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) (evidence that the defendant "sets prices with little concern for its competitors" established monopoly power because it is "'something a firm without a monopoly would have been unable to do'") (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001)).

There is also ample indirect evidence of SESAC's monopoly power;  it controls 100% of the market for licenses to the copyrighted musical compositions and performances in its repertory, and there are insurmountable barriers to entering that market.  *Broadcom Corp.*, 501 F.3d at 307 (indirect evidence of monopoly power from evidence of "a dominant share in a relevant market, and that significant 'entry barriers' protect that market.").  The Southern District of New York previously concluded that this can be a relevant market for antitrust purposes and that SESAC would obviously have monopoly power in it.  *Meredith Corp. v. SESAC LLC*, 2011 WL 856266, at *5-10, 15 (S.D.N.Y. Mar. 9, 2011).

### 2.   RMLC Can Readily Show That SESAC Engaged In Exclusionary Conduct

The evidence also shows far more than a likelihood that SESAC has engaged in exclusionary conduct, *i.e.*, conduct designed to willfully obtain or maintain its monopoly power. *Broadcom Corp.*, 501 F.3d at 308.  SESAC has unlawfully acquired its monopoly power by strategically handpicking its affiliates and paying them greater royalties than the other PROs could afford, given their rate regulation.  RMLC Decl. ¶¶ 7-8.  SESAC has also entered into *de facto* exclusive dealing contracts with its affiliates and has refused to deal with RMLC's members other than on a blanket basis.  RMLC Decl. ¶ 11; MacDonald Decl. ¶ 8.  It has also refused to deal with RMLC at all.  RMLC Decl. ¶ 9.  These each independently establish the necessary element of willful acquisition or maintenance of monopoly power.  *Dentsply*, 399 F.3d at 187 (a monopolist's *de facto* exclusive dealing policy constituted exclusionary conduct);

*LePage's, Inc. v. 3M*, 324 F.3d 141, 157-58 (3d Cir. 2003) (same); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 278-79 (3d Cir. 2012) (refusing to deal and exclusive dealing are "long recognized forms of exclusionary conduct").

### B.      SESAC Has Violated Section 1 Of The Sherman Act

RMLC is also likely to succeed on its separate Section 1 claim, which requires evidence of (1) an agreement (sometimes called "concerted action"), (2) imposition of an unreasonable restraint of trade within a relevant product market, and (3) antitrust injury to the plaintiff. *TruePosition, Inc. v. LM Ericsson Tel. Co.*, 2012 WL 3584626, at *3 (E.D. Pa. Aug. 21, 2012). "Some agreements are so plainly anticompetitive that they are condemned *per se*; that is, they are conclusively presumed to unreasonably restrain trade.  Other agreements are condemned only if evaluation under the fact-intensive rule of reason indicates that they unreasonably restrain trade." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010) (citations omitted).  RMLC will succeed in showing all of the required elements of both *per se* and rule-of-reason violations of Section 1.

### 1.      SESAC Has Engaged In A *Per Se* Unlawful Conspiracy

SESAC and its affiliates are potential horizontal competitors for licenses to copyrighted works.  That means SESAC's agreement with its affiliates to eliminate all licensing competition among them, to allow SESAC to act as the exclusive licensor of their intellectual property rights, and to refuse to deal with radio stations on terms other than blanket licenses is a *per se* violation of Section 1 of the Sherman Act.  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 214-15, 218 (1940).  It is well-established that concerted refusals to deal (or agreements to deal only on specific terms) among horizontal competitors are *per se* illegal.  *Nynex Corp. v. Discon, Inc.*, 525 U.S. 128, 134-35 (1998) (citing *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212-13 (1959) (agreement among appliance manufacturers and distributors to deal with retailer

only on highly unfavorable terms was a *per se* violation of Section 1); *Fashion Originators'*
*Guild of Am. v. FTC*, 312 U.S. 457, 467-68 (1941) (agreement among clothing manufacturers,
designers and suppliers only to sell to retailers on specific terms was *per se* unlawful under
Section 1)).

Even if the Court did not consider SESAC and its affiliates potential horizontal
competitors, SESAC's agreements with its affiliates would still be *per se* unlawful under a "hub
and spoke" theory. A "rimmed wheel" or "hub and spoke conspiracy" is one in which a central
hub (here, SESAC) enters into similar agreements with several similarly situated entities (in this
case, its affiliates). A plaintiff is not required to show direct evidence of an actual agreement
among the spokes; circumstantial evidence suffices. *In re Ins. Brokerage Antitrust Litig.*, 618
F.3d 300, 321-22 (3d Cir. 2010). Showing that (1) each spoke's separate agreement is similar;
and (2) each spoke's decision to enter into that agreement was against its independent self-
interest can constitute the circumstantial evidence to establish a *per se* illegal hub and spoke
conspiracy. *Id.* at 323 n.22.

RMLC will show that, save to eliminate competition and obtain monopoly power, it is
against any given SESAC affiliate's independent self-interest to force RMLC's members to enter
into blanket licenses with SESAC. Absent horizontal agreement, each affiliate's self-interest is
to maintain maximum flexibility to negotiate the best possible license fee for its own work,
including the ability to negotiate direct licenses with individual RMLC members. *See also Toys*
*"R" Us v. FTC*, 221 F.3d 928, 935-36 (7th Cir. 2000) (affirming *per se* illegal hub and spoke
conspiracy where individual agreements were against spoke's independent self-interest).

### 2. RMLC Is Also Likely To Establish A Violation Of Section 1 Under The Rule Of Reason

RMLC will also show that SESAC's agreements with its affiliates are illegal because they unreasonably restrain trade in the market for licenses to the copyrighted musical compositions and performances in SESAC's repertory. "[A] plaintiff may satisfy the unreasonable-restraint element [of the rule of reason] by alleging that the conspiracy produced anticompetitive effects in the relevant markets." *W. Penn*, 627 F.3d at 100.

Showing that the defendant has market power, or that its conduct raises prices, forecloses competition or reduces consumer choice is sufficient to satisfy the harm-to-competition requirement. *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 226 (3d Cir. 2008) (plaintiff can prove anticompetitive effect by demonstrating "raised prices," or the defendant's market power, and affirming jury verdict based on evidence of market power); *see also W. Penn*, 627 F.3d at 100 ("Anticompetitive effects include increased prices, reduced output, and reduced quality."); *LePage's*, 324 F.3d at 159-63 (excluding potential competitors harms competition); *Dentsply*, 399 F.3d at 194 (reducing consumer choice is recognized competitive harm); *ZF Meritor*, 696 F.3d at 286 (market foreclosure from *de facto* exclusive dealing harms competition). RMLC will show not only direct and indirect evidence of SESAC's market power, *supra* Part I.A.1, but also that SESAC's conduct has resulted in supracompetitive prices, has foreclosed competition and has reduced consumer choice. *E.g.,* RMLC Decl. ¶¶ 8-9; MacDonald Decl. ¶P 4-5, 10; Souza Decl. ¶¶ 4-5, 7.

## II. RMLC AND ITS MEMBERS WILL SUFFER IRREPARABLE HARM IF SESAC IS NOT ENJOINED

RMLC is, at minimum, likely to prevail on the merits of this case eventually. In the meantime, however, it and its members will suffer serious and irreparable harm if SESAC's imminent five-year rate hikes take effect. While SESAC's conduct no doubt justifies more

rigorous relief forcing SESAC to engage in negotiations with RMLC on a court-supervised basis, like ASCAP and BMI do, at this point RMLC merely seeks an injunction to preserve the *status quo* while this case proceeds.   While that status quo already involves SESAC charging supracompetitive rates, SESAC's planned five-year rate hike would devastate the industry. RMLC asks that the Court, during this litigation, prevent SESAC from imposing any additional devastating rate increases.  *Kos Pharma., Inc. v. Andrx Corp.*, 369 F.3d 700, 729 (3d Cir. 2004) (preliminary injunction is designed to maintain the status quo); *EUSA Pharma (US), Inc. v. Innocoll Pharms., Ltd.*, 594 F. Supp. 2d 570, 578 (E.D. Pa. 2009) (same).

### A.      SESAC's Imminent Conduct Will Irreparably Harm RMLC's Members

SESAC's incessant price gouging goes to the heart of how U.S. radio stations do business, and the harm that this practice does to the industry is irreparable.  MacDonald Decl. ¶ 10; Souza Decl. ¶ 7; RMLC Decl. ¶ 9.   SESAC's behavior deprives U.S. radio stations of choice—choice in program content, choice in form of delivery, choice in how best to control costs, and choice in how to do business.  *Id.*   By refusing per-program or adjustable fee blanket licenses and imposing ever-greater prices, SESAC prevents U.S. radio stations from innovating and building the programs that they wish to broadcast.  *Id.*

Losing control over the development of one's own business plan is a well-recognized irreparable harm.  In particular, anticompetitive conduct that limits a firm's choices about how to structure its business is irreparable and supports an injunction.  *Cf. United States v. Dentsply Int'l*, 399 F.3d 181, 194 (3d Cir. 2005) (exclusionary conduct that "impairs the [firm's] choice in the marketplace" supports injunctive relief).  For example, in *EUSA Pharma*, the court noted that the plaintiff was contractually entitled to oversee the development of defendant's product.  594 F. Supp. 2d at 581.  Although the court could still enforce the requirement that plaintiff have access to the product after it was developed, the court could do nothing short of pausing

development to remedy the lost opportunity to guide the product. *Id.* This lost control over development made the harm irreparable. Similarly, in *Pierre & Carlo, Inc. v. Premier Salons, Inc.*, the court found that depriving a business owner of the opportunity to pursue a new venture constitutes irreparable harm. 713 F. Supp. 2d 471, 477, 481 (E.D. Pa. 2010). The plaintiff sought to open a new salon, but was unable to do so without the equipment that his former landlord had improperly retained. *Id.* Noting that the lost trade from this potential new business could not be remedied through damages, the court issued an injunction requiring the return of equipment to "return to the status quo—that is, the last peaceable, noncontested status of the parties." *Id.* at 481. SESAC's behavior has and will indisputably limit the choices that RMLC's members have in how to structure their businesses. MacDonald Decl. ¶ 10; Souza Decl. ¶¶ 7-8; RMLC Decl. ¶ 9.

In entering into exclusive-dealing arrangements and refusing to deal other than through a blanket license, SESAC forces stations to devote an ever-larger percentage of their budgets to SESAC royalties. It makes those stations pay royalties for works that they have no intention or desire of airing. MacDonald Decl. ¶ 8; Souza Decl. ¶ 4. Member stations cannot choose, for example, to decrease their license expenditures by focusing on a specific genre of music, and use the resulting savings to fund investment in new equipment/infrastructure, on-air talent, advertising, or digital capability. MacDonald Decl. ¶ 10; Souza Decl. ¶ 7. SESAC puts these decisions out of the control of radio stations, which operate in a very thin-margin industry. Souza Decl. ¶¶ 3-4. SESAC unilaterally dictates what license stations must buy, what is included in that license, and its price. RMLC Decl. ¶ 11; MacDonald Decl. ¶¶ 7-8.

While this suit has been pending, SESAC has raised analog rates 8%. RMLC Decl. ¶ 8; MacDonald Decl. ¶ 9. In fact, it has raised fees at a compounded annual rate of 8% every year

since 2009.  RMLC Decl. ¶ 8.  Its increases in digital streaming and HD licensing fees have been comparable or even higher.  *Id.*  By contrast, combined radio industry payments to ASCAP and BMI have *decreased* by some 35% since 2010.  *Id.*  Indeed, even though SESAC has a much smaller repertory than either ASCAP or BMI, SESAC has used its power to force stations like KCKM to pay nearly the same amount for a blanket license.  Souza Decl. ¶ 3.

SESAC presents radio stations with a Hobson's choice: a blanket license or no license at all.  MacDonald Decl. ¶ 8; RMLC Decl. ¶ 11.  SESAC leaves stations under no illusions of the consequences of refusing a license, threatening $150,000 fine per single act of infringement. MacDonald Decl. ¶ 6; Souza Decl. ¶ 5; RMLC Decl. ¶ 7.  Thus, stations can either shut down or pay ever-higher monopoly prices for a blanket license.  *Id.*  To make matters even worse for the radio industry, SESAC refuses to make available a complete list of the works in its catalogue. MacDonald Decl. ¶ 14; Souza Decl. ¶ 5; RMLC Decl. ¶ 7.  Thus, coupled with the lack of licensing options, stations can neither "program around" SESAC's repertory nor purchase licenses only to the songs that they wish to air.  *Id.*

SESAC thus denies the U.S. terrestrial radio industry any choice and subjects it to a never-ending array of punitive fee hikes.  In forcing stations to choose between extortionate prices combined with a loss of control over their business, on the one hand, and shutting down or running the risk of disastrous copyright-infringement suits, on the other, SESAC irreparably harms RMLC's members.

The situation here is even worse than that facing the parties in *Beilowitz v. General Motors Corporation*, 233 F. Supp. 2d 631 (D.N.J. 2002), where the court issued a preliminary injunction.  There, the court noted that "General Motors Corporation ("GM"), offered the Plaintiff franchisee, Steven Beilowitz, a Hobson's choice—either to accede to GM's new

business plan, which would result in the loss of forty percent of Beilowitz's revenue, or, after a twenty-three-year-long relationship with GM, to be cut out of doing any business with GM at all." 233 F. Supp. 2d at 633. But here, RMLC's members do not even have the ability to walk away from SESAC; SESAC aggressively pursues infringement claims against stations that do not take a SESAC blanket license. *See* cases cited *supra* Part I.A.1. Such a Hobson's choice causes irreparable harm. *See, e.g.*, *Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1057 (9th Cir. 2009) (Hobson's choice between signing an agreement that is unconstitutional and will require the party to incur large costs and refusing to sign and losing customer goodwill was irreparable harm); *Everett Labs., Inc. v. Breckenridge Pharm., Inc.*, 573 F. Supp. 2d 855, 869 (D.N.J. 2008) (Hobson's choice between developing market that would serve only to benefit infringing manufacturer and ceasing all marketing was irreparable harm). SESAC's serial monopoly price increases do not simply transfer money from the U.S. radio industry to SESAC and its affiliates; they damage the market position of RMLC's members, reducing the quality of their content, and depriving them of choice in how to structure their business. This injury epitomizes irreparable harm.

### B.     SESAC's Imminent Conduct Will Also Irreparably Harm RMLC

RMLC negotiates on behalf of the commercial radio industry to achieve "reasonable license fees with PROs." RMLC Decl. ¶ 3. But SESAC, having created an illegal monopoly, has cast aside RMLC's every effort to negotiate. *Id.* ¶ 7. SESAC has no interest in discussing rates because reasonable fees are not on its radar. It simply wants to extort RMLC's radio-station members.

SESAC's boycott and monopoly pricing threaten RMLC's mission. *Id.* ¶¶ 9-10, 12. They prevent RMLC from serving its radio-station members, for which contracts with PROs are essential. *Id.* ¶ 4. Knowing this, SESAC has refused to negotiate precisely to harm RMLC's

13

reputation, in the hope of eliminating it as a future constraint on its monopoly pricing.  Such harm is irreparable.  *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 263 (3d Cir. 2000) ("injuries to reputation are difficult to calculate, and thus money damages are an inadequate remedy"); *Kos* 369 F.3d at 726 (injury to reputation can constitute irreparable harm); *Feldman & Pinto, P.C. v. Seithel*, 2011 U.S. Dist. LEXIS 147655, at *47-50 (E.D. Pa. Dec. 22, 2011) (harm to a business's reputation is irreparable and can support preliminary injunction).

If implemented, SESAC's imminent five-year price hikes will seriously harm RMLC's reputation.  RMLC Decl. ¶ 12; MacDonald Decl. ¶ 11.  Final disposition of this litigation may take years.  In the meantime, radio stations subject to egregious price hikes and stripped of all choice will question RMLC's role in the industry.  *Id.*  Such reputational damage would be irreversible and uncompensable.

A preliminary injunction freezing the *status quo* will protect RMLC's reputation with its members and the industry generally, while this case works its way to completion.  Once SESAC is subject to a regulatory decree and required to offer consumers a choice in licenses, RMLC will be able serve its industry function in negotiating with SESAC as it does today with other PROs.

Conversely, if SESAC continues to impose further monopolistic rate increases, RMLC's reputational standing will suffer, potentially damaging its bargaining position with PROs other than SESAC, and thus further harming each RMLC member.  RMLC Decl. ¶ 12; MacDonald Decl. ¶ 11.  A preliminary injunction is necessary to avoid this reputational harm.

## III.    THE BALANCE OF HARMS CLEARLY WEIGHS IN RMLC'S FAVOR

In this case, "the potential harm to the plaintiff if an injunction does not issue" far exceeds "the potential injury to the defendant if the injunction is issued," making preliminary relief appropriate.  *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Pharms. Co.*, 290 F.3d 578 (3d Cir. 2002).  SESAC currently enjoys excess profits on account of its

unconstrained monopoly power.  In the last year alone, it has imposed: (i) an 8% annual compounded rate increase in analog/over-the-air broadcasting; (ii) a 20% annual compounded rate increase in digital streaming; and (iii) heightened HD radio-license fees.  RMLC Decl. ¶ 8.  Thus, even though a *status quo* injunction will permit SESAC to continue earning monopoly profits pending the resolution of this case, it would at least deny SESAC the ability to extort even more money from U.S. radio stations.[3]  Further, SESAC cannot allege that the loss of the opportunity to acquire funds illegally constitutes a harm that should be considered in this balancing analysis.  "[A] party 'can hardly claim to be harmed [where] it brought any and all difficulties occasioned by the issuance of an injunction upon itself."  *Kos*, 369 F.3d at 728.

Conversely, the sought injunction would prevent the irreparable harm described above and would permit U.S. radio stations to plan their business operations, programming content and schedule for 2014 and beyond with the certainty that is so sorely lacking today.  When balancing the irreparable harm that RMLC and its members face against a cap on SESAC's monopoly rents at today's level, there can be no doubt that the equities favor an injunction.

## IV.   THE PUBLIC INTEREST FAVORS AN INJUNCTION

Finally, a preliminary injunction will serve the public interest.  Preventing SESAC from extorting the radio industry even more than it already is will ensure that the public enjoys choice in radio broadcasting.  It will reduce the pressure on stations to focus on certain programming to the exclusion of others, MacDonald Decl. ¶ 10, or to have to pick and choose which stations

---

[3]   SESAC has maintained itself as a highly profitable organization under the *status quo*.  New reports suggest that it had $42 million in EBITDA on revenues of $128 million and, in January 2013, private equity firm Rizvi Travese bought a 75% stake in SESAC at an estimated price of $600 million.  *See, e.g., Music Rights Company SESAC Sells Majority Stake*, Wall Street Journal (Jan. 2, 2013) available at http://blogs.wsj.com/deals/2013/01/02/music-rights-company-sesac-sells-majority-stake/; *Rizvi Traverse Management Buys 75% Stake In SESAC*, Billboard (Jan. 7, 2013) available at http://www.billboard.com/biz/articles/news/publishing/1510471/rizvi-traverse-management-buys-75-stake-in-sesac-report.

survive.  Souza Decl. ¶ 4.  *Knology, Inc. v. Insight Communications Co., L.P.*, 2001 WL 1750839, at *6 (W.D. Ky. Mar. 20, 2001) ("[A] choice of consumer services serves the public interest more than no choice.").  KCKM, for example, should not have to consider cutting back the valuable news services that it provides to the local and regional communities it serves.  Souza Decl. ¶¶ 1, 8.

A preliminary injunction will also ensure that these stations retain the financial flexibility necessary to fund superior programming and innovation, which will result in a better product for public consumption.  Souza Decl. ¶ 7.  *Centimark Corp. v. Lavine*, 2011 WL 3209106, at *5 (W.D. Pa. July 28, 2011) (finding public interest in policy that promotes innovation).  Denying the injunction, by contrast, would yield no cognizable social benefit at all.  The public interest lies with protecting RMLC and its members from SESAC's threatened irreparable harm.

## CONCLUSION

For the preceding reasons, the Court should grant RMLC's motion for a preliminary injunction and maintain the *status quo*.

Dated:  October 7, 2013                     Respectfully submitted,

                                            s/ Margaret M. Zwisler
                                            Margaret M. Zwisler (*pro hac vice*)
                                            Jennifer L. Giordano (*pro hac vice*)
                                            LATHAM & WATKINS LLP
                                            555 Eleventh Street, N.W., Suite 1000
                                            Washington, D.C. 20004-1304
                                            Telephone: (202) 637-2200
                                            Facsimile: (202) 637-2201
                                            Email: Margaret.Zwisler@lw.com
                                            Email: Jennifer.Giordano@lw.com

                                            Alfred C. Pfeiffer, Jr. (*pro hac vice*)
                                            LATHAM & WATKINS LLP
                                            505 Montgomery Street, Suite 2000
                                            San Francisco, CA 94111-6538
                                            Telephone: (415) 391-0600
                                            Facsimile: (415) 395-8095
                                            Email: Al.Pfeiffer@lw.com

                                            Peter J. Mooney
                                            WHITE & WILLIAMS LLP
                                            1650 Market Street
                                            One Liberty Place, Suite 1800
                                            Philadelphia, PA 19103-7395
                                            Telephone: (215) 864-7164
                                            Facsimile: (215) 789-7664
                                            Email: mooneyp@whiteandwilliams.com

                                            Attorneys for Plaintiff
                                            Radio Music License Committee

17

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that, on October 7, 2013, a true and correct copy of the foregoing PLAINTIFF RADIO MUSIC LICENSE COMMITTEE'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION was served on all counsel of record by the Court's electronic filing system (CM/ECF).

<u>s/ Margaret M. Zwisler</u>
Margaret M. Zwisler (*pro hac vice*)