UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

-----------------------------------------------------:
                                                     :
Radio Music License Committee,                       :
                                                     :
                        Plaintiff,                   :
                                                     :
            v.                                       :            No. 2:12-cv-05807-CDJ
                                                     :
SESAC, Inc., SESAC, LLC, and SESAC                   :
Holdings, Inc.,                                      :
                                                     :
                        Defendants.                  :
                                                     :
-----------------------------------------------------:


**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................................1

BACKGROUND .................................................................................................................2

ARGUMENT .......................................................................................................................6

   I.   RMLC CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS. ...........7

       A.  RMLC's Section 2 Claim...........................................................................9

       B.  RMLC's Section 1 Claims .......................................................................12

  II.  RMLC CANNOT DEMONSTRATE IRREPARABLE HARM. ......................................15

       A.  RMLC's Claimed Injuries To Stations Cannot Support Injunctive Relief................17

       B.  RMLC's Claimed Injuries To Itself Cannot Support Injunctive Relief.....................22

 III. THE BALANCE OF EQUITIES OVERWHELMINGLY FAVORS SESAC. ................25

 IV. RMLC CANNOT ESTABLISH THAT THE PUBLIC INTEREST FAVORS AN INJUNCTION. .................................................................................................................27

  V.  THE COURT CANNOT GRANT RMLC'S MOTION WITHOUT REQUIRING RMLC TO POST A BOND.................................................................................................29

CONCLUSION ...............................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*A.O. Smith Corp. v. FCC*,
   530 F.2d 515 (3d Cir. 1976) ........................................................................................18, 19

*Acierno v. New Castle Cnty.*,
   40 F.3d 645 (3d Cir. 1994) ..................................................................................................24

*Adams v. Freedom Forge Corp.*,
   204 F.3d 475 (3d Cir. 2000) ............................................................................................6, 17

*Am. Trucking Ass'ns, Inc. v. City of L.A.*,
   559 F.3d 1046 (9th Cir. 2009) ............................................................................................22

*Arsberry v. Illinois*,
   244 F.3d 558 (7th Cir. 2001) (Posner, J.) ..........................................................................27

*Asian-Am. Licensed Beverage Ass'n v. Commonwealth of Pa.*,
   No. Civ.A. 1:05-CV-2135, 2005 WL 3077246 (M.D. Pa. Nov. 3, 2005) ...........................17

*Beilowitz v. Gen. Motors Corp.*,
   233 F. Supp. 2d 631 (D.N.J. 2002) ....................................................................................22

*Bell Atl. Co. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................................7, 12

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
   603 F.2d 263 (2d Cir. 1979) ...............................................................................................28

*Blue Cross & Blue Shield United v. Marshfield Clinic*,
   65 F.3d 1406 (7th Cir. 1995) (Posner, J.) ..........................................................................14

*Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*,
   441 U.S. 1 (1979) ("*BMI*") ......................................................................................... passim

*Broadcom Corp. v. Qualcomm Inc.*,
   501 F.3d 297 (3d Cir. 2007) .................................................................................................9

*Caplan v. Felheimer Eichen Braverman & Kaskey*,
   68 F.3d 828 (3d Cir. 1995) ..................................................................................................25

*Cargill, Inc. v. Monfort of Colo., Inc.*,
   479 U.S. 104 (1986) .............................................................................................................23

*Colorcon, Inc. v. Lewis*,
   792 F. Supp. 2d 786 (E.D. Pa. 2011) ............................................................................25, 26

*Concord v. Boston Edison Co.*,
915 F.2d 17 (1st Cir. 1990) ..................................................................27, 28

*Conestoga Wood Specialties Corp. v. Sec'y of the U.S. Dep't of Health & Human Servs.*,
724 F.3d 377 (3d Cir. 2013) ............................................................................6

*Copperweld v. Independence Tube Corp.*,
467 U.S. 752 (1984) ......................................................................................12

*Delco LLC v. Giant of Md., LLC*,
No. 07-3522, 2007 WL 3307018 (D.N.J. Nov. 8, 2007) ......................................23

*Doe v. Nat'l Bd. of Med. Exam'rs*,
199 F.3d 146 (3d Cir. 1999) .............................................................................8

*Ecri v. McGraw-Hill, Inc.*,
809 F.2d 223 (3d Cir. 1987) .......................................................................6, 15

*EUSA Pharma (US), Inc. v. Innocoll Pharms., Ltd.*,
594 F. Supp. 2d 570 (E.D. Pa. 2009) ...........................................................20, 21

*Everett Labs., Inc. v. Breckenridge Pharm., Inc.*,
573 F. Supp. 2d 855 (D.N.J. 2008) ..................................................................22

*Feldman & Pinto, P.C. v. Seithel*,
Civil Action No. 11-5400, 2011 WL 6758460 (E.D. Pa. Dec. 22, 2011) .........23, 24

*Fox Film Corp. v. Doyal*,
286 U.S. 123 (1932) ........................................................................................2

*Frank's GMC Truck Center, Inc. v. Gen. Motors Corp.*,
847 F.2d 100 (3d Cir. 1988) ...........................................................................30

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
423 F.3d 374 (3d Cir. 2005) ........................................................................9, 14

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
602 F.3d 237 (3d Cir. 2010) ...........................................................................12

*In re Application of MobiTV, Inc.*,
712 F. Supp. 2d 206 (S.D.N.Y. 2010) ...............................................................28

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
906 F.2d 432 (9th Cir. 1990) ...........................................................................28

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010) ...........................................................................12

*In re Warfarin Sodium Antitrust Litig.*,
214 F.3d 395 (3d Cir. 2000)……………………...............................................23

*Lanin v. Borough of Tenafly*,
515 Fed. Appx. 114 (3d Cir. 2013) ......................................................16

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007)...........................................................................7, 13

*Lei Ke v. Drexel Univ.*,
No. 11-6708, 2013 WL 1092668 (E.D. Pa. Mar. 14, 2013) ................25

*LePage's Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003) (en banc)...............................................11

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*,
478 U.S. 501 (1986)..............................................................................10

*N.J. Ass'n of Health Care Facilities, Inc. v. Gibbs*,
838 F. Supp. 881 (D.N.J. 1993) ..........................................................20

*N.J. Hosp. Ass'n v. Waldman*,
73 F.3d 509 (3d Cir. 1995)..................................................................6, 8

*Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*,
69 Fed. Appx. 550 (3d Cir. Pa. 2003) ..................................................8

*New Dana Perfumes v. The Disney Store, Inc.*,
131 F. Supp. 2d 616 (M.D. Pa. 2001) .................................................16

*Orson, Inc. v. Miramax Film Corp.*,
836 F. Supp. 309 (E.D. Pa. 1993) ..................................................16, 24

*Pac. Bell Tel. Co. v. LinkLine Communs., Inc.*,
555 U.S. 438 (2009)..................................................................... passim

*Pennsy Supply Inc. v. Susquehanna River Basin Comm'n*,
No. 1:CV-06-2454, 2007 WL 551573 (M.D. Pa. Feb. 20, 2007)..........18

*Pharmacia Corp. v. Alcon Labs., Inc.*,
201 F. Supp. 2d 335 (D.N.J. 2002) .....................................................16

*Pierre & Carlo, Inc. v. Premier Salons, Inc.*,
713 F. Supp. 2d 471 (E.D. Pa. 2010)...................................................21

*Premier Sys. Consultants, Ltd. v. Mahin*,
No. CIV. A. 99-2660, 1999 WL 1212186 (E.D. Pa. Dec. 16, 1999)......20

*R.R. Com. of Texas v. Pullman Co.*,
    312 U.S. 496 (1941)................................................................................27

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997)..................................................................................15

*Stewart v. Abend*,
    495 U.S. 207 (1990)................................................................................2

*Sys. Operations, Inc. v. Scientific Games Dev. Corp.*,
    555 F.2d 1131 (3d Cir. 1977)................................................................30

*Twentieth Century Music Corp. v. Aiken*,
    422 U.S. 151 (1975)................................................................................2

*United States v. Dentsply*,
    399 F.3d 181 (3d Cir. 2005)..................................................................21

*Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)......................................................................5, 27, 28

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010)....................................................................23

*Warner Bros. Pictures, Inc. v. Gittone*,
    110 F.2d 292 (3d Cir. 1940)....................................................................6

*Wegoland Ltd. v. NYNEX Corp.*,
    27 F.3d 17 (2d Cir. 1994)......................................................................28

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982)..............................................................................27

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008)..........................................................................6, 25, 27

*Zambelli Fireworks Mfg. Co. v. Wood*,
    592 F.3d 412 (3d Cir. 2010)..............................................................29, 30

**STATUTES**

17 U.S.C. § 106(4) ....................................................................................2, 11

17 U.S.C. § 114(d)(3)(E)(ii) ............................................................................2

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 65(c) ..........................................................29, 30

http://www.sesac.com/Repertory/Terms.aspx. ..............................................................................14

## INTRODUCTION

Defendant SESAC is the smallest of three "performing rights organizations" (PROs) that license the right to perform copyrighted musical compositions.[1]  SESAC, like the other PROs, does not own copyrights itself.  Rather, it licenses rights held by songwriters and publishers – SESAC's "affiliates" – and distributes royalties to those affiliates.  SESAC-issued licenses typically take the form of fixed-fee "blanket licenses," which entitle a licensee to perform any of the works in SESAC's repertory without fear of copyright infringement.  Radio stations, of course, frequently broadcast copyrighted works – including works in SESAC's repertory – and choose to purchase the blanket licenses that SESAC offers.

No less an authority than the United States Supreme Court has noted the obvious efficiencies of blanket licensing in a marketplace with "thousands of users, thousands of copyright owners, and millions of compositions."  *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 4-5, 20-22 (1979) ("*BMI*").  Still, in October 2012, the Radio Music License Committee (RMLC), an association purporting to represent the multi-billion-dollar commercial radio industry, filed this suit against SESAC, alleging that its licensing practices violate Section 1 and Section 2 of the Sherman Act.  SESAC's motion to dismiss the case in its entirety remains pending.

Now, one year after filing its complaint, RMLC seeks preliminary injunctive relief that would prevent SESAC from issuing a new multi-year rate schedule and would freeze SESAC's license fees.  RMLC's motion insists that, even though SESAC's fees have increased from 2009 to 2013, any *further* increase for 2014 – whose magnitude is not even known – would "devastate" the radio industry.  It therefore asks the Court to take the extraordinary step of acting

---

[1] The complaint names as defendants SESAC, Inc.; SESAC, LLC; and SESAC Holdings, Inc.  This brief, like the complaint, refers to the defendants collectively as "SESAC."

as a price regulator and dictating what fees SESAC may charge to its customers. RMLC's motion should be denied.

## BACKGROUND

Under the Copyright Act, owners of copyright in musical compositions have the exclusive right to publicly perform those compositions. 17 U.S.C. § 106(4). Thus, if someone other than the copyright holder wishes to publicly perform a composition – for instance, by playing the composition at a bar, piping it through the loudspeakers at a roller skating rink, or broadcasting it on the radio – that person must obtain authorization. *See, e.g.*, *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156-58 (1975). A copyright holder, in turn, generally may authorize the proposed public performance for a price it deems fit, or may choose to withhold authorization altogether. *See generally Stewart v. Abend*, 495 U.S. 207, 228-29 (1990); *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932).

It would be extraordinarily time-consuming and expensive, of course, if each music user (such as a radio station) had to negotiate a separate agreement with the holder of the copyright in each work the user wished to perform. Long ago, these impracticalities led to the formation of "performing rights organizations" – or "PROs" for short – that license performing rights on behalf of songwriters and music publishers. Virtually all songwriters and publishers are members or affiliates of one of the three PROs specifically identified in the Copyright Act: the American Society of Composers, Authors and Publishers ("ASCAP"), Broadcast Music, Inc. ("BMI"), and SESAC. 17 U.S.C. § 114(d)(3)(E)(ii).

All three PROs typically issue "blanket licenses," under which the licensee pays a fixed fee in exchange for the right to perform any of the works in the PRO's repertory, as many times as it wants, for a given period. A blanket license thus frees vast numbers of licensees and copyright holders from the need to negotiate separately with each other for rights to each and

every performance.  In addition, holding a blanket license from each of the three PROs eliminates the need for a music user – such as a radio station – to account laboriously for the specific music that it plays.  *See generally BMI*, 441 U.S. at 4-5, 20-22 (describing "thousands of individual negotiations" as "a virtual impossibility").

Decades ago, the United States Department of Justice sued ASCAP and BMI for antitrust violations.  Without any finding of antitrust liability, both ASCAP and BMI resolved those lawsuits by entering into consent decrees with the United States.  The consent decrees require these PROs to offer certain alternatives to blanket licenses.  They also provide for judicial determination of license fees in so-called "rate courts."  Compl. ¶¶ 26-27.

With its affiliates amounting to less than three percent of the PRO-affiliated songwriters and publishers, SESAC is much smaller than ASCAP and BMI.  Compl. ¶¶ 20, 22, 33.  SESAC is not subject to rate regulation or any decree otherwise constraining its activities.  *Id.* ¶ 29.  Indeed, when it conducted a formal investigation of SESAC just five years ago, the Department of Justice elected to close the investigation without taking any action against SESAC.  Declaration of Patrick Collins ("SESAC Decl.") ¶ 38.

In October 2012, however, RMLC – a private plaintiff purporting to speak for the commercial radio industry – sued SESAC for supposedly violating Section 1 and Section 2 of the Sherman Act.  The complaint asks this Court ultimately to burden SESAC with restraints similar to those that its much larger competitors, ASCAP and BMI, agreed to in voluntary consent decrees.  Compl. pp. 29-30 ("Relief Sought").  The thrust of RMLC's complaint is that SESAC has violated the antitrust laws because (a) stations cannot avoid playing the copyrighted works in SESAC's repertory; (b) SESAC will license those works only on a blanket basis; (c) SESAC sells the blanket license for a flat fee, without offering a deduction to reflect a station's purchase

of performance rights directly from a copyright owner; and (d) stations thus lack the incentive to purchase rights directly from the copyright owner. *See id.* ¶¶ 32, 34.

SESAC moved to dismiss RMLC's suit for failure to state a claim; that motion remains pending. Now, however – one year after filing suit – RMLC has asked the Court to take the extraordinary step of issuing a preliminary injunction freezing the fees that SESAC charges stations for blanket licenses. RMLC's motion insists that if SESAC's fees increase for 2014, irreparable harm will befall both radio stations and RMLC itself. RMLC Br. 9-14. Relying on declarations from two broadcasters, RMLC claims that stations will be irreparably harmed because an increase in SESAC's license fees supposedly will effect a severe disruption in their ability to do business. *Id.* at 10-13. RMLC also insists that an increase in SESAC's fees for 2014, put in place without direct negotiation between SESAC and RMLC, will irreparably damage RMLC's own reputation among its station members. *Id.* at 13-14. RMLC makes this incredible claim despite also asserting that (a) SESAC's fees have *already* increased from 2009 to 2013; and (b) SESAC and RMLC have *never* had an industry-wide licensing agreement. *Id.* at 2-3, 11-12, 13.

RMLC's motion must be denied, for RMLC cannot satisfy any prong of the preliminary injunction standard. *First*, RMLC cannot demonstrate a likelihood of success on the merits. *See infra* pp. 7-15. Not only is its complaint insufficient for the reasons stated in SESAC's motion to dismiss, but RMLC's motion puts forward virtually no evidence to *prove* the allegations in the complaint. This alone is reason enough to deny the motion.

*Second*, with respect to irreparable harm, RMLC's motion fails to overcome the fact that the consequences of an increase in SESAC's fees would be strictly financial. *See infra* pp. 15-25. RMLC attempts to skirt this problem by claiming that an increase in SESAC's fees would

profoundly disrupt stations' programming and business decisions – but that claim cannot be taken seriously. RMLC never mentions that even an increase of eight percent in SESAC's fees – the annual rate by which RMLC asserts SESAC's rates have increased from 2009 to 2013 – would come to just twenty-seven dollars a month per station for one of the two broadcaster declarants, and less than sixteen dollars a month for the other. Nor can RMLC avoid the inescapably financial nature of a fee increase by claiming that its own reputation will be harmed; besides lacking factual support, that argument amounts to an improper effort by RMLC to bootstrap its choice to litigate into injunctive relief. And in any event, RMLC's long delay before seeking injunctive relief should make this Court deeply skeptical that higher SESAC fees truly will cause irreparable harm.

*Third*, RMLC cannot show that the balance of equities tips in its favor. *See infra* pp. 25-26. Because RMLC cannot show irreparable harm of any sort, the balance of equities necessarily does not support injunctive relief. But even if RMLC's primary theory of irreparable harm were valid, it would apply with equal or greater force to SESAC, for the financial consequences of a freeze in license fees would fall entirely on SESAC in the first instance (rather than being spread out across an entire industry).

*Finally*, RMLC cannot demonstrate that an injunction would serve the public interest. *See infra* pp. 26-29. RMLC asks this Court to freeze SESAC's licensing fees at their current levels. Yet when antitrust courts "act as central planners, identifying the proper price," *Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004); *Pac. Bell Tel. Co. v. LinkLine Communs., Inc.*, 555 U.S. 438, 452-53 (2009), they act contrary to the free-market, competitive policies that the antitrust laws are designed to protect. Indeed, RMLC has not pointed to a single case in which an antitrust court has imposed a system of price regulation

over the defendant's objection.  If anything, RMLC's request for a rate freeze highlights that its "antitrust" complaint is really just a plea for SESAC to charge less for a product that radio stations find useful.

## ARGUMENT

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008); *see Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) (preliminary injunctions "should be reserved for 'extraordinary' situations"); *Warner Bros. Pictures, Inc. v. Gittone*, 110 F.2d 292, 293 (3d Cir. 1940) ("[T]he granting of a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.").  As the Supreme Court has made clear, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  The burden is on the plaintiff to "produce[] evidence sufficient to convince the district court that all four factors favor preliminary relief." *N.J. Hosp. Ass'n v. Waldman*, 73 F.3d 509, 512 (3d Cir. 1995); *accord Ecri v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987).  "[A] plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate." *Conestoga Wood Specialties Corp. v. Sec'y of the U.S. Dep't of Health & Human Servs.*, 724 F.3d 377, 382 (3d Cir. 2013) (quoting *Nutrasweet Co. v. Vit-Mar Enters.*, 176 F.3d 151, 153 (3d Cir. 1999)).

RMLC cannot satisfy any prong of the four-factor preliminary injunction standard, so its motion must be denied.

## I.    RMLC CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS.

To obtain a preliminary injunction, RMLC must establish that it is likely to succeed on the merits.  Yet RMLC's complaint does not even state a claim.  As argued in SESAC's motion to dismiss (which remains pending):

- Counts 1 and 2, which allege violations of Section 1 of the Sherman Act, must be dismissed because they do not plausibly plead any agreement – much less an agreement among SESAC's many thousands of affiliates – for SESAC to undertake the supposedly anticompetitive conduct of which RMLC complains.  *See* Def.'s Mem. of Law in Supp. of Def.'s Mot. to Dismiss ("MTD") 6-12; Def.'s Reply in Supp. of Def.'s Mot. to Dismiss ("MTD Reply") 2-5; *Bell Atl. Co. v. Twombly*, 550 U.S. 544, 553 (2007) ("crucial question" for Section 1 liability "is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express").[2]

- Alternatively, to the extent that the complaint claims per se violations of Section 1, that claim is foreclosed by the Supreme Court's decision in *BMI v. CBS*, 441 U.S. 1 (1979). *See* MTD 15-17; MTD Reply 5-6; *BMI*, 441 U.S. at 20 (holding that blanket licensing is not a per se violation of Section 1).  And to the extent that the complaint claims a rule-of-reason violation of Section 1, its allegations fail for want of any cognizable harm to competition in a relevant antitrust market.  *See* MTD 17-24; MTD Reply 6-9; *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885-86 (2007) (rule-of-reason claim requires that the plaintiff establish harm to competition in a relevant antitrust market).

---

[2] For the Court's convenience, courtesy copies of the briefing on SESAC's motion to dismiss are attached as Exhibits 1 through 3 to the Declaration of Susan J. Kohlmann.  SESAC incorporates its motion-to-dismiss arguments by reference into this opposition to RMLC's motion for a preliminary injunction.

- Count 3, which alleges that SESAC has unlawfully monopolized the "market" for performance rights to works in its own repertory, fails because, again, the complaint alleges no cognizable harm to competition. Nor does the complaint allege that SESAC's supposed monopoly power has been acquired through conduct that is wrongful or exclusionary – a requirement for liability to attach under Section 2 of the Sherman Act. *See* MTD 24-27; MTD Reply 9-10; *Linkline*, 555 U.S. at 447-48 (reaffirming that Section 2 does not bar all monopolization, but only "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident").

Even if RMLC's complaint did set forth *allegations* sufficient to state an antitrust claim, moreover, the likelihood-of-success prong of the preliminary injunction standard still would remain unmet. For a plaintiff to have any potential entitlement to preliminary injunctive relief, the plaintiff must present *evidence* that it is likely to prevail on the merits. *See N.J. Hosp. Ass'n*, 73 F.3d at 512 (plaintiff must "produce[] evidence sufficient to convince the district court that all four factors favor preliminary relief"); *Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*, 69 Fed. Appx. 550, 554 (3d Cir. Pa. 2003) (moving party has "the burden of introducing evidence" to establish a likelihood of success on the merits); *Doe v. Nat'l Bd. of Med. Exam'rs*, 199 F.3d 146, 149, 157 (3d Cir. 1999) (reversing grant of preliminary injunction on ground that court's likelihood-of-success conclusion "was unsupported by the evidence [the plaintiff] presented," and stressing that the plaintiff "has not met [his] evidentiary burdens" to "demonstrate[] a reasonable likelihood of success"). Here, RMLC has presented only the most minimal evidence of any sort. In this complex antitrust case, RMLC's evidence supposedly supporting the likelihood-of-success prong of the preliminary injunction standard consists of just a dozen

paragraphs, some altogether irrelevant, in three declarations.  And RMLC offers no expert

testimony of any sort – even though antitrust cases, which rely heavily on economic analysis, are

seldom proved without such testimony.

The scant evidence that RMLC *has* actually offered is woefully insufficient to establish a

likelihood of success on the merits, as set forth below.[3]

## A.    RMLC's Section 2 Claim

To establish liability under Section 2 of the Sherman Act, a plaintiff must show not only

(1) that the defendant possesses monopoly power; but also (2) that the defendant has done

something wrongful to acquire or maintain that power.  *See, e.g.*, *Linkline*, 555 U.S. at 447-48;

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007).  RMLC has not

established a likelihood of success with respect to either of these elements.  With respect to

monopoly power, RMLC has offered evidence showing that SESAC's prices are higher than they

once were, and that SESAC's prices are supposedly disproportionate to those charged by

ASCAP and BMI.  RMLC Br. 5.  Yet none of this is evidence that SESAC has raised prices

above *competitive* levels, nor does RMLC even attempt to explain what a "competitive" price

might be.  *See Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005)

(noting that monopoly power "is the power to charge a price *higher than the competitive price*

without inducing so rapid and great an expansion of output from competing firms as to make the

supracompetitive price untenable" (emphasis added; internal quotation marks omitted)).

With respect to wrongful conduct, meanwhile, RMLC's motion fares no better.  RMLC

chides SESAC for "strategically handpicking its affiliates and paying them greater royalties than

---

[3] RMLC has represented to the Court that it intends to support its preliminary injunction
motion solely with testimony from its three declarants.  RMLC should not be permitted to use its
reply to patch the gaping evidentiary holes in its motion with respect to this or any other prong of
the preliminary-injunction standard.

the other PROs could afford, given their rate regulation."  RMLC Br. 6.  RMLC offers no

evidence that this is so – and in any event, this statement appears to describe normal business

conduct: *of course* a firm will have an interest in developing a superior product, and may be

willing to pay higher prices for the necessary inputs.  Even if the result is monopoly power, that

is not the sort of conduct that the Sherman Act condemns.  *See, e.g.*, *Linkline*, 555 U.S. at 447-48

(Section 2 does not prohibit monopoly power resulting from "a superior product, business

acumen, or historic accident").  Whether or not the two much larger PROs could afford to pay

the same royalties as SESAC is irrelevant (and entirely speculative in any event); the antitrust

laws obviously do not require a firm to take only those steps that its competitors could afford to

take.  And it would be nonsensical to hold *SESAC* to the requirements of consent decrees to

which it is not a party.  *See Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478

U.S. 501, 529 (1986) ("Of course, parties who choose to resolve litigation through settlement . . .

may not impose duties or obligations on a third party, without that party's agreement.").

No more availing is RMLC's statement that SESAC has "refused to deal with RMLC's

members other than on a blanket basis."  RMLC Br. 6.  Far from being a means of wrongfully

acquiring monopoly power, blanket licensing is a practice whose salutary nature has been

recognized by the Supreme Court.  *See BMI*, 441 U.S. at 20.  As the Court explained, there are

"thousands of users, thousands of copyright owners, and millions of compositions."  *Id.*

Explaining the blanket license's benefits, the Court continued:

> Most users want unplanned, rapid and indemnified access to any and all of the
> repertory of compositions, and the owners want a reliable method of collecting for
> the use of their copyrights.  Individual sales transactions in this industry are quite
> expensive, as would be individual monitoring and enforcement, especially in light
> of the resources of single composers.  Indeed, . . . the costs are prohibitive for
> licenses with individual radio stations, nightclubs, and restaurants, and it was in
> that milieu that the blanket license arose.

A middleman with a blanket license was an obvious necessity if the thousands of individual negotiations, a virtual impossibility, were to be avoided.

*Id.*

As for RMLC's complaint that SESAC offers *only* the blanket license, RMLC's position apparently is that this eliminates stations' incentive to license performance rights (for some unknown portion of SESAC's repertory) directly from SESAC affiliates, rather than from SESAC itself.[4] But even if true, this assertion has no legal significance, for it amounts to a claim that SESAC is wrongfully "excluding" its own copyright-holding affiliates.[5] *See also* Compl. ¶ 45 ("The only potential competitors to SESAC are SESAC's own affiliates."); *id.* ¶¶ 49, 53 (asserting that SESAC has wrongfully monopolized the supposed market for performance rights to works in its own repertory). SESAC's affiliates plainly are not being excluded; rather, they are participating in the market as SESAC's suppliers. Indeed, it is absurd to suggest that the affiliates are unlawfully "excluded" by a distributor that (according to RMLC's own theory) enables them to earn a greater profit than they otherwise would. Compl. ¶ 59; *compare, e.g.*, *LePage's Inc. v. 3M*, 324 F.3d 141, 157 (3d Cir. 2003) (en banc) (holding that 3M had engaged in exclusionary conduct by depriving another manufacturer of a market for its tape). Nor does it make sense to conclude – as RMLC's theory requires – that antitrust law demands that there be *two* sellers of licenses to perform a particular copyrighted work, where Congress has already decreed that there shall be just one. *See* 17 U.S.C. § 106(4).

---

[4] RMLC insists that SESAC has acquired or maintained monopoly power through "*de facto* exclusive dealing contracts with its affiliates," RMLC Br. 6, yet it cites no evidence of such contracts.

[5] Notably, RMLC never mentions that SESAC offers a 75% fee discount for a station that chooses to air primarily talk shows. *See* SESAC Decl. ¶ 10.

Finally, RMLC charges that SESAC has wrongfully acquired or maintained monopoly power by refusing to deal with RMLC. RMLC Br. 6. Yet there is incontrovertible documentation that SESAC *has* negotiated with RMLC – and has invited RMLC to the table for the license period beginning in 2014. *See* SESAC Decl. ¶¶ 33-37. More fundamentally, RMLC's papers nowhere explain the mechanics by which a refusal to deal with RMLC could have helped SESAC acquire or maintain monopoly power. Perhaps RMLC's point is simply that it would prefer to aggregate the bargaining power of thousands of radio stations, *see* Declaration of William Velez ("RMLC Decl.") ¶ 4 – but it is hornbook antitrust law that a seller normally has no duty to deal with any particular buyer. *See, e.g.*, *Linkline*, 555 U.S. at 447-48 ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."). In short, RMLC cannot establish the requisite likelihood that it will prevail on the merits of its Section 2 claim.

## B. RMLC's Section 1 Claims

RMLC's showing with respect to its Section 1 claims is no stronger. With great fanfare, RMLC proclaims that SESAC "has engaged in a *per se* unlawful conspiracy" because it has "agree[d] with its affiliates to eliminate all licensing competition among them, to allow SESAC to act as the exclusive licensor of their intellectual property rights, and to refuse to deal with radio stations on terms other than blanket licenses." RMLC Br. 7 (capitalization altered). RMLC cites no evidence at all in support of such an agreement – even though proof of an unlawful agreement is the *sine qua non* of a Section 1 claim. *See, e.g.*, *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 254 (3d Cir. 2010); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327-28 (3d Cir. 2010); *Copperweld v. Independence Tube Corp.*, 467 U.S. 752, 767 n.13 (1984) (noting that Section 1 is limited to concerted action, not unilateral conduct); *see also Twombly*, 550 U.S. at 557 ("[A]llegations of parallel conduct . . . must be placed in a

context that raises a suggestion of a preceding agreement.").  And RMLC makes no effort to square its per se claim with the Supreme Court's outright repudiation of the notion that blanket licensing is per se unlawful.  *See BMI*, 441 U.S. at 20.

Alternatively, RMLC asserts that it can establish a rule-of-reason violation of Section 1 because SESAC's "agreements with its affiliates . . . unreasonably restrain trade in the market for licenses to the copyrighted musical compositions and performances in SESAC's repertory." RMLC Br. 9.  To be sure, SESAC's affiliates do agree to allow SESAC to grant licenses authorizing others to perform their copyrighted works.  Yet RMLC's motion is altogether devoid of evidence that SESAC's affiliates agree that SESAC will undertake any of the conduct of which RMLC complains.

Even setting that point aside, moreover, RMLC cannot show that SESAC's conduct has harmed competition in a relevant antitrust market, as is required for a rule-of-reason claim.  *See, e.g.*, *Leegin*, 551 U.S. at 885-86.  Claiming that SESAC's conduct has had anticompetitive effects, RMLC points to a handful of paragraphs in its three declarations.  *See* RMLC Br. 9 (citing RMLC Decl. ¶¶ 8-9; Declaration of Kenneth H. MacDonald ("MacDonald Decl.") ¶¶ 4-5, 10; and Declaration of Robert Souza ("Souza Decl.") ¶¶ 4-5, 7).  But none of this evidence supports a claim of competitive harm.

- RMLC cites evidence that SESAC has told stations that, if they broadcast songs in SESAC's repertory without authorization, they will be subject to suit for copyright infringement.  *See* Souza Decl. ¶ 5.  RMLC has offered no evidence that it is anticompetitive to enforce intellectual property rights, or to truthfully inform parties of their obligations under the copyright laws.

- RMLC cites evidence that SESAC's license fees have increased over time.  *See* RMLC Decl. ¶ 8.  Yet RMLC offers no reason to think that SESAC's license fees are supracompetitive, nor does RMLC even suggest how one might determine "competitive" fees for the licenses that SESAC sells.  *See Harrison Aire, Inc.*, 423 F.3d at 381; *Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1411-12 (7th Cir. 1995) (Posner, J.).

- RMLC cites assertions by its broadcaster declarants that further increases in SESAC license fees will cause them to consider changing the way they operate or forgoing other investments.  *See* MacDonald Decl. ¶ 10; Souza Decl. ¶ 7.  As set forth below, these assertions are implausible in light of how little these broadcasters actually pay to SESAC.  *See infra* Part II.A.  But even if the declarants' assertions are taken at face value, they merely reflect the unremarkable proposition that a business paying more for an input may have to find places to cut costs.  They say nothing about whether any conduct by SESAC has harmed competition.

- Finally, RMLC cites assertions by its broadcaster declarants that they cannot avoid playing music in SESAC's repertory because (among other things) SESAC supposedly fails to disclose what works its repertory contains.   *See* MacDonald Decl. ¶¶ 4-5, 10; Souza Decl. ¶ 5.  SESAC denies in the strongest terms that it fails to make adequate disclosure of its repertory; in fact, the Court can readily observe that SESAC's website permits its repertory to be searched electronically by song, writer, publisher, or artist.  *See* http://www.sesac.com/Repertory/Terms.aspx.[6]  RMLC's own assertions, moreover, lead to the conclusion that even if SESAC's disclosure of its repertory *were* somehow

---

[6] Mr. Souza's statement that "it is impossible to go on SESAC's website to determine what songs are, and are not, within its catalogue," Souza Decl. ¶ 5, thus is demonstrably false.

deficient, stations *still* would need a license covering all works in that repertory. That is because, according to RMLC, stations often do not know what songs they are playing, and certain songs in SESAC's repertory are "must-haves." Compl. ¶ 22; Souza Decl. ¶ 5; MacDonald Decl. ¶ 4.

Finally, as argued in SESAC's motion to dismiss, RMLC's rule-of-reason claims fail because RMLC has not even articulated a viable theory of competitive harm. RMLC has provided no reason for this Court to conclude that SESAC licenses so much of the universe of copyrighted compositions that it meaningfully affects competition *among* copyright holders. And harm to "competition" *between* SESAC and its own copyright-holding affiliates simply is not a concern of the antitrust laws. *See* MTD 19; MTD Reply 8; *cf. State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997) (primary purpose of antitrust law is to "protect interbrand competition"). In short, as with its Section 2 claim, RMLC has not established the requisite likelihood of success for its claims under Section 1.

## II. RMLC CANNOT DEMONSTRATE IRREPARABLE HARM.

To establish entitlement to preliminary injunctive relief, RMLC has the burden of making a "clear showing of immediate irreparable injury." *ECRI*, 809 F.2d at 226; *see id.* (noting that proving even "a serious or substantial" injury will not do). RMLC's motion falls woefully short of this showing.

As an initial matter, RMLC's claims of irreparable harm are belied by its one-year delay in seeking a preliminary injunction. RMLC filed this action on October 11, 2012, complaining of price increases reflected in SESAC's current five-year rate schedule. *See* Compl. ¶ 71 (alleging that "since at least 2009," SESAC's rate card rates "have increased by a compounded rate of approximately 8% and 20% every year for analog and website broadcasting . . . respectively"). In its complaint, RMLC stated: "RMLC's members face an *imminent threat of*

*continued harm* as they are currently renegotiating license fees with SESAC." *Id.* ¶ 73

(emphasis added). Yet RMLC did not seek a preliminary injunction until October 7, 2013 –

nearly one year later.

RMLC's long delay in seeking injunctive relief undermines any notion that rate increases

by SESAC, along the lines of the increases reflected in SESAC's 2009-2013 rate schedule, will

cause irreparable harm. RMLC knew when it filed its lawsuit that rates were going to increase

for 2013, yet it still did not move for a preliminary injunction to freeze rates at the 2012 levels.

Concluding that irreparable harm is threatened *now* would require this Court to determine that,

even though past increases were not irreparably harmful, a comparable increase for 2014 would

be the proverbial straw that breaks the camel's back. RMLC's motion provides no basis to reach

this conclusion. Rather, RMLC's lengthy delay in seeking injunctive relief precludes a finding

of imminent irreparable harm. *See Lanin v. Borough of Tenafly*, 515 Fed. Appx. 114, 117-118

(3d Cir. 2013) (finding no irreparable harm because challenged traffic scheme was adopted two

years before plaintiff filed motion for preliminary injunction); *Orson, Inc. v. Miramax Film

Corp.*, 836 F. Supp. 309, 312-13 (E.D. Pa. 1993) (50-day delay between complaint and motion

warranted denial of preliminary injunction for want of irreparable harm); *Pharmacia Corp. v.

Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 383-384 (D.N.J. 2002) (one-year delay between

complaint and motion undermined plaintiff's claim of irreparable harm); *New Dana Perfumes v.

The Disney Store, Inc.,* 131 F. Supp. 2d 616, 630 (M.D. Pa. 2001) (delay of two months in

sending demand letter and five months in moving for relief precluded preliminary injunction).

Even if the Court were to disregard RMLC's lengthy delay in seeking injunctive relief,

moreover, the "harms" that the motion asserts – whether to stations or to RMLC itself – are

insufficient to support a preliminary injunction, as set forth below.

**A.     RMLC's Claimed Injuries To Stations Cannot Support Injunctive Relief.**

RMLC seeks an industry-wide freeze of SESAC's licensing fees, asserting that stations will be irreparably harmed by fee increases in 2014.  Indeed, RMLC makes the dramatic assertion that "SESAC's planned five-year rate hike would devastate the industry."  RMLC Br. 10.[7]  In support of this claim of industry-wide financial ruin, however, RMLC offers declarations from just two station representatives.  RMLC Br. 11-13; MacDonald Decl. ¶ 10 (discussing supposed harm to MacDonald Broadcasting); Souza Decl. ¶ 7 (discussing supposed harm to KCKM); *compare* Compl. ¶ 70 (noting that RMLC's membership includes 6,500 stations, with another 3,500 having agreed to be bound by RMLC-negotiated licenses with ASCAP and BMI).

Even assuming that these two declarations establish harm to MacDonald Broadcasting and KCKM – which they do not, as discussed below – granting an industry-wide injunction on the basis of harm to just two participants is impermissible.  As the Third Circuit has made clear, a court may "rest[] a preliminary injunction for many on the testimony of a few" only if "the plaintiffs lay an adequate foundation from which one could draw inferences that the testifying plaintiffs are similarly situated – in terms of irreparable harm – to [all others who would benefit from the preliminary injunction]."  *Adams*, 204 F.3d at 487; *see, e.g.*, *Asian-Am. Licensed Beverage Ass'n v. Commonwealth of Pa.*, No. Civ.A. 1:05-CV-2135, 2005 WL 3077246, at *6 n.6 (M.D. Pa. Nov. 3, 2005) ("Even should Mr. Ngo demonstrate irreparable harm to his own business, the court questions whether the injury to his business can be imputed to all other members of [the plaintiff organization], and the remaining named Plaintiffs.").

---

[7] In fact, SESAC has not yet issued or even determined its rate schedule for the period beginning in 2014.  SESAC Decl. ¶ 29.

RMLC has not done that here.  For instance, it has provided no basis for concluding that the MacDonald and Souza stations are similar to the many thousands of other stations in terms of their profitability, their assets, their programming, their operations, or the license fees they pay to SESAC.  RMLC does attempt to rescue its claim of irreparable harm with a bare-bones statement from its own executive director, William Velez, that the MacDonald and Souza stations are "representative" of all others in the industry.  RMLC Decl. ¶ 13.  But that statement amounts to no more than Mr. Velez's say-so.  It cannot support a conclusion that RMLC has discharged its burden of showing irreparable harm to the industry, rather than just to the MacDonald and Souza stations.

Even as to the MacDonald and Souza stations themselves, moreover, RMLC cannot show irreparable harm.  RMLC complains that these stations may have to pay more for SESAC licenses in 2014 than they have paid in 2013.  RMLC Br. 3.  But it is well-settled that monetary harm generally is *not* irreparable.  *See A.O. Smith Corp. v. FCC*, 530 F.2d 515, 527 (3d Cir. 1976) (noting that "it could hardly be contended" that "spend[ing] money and los[ing] profits" is sufficient to demonstrate irreparable harm); *Pennsy Supply Inc. v. Susquehanna River Basin Comm'n*, No. 1:CV-06-2454, 2007 WL 551573, at *3-4 (M.D. Pa. Feb. 20, 2007) (finding no irreparable harm from costs of complying with regulation because "this is simply an example of a corporation spending money . . . , not some type of peculiar harm to the business").  And RMLC has offered no basis for this Court to conclude that this is the rare case in which monetary harm may support injunctive relief.  Indeed, although RMLC does assert that SESAC's analog radio fees have increased by eight percent each year since 2009, *see* RMLC Br. 11-12, RMLC's declarations glaringly omit crucial facts necessary to evaluate any claim of irreparable harm associated with higher fees.  The declarations make no mention of (1) how much the stations

currently pay for SESAC licenses; (2) what an eight-percent increase over their current SESAC fees would actually be; or (3) how the stations' SESAC license fees compare to their overall revenues or expenses. Without such information, this Court cannot possibly determine that increased SESAC license fees would irreparably harm stations. *Cf. A.O. Smith*, 530 F.2d at 527-28 ("[T]here is no contention that compliance with the . . . program would render any appellee unable to meet its debts as they come due. Nor is there any contention that the cost of compliance would be so great vis-à-vis the corporate budget that significant changes in a company's operations would be necessitated.").

In fact, the amounts that the declarant broadcasters pay in SESAC license fees are so small as to belie any claim of irreparable harm. MacDonald Broadcasting's total SESAC fees for 2013 currently are calculated as $32,850, spread among eight radio stations. SESAC Decl. ¶ 28. An eight percent increase in that fee would cause each MacDonald station to pay, on average, just twenty-seven dollars more each month. Meanwhile, KCKM – the subject of the Souza declaration – has a total annual SESAC fee of $2,352 for 2013. SESAC Decl. ¶ 21. If that fee were to increase by eight percent, KCKM would have to pay less than sixteen dollars more each month. It is implausible that fee increases of this magnitude could irreparably harm a radio station.

Still, RMLC attempts to transform monetary harm into something more by conjuring up a claim of disruption to business operations. RMLC Br. 10-11. Yet the declarants' claims of business disruption fall far short of anything that could warrant preliminary injunctive relief. *First*, the stations claim only that they may "consider" staff reductions. Mr. MacDonald asserts that he "will be forced to *consider* cutting back staff if these rate increases continue to compound." MacDonald Decl. ¶ 10 (emphasis added). Mr. Souza, for his part, equivocates even

more, stating that he "will *likely* have to *consider* significant operations changes in [his] business, including laying off staff." Souza Decl. ¶ 8 (emphasis added). Merely contemplating a change in operations is plainly insufficient to constitute an irreparable harm. *See EUSA Pharma (US), Inc. v. Innocoll Pharms., Ltd.*, 594 F. Supp. 2d 570, 581 (E.D. Pa. 2009) ("Establishing a *risk* of irreparable harm is not enough." (quoting *ECRI*, 809 F.2d at 226)); *Premier Sys. Consultants, Ltd. v. Mahin*, No. CIV. A. 99-2660, 1999 WL 1212186, at *3 (E.D. Pa. Dec. 16, 1999) ("Petitioner's claims expressly demonstrate that [it] is simply at *the risk of harm* (e.g., it may lose business, it may suffer reputational loss, it may have a lessened ability to compete in the marketplace, etc.). Under Third Circuit jurisprudence, 'risk of harm' simply does not equate to 'irreparable injury.'").

*Second*, Mr. Souza complains that increased SESAC fees will cause him to lose "money that [he] would otherwise invest in [his] business." Souza Decl. ¶ 7. But the same complaint could be made by *any* business owner facing the prospect of paying more for an input, and does not support a finding of irreparable harm. *See N.J. Ass'n of Health Care Facilities, Inc. v. Gibbs*, 838 F. Supp. 881, 927 (D.N.J. 1993) ("[L]oss of profits is not a sufficient predicate for preliminary injunctive relief in this Circuit."); *EUSA Pharma*, 594 F. Supp. 2d at 581 ("A district court cannot award an injunction where the claimed injury constituted a loss of money." (quotation marks and citation omitted)). Indeed, Mr. Souza points to no specific investment that an increase in SESAC's fees would actually force him to forgo – which is unsurprising, given the magnitude of the fees at issue. *Compare* Souza Decl. ¶ 7 (statement that Mr. Souza "would like" to transition his station to digital).

*Third*, Mr. MacDonald states that increases in SESAC's fees will "force[]" his stations "to limit the variety of music" that they play. MacDonald Decl. ¶ 10. That assertion makes no

sense at all.  A SESAC blanket license allows a station to play *any* song in SESAC's repertory; the station's fee is fixed and thus does not increase with the amount of SESAC music that it plays.  The only way an increase in SESAC's fees could conceivably "force[]" any station to "limit the variety of music" it plays is if the station chooses to forgo a SESAC license altogether – but that is exactly what RMLC claims is not possible.  RMLC Br. 12.

The cases that RMLC cites on the "business disruption" issue merely highlight that the stations' claimed disruptions cannot support preliminary injunctive relief.  *Pierre & Carlo, Inc. v. Premier Salons, Inc.*, 713 F. Supp. 2d 471 (E.D. Pa. 2010), found irreparable harm when the defendant's misappropriation of furniture, fixtures, and equipment prevented the plaintiff from opening a business in a new location.  *See id.* at 481.  In support of its conclusion, the court credited evidence that such a new venture was in fact likely to succeed.  *Id.*  Similarly, *EUSA Pharma* concluded that the plaintiff would suffer irreparable harm by "losing a unique, non-replicable business opportunity" if the defendant oversaw the development of a novel product for which the plaintiff had an option and right of first refusal to commercialize.  594 F. Supp. 2d at 576, 582.  This case is nowhere near comparable.  And while the court in *United States v. Dentsply*, 399 F.3d 181, 194 (3d Cir. 2005) – which RMLC also cites – did happen to use the phrase "choice in the marketplace," it did not even analyze the issue of irreparable harm, let alone the circumstances in which a claim of "business disruption" can warrant a preliminary injunction.

By way of an alternative to its business-disruption theory, RMLC asserts that stations face a "Hobson's choice" with respect to the purchase of SESAC licenses.  RMLC Br. 12-13.  But RMLC's claim of a "Hobson's choice" is just a dressed-up complaint about higher prices.  The choice that stations face (according to RMLC) is between the risk of copyright infringement,

on one hand, and paying for a SESAC license, on the other.  RMLC Br. 12.  Even if a SESAC

blanket license truly were the stations' only viable option for avoiding infringement, all that

RMLC is really complaining about is a loss of money.  RMLC has provided no evidence that

SESAC's license fees approach the debilitating costs that the cases it cites have treated as

irreparable harm.  *See* RMLC Br. 12-13; *Beilowitz v. Gen. Motors Corp.*, 233 F. Supp. 2d 631,

633 (D.N.J. 2002) (potential loss of 40% of revenue); *Am. Trucking Ass'ns, Inc. v. City of L.A.*,

559 F.3d 1046, 1057 (9th Cir. 2009) (costs large enough to jeopardize survival of business).  And

while *Everett Labs., Inc. v. Breckenridge Pharm., Inc.*, 573 F. Supp. 2d 855, 869 (D.N.J. 2008),

certainly uses the phrase "Hobson's choice," the loss of market share and goodwill at issue in

that case are a far cry from the purely monetary injuries that RMLC claims stations will suffer if

SESAC's rates increase for 2014.[8]

### B.     RMLC's Claimed Injuries To Itself Cannot Support Injunctive Relief.

Perhaps because its claim of irreparable harm to stations is so weak, RMLC also asserts

that it will suffer irreparable harm *itself* if SESAC's license fees increase.  RMLC Br. 13-14.

RMLC seems to suggest that its members will hold it in lower regard if it is unable to achieve a

rate freeze.  That sort of bootstrapping cannot justify a preliminary injunction:  if this kind of

"reputational" harm is sufficient, then any associational plaintiff could readily skirt the

irreparable harm requirement simply by asserting that its members will lose faith in it should it

not achieve a favorable outcome.  That cannot be the law.  Nor, in any event, can any harm to

RMLC's reputation possibly be *irreparable* at this stage of the case, since RMLC's reputation

---

[8] What is more, the stations' supposed "Hobson's choice" is not even such a choice at all.
RMLC pretends that all of SESAC's radio station customers pay the fees listed on SESAC's rate
schedule.  But approximately 1700 stations instead pay fees that are separately negotiated
between SESAC and radio station groups – a fact that RMLC nowhere mentions.  SESAC Decl.
¶¶ 12, 18.

undoubtedly would improve if it were ultimately to prevail on the merits. *See Feldman & Pinto, P.C. v. Seithel*, Civil Action No. 11-5400, 2011 WL 6758460, at *16-17 (E.D. Pa. Dec. 22, 2011) (noting that "showing some *potential* harm to reputation is usually insufficient to support a conclusion that irreparable harm exists" (emphasis added) (quoting *Acierno v. New Castle Cnty.*, 40 F.3d 645, 654 (3d Cir. 1994))).

Further, RMLC's present claim of harm to *itself* cannot support injunctive relief because it is at odds with the very basis for this suit. Rather than sue SESAC on its own behalf, RMLC invoked the doctrine of associational standing to sue "on behalf of its members." Compl. ¶ 69. Similarly, RMLC alleged "antitrust injury" only to its members – not to itself. *Id.* ¶ 67; *see Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986) (plaintiff seeking injunctive relief under the Clayton Act must show "antitrust injury," which is "an injury of the type the antitrust laws were designed to prevent"); *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 399 (3d Cir. 2000) (same). RMLC's choice to sue only on behalf of its members made procedural sense, for it is highly doubtful that RMLC's own supposed reputational harm could give rise to the right to sue. *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010) ("As a general matter, the class of plaintiffs capable of satisfying the antitrust-injury requirement is limited to consumers and competitors in the restrained market, and to those whose injuries are the means by which the defendants seek to achieve their anticompetitive ends." (internal citations omitted)); *Delco LLC v. Giant of Md., LLC*, No. 07-3522, 2007 WL 3307018, at *9 (D.N.J. Nov. 8, 2007) (denying one plaintiff's preliminary injunction motion in an antitrust case because it was "neither a consumer nor a competitor in the market in which trade was [allegedly] restrained"). RMLC cannot now take a different tack altogether.

Nor is RMLC's claim of reputational harm even supported by the evidence. RMLC itself asserts that, for many years, it has been unsuccessful in preventing increases in SESAC's license fees. RMLC Br. 2. And RMLC recognizes that it has *never* had an industry-wide licensing agreement with SESAC. RMLC Br. 13. RMLC has put forward no evidence that any station has threatened to end its RMLC membership in the past – let alone withdrawn from the organization – because SESAC's fees have increased, or because RMLC has not managed to strike an industry-wide SESAC deal. *Compare Feldman & Pinto*, 2011 WL 6758460, at *15 (plaintiff "produced evidence to demonstrate that it has already faced a loss of clients" due to the harm to its reputation). And RMLC has put forward no evidence suggesting that a fee increase *this* year would have a different result. The fact that RMLC claims to have been unsuccessful for years in reining in SESAC's prices, yet has waited until now to seek injunctive relief on the basis of supposed reputational harm, merely confirms that such harm is not imminent here. *See Orson*, 836 F. Supp. at 312-13.

Indeed, RMLC cannot reconcile its claim of reputational harm here with its demonstrated success in achieving fee reductions for stations from the two much larger PROs. RMLC's papers boast that "[i]n 2012, RMLC successfully negotiated fees on behalf of U.S. terrestrial radio stations with ASCAP and BMI." RMLC Br. 2. Having succeeded with both ASCAP and BMI, RMLC provides no basis to suppose that a lack of comparable success with SESAC – the smallest PRO by far – would somehow turn radio stations against it. RMLC's claim of reputational harm should be rejected for this reason as well. *See Acierno*, 40 F.3d at 654 (rejecting irreparable harm to developer's reputation based on denial of a building permit for want of evidence that "this particular development is uniquely important to [the developer] in light of . . . all the other real estate projects in which he is interested").

Finally, RMLC grounds part of its reputational harm argument on SESAC's supposed refusal to negotiate with RMLC. RMLC Br. 13. Yet RMLC nowhere acknowledges that the parties *did* negotiate with each other in 2008 and 2009. SESAC Decl. ¶¶ 33-35. Although those negotiations may not have reached RMLC's desired result, it is simply false to deny that they took place.[9] *Id.* Not only that, but RMLC never mentions that, in March 2009, SESAC's President and Chief Executive Officer expressly invited RMLC to return to the negotiating table "as we approach the end of the current radio license term." SESAC Decl. ¶ 36. SESAC is unaware of any subsequent request by RMLC that SESAC restart negotiations. SESAC Decl. ¶ 37. Thus, to the extent that RMLC is claiming reputational harm as a result of the absence of negotiations between RMLC and SESAC, that injury is purely self-inflicted and therefore cannot support injunctive relief. *See, e.g.*, *Caplan v. Felheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) ("If the harm complained of is self-inflicted, it does not qualify as irreparable.").

## III.    THE BALANCE OF EQUITIES OVERWHELMINGLY FAVORS SESAC.

An injunction here would be improper for another reason: RMLC cannot "establish . . . that the balance of equities tips in [its] favor." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *see also id.* at 25 (a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief" (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)); *Lei Ke v. Drexel Univ.*, No. 11-6708, 2013 WL 1092668, at *8 (E.D. Pa. Mar. 14, 2013) (denying a preliminary injunction in part because the defendant was "likely to suffer greater harm if" an injunction was issued); *Colorcon, Inc. v.*

---

[9] Still more outlandish is RMLC's claim that "SESAC has refused to negotiate precisely to harm RMLC's reputation, in the hope of eliminating it as a future constraint on its monopoly pricing." RMLC Br. 13-14. The injunction papers provide no support for the notion that SESAC has done *anything* with the aim of "harm[ing] RMLC's reputation."

*Lewis*, 792 F. Supp. 2d 786, 805 (E.D. Pa. 2011) (same).  Rather, the balance of equities overwhelmingly favors SESAC.

As an initial matter, as discussed above, RMLC has failed to demonstrate irreparable harm.  *See supra* Part II.  Without irreparable harm, the balance of equities necessarily cannot tip in RMLC's favor.  *See, e.g.*, *Colorcon*, 792 F. Supp. 2d at 805.

But even if RMLC's theories of irreparable harm were valid, granting an injunction would harm SESAC far more than denying an injunction would harm RMLC.  All of the harm that RMLC claims stations will suffer stems from their having to pay slightly higher fees to SESAC.  Whereas any SESAC fee increase would be spread among many thousands of radio stations, the burden of an injunction *freezing* rates would fall entirely on SESAC.  And while RMLC has offered no evidence suggesting that SESAC license fees comprise anything but a tiny fraction of each station's expenses, commercial radio license fees comprise a substantial percentage of SESAC's domestic revenue.  SESAC Decl. ¶ 3.

More broadly, an injunction would prevent SESAC from doing business the way it pleases.  And it is well settled that "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."  *LinkLine*, 555 U.S. at 448.  RMLC's requested injunction would restrain SESAC's freedom to do business as it sees fit.

In sum, under RMLC's own theories of irreparable harm, an injunction would harm SESAC more than denying an injunction would harm RMLC and its members.  RMLC therefore cannot show that the balance of equities tips in its favor.

## IV. RMLC CANNOT ESTABLISH THAT THE PUBLIC INTEREST FAVORS AN INJUNCTION.

The fourth prong of the preliminary injunction standard requires RMLC to establish that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. As the Supreme Court has cautioned, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982); *accord R.R. Com. of Texas v. Pullman Co.*, 312 U.S. 496, 500 (1941) ("The history of equity jurisdiction is the history of regard for public consequences in employing the extraordinary remedy of the injunction."). RMLC cannot make the required showing.

RMLC asks this Court to freeze SESAC's radio license rates while this litigation is pending. Yet public policy clearly disfavors this sort of judicial rate-setting. The antitrust laws are designed to promote competition, not set prices. As then-Judge Breyer explained, "antitrust courts normally avoid direct price administration, relying on rules and remedies . . . that are easier to administer," for "how is a judge or jury to determine a 'fair price'?" *Concord v. Boston Edison Co.*, 915 F.2d 17, 25 (1st Cir. 1990). More recently, the Supreme Court has emphasized that courts have long refused to "act as central planners, identifying the proper price, quantity, and other terms of dealing," because that is a "role for which they are ill suited." *Trinko,* 540 U.S. at 408; *LinkLine*, 555 U.S. at 452-53 (same); *see Arsberry v. Illinois*, 244 F.3d 558, 562 (7th Cir. 2001) (Posner, J.) (noting "historical antipathy to rate setting by courts, deemed a task they are inherently unsuited to perform competently"). Thus, RMLC's request for a preliminary injunction asks this Court to provide a remedy – setting a price – that antitrust courts eschew.

RMLC will no doubt point to the ASCAP and BMI consent decrees as precedent for the judicial rate-setting that it seeks – but those decrees are unavailing. *First*, ASCAP and BMI are subject to rate courts only because they have *agreed* to be. Whatever policy concerns arise

where parties agree to a rate court, there is a clear public policy against courts determining "fair" prices without the parties' consent. *See Trinko*, 540 U.S. at 408; *LinkLine*, 555 U.S. at 452-53; *Concord*, 915 F.2d at 25; *see also, e.g.*, *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 445 (9th Cir. 1990) ("The federal courts generally are unsuited to act as rate-setting commissions."). Even the Second Circuit, the venue for the ASCAP and BMI rate courts, strongly disfavors judicial rate-setting absent the parties' consent. *See, e.g.*, *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 19 (2d Cir. 1994) (stressing that "courts are not institutionally well suited to engage in retroactive rate setting" (quoting *Wegoland, Ltd. v. NYNEX Corp.*, 806 F. Supp. 1112, 1115 (S.D.N.Y. 1992))); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 294 (2d Cir. 1979) (cautioning that "judicial oversight of pricing policies would place the courts in a role akin to that of a public regulatory commission," and "we would be wise to decline that function unless Congress clearly bestows it upon us").

*Second*, the ASCAP and BMI consent decrees were the product of antitrust suits brought by the U.S. Department of Justice, which acts solely in the public interest. Here, however, the Justice Department investigated SESAC and *declined* to take any action. SESAC Decl. ¶ 38. This suit is brought by a private party whose interest is not to promote competition – the public interest behind the antitrust laws – but simply to pay less for a product that it claims is indispensable.

*Third*, even the ASCAP and BMI rate courts – which, again, exist only as a result of consent decrees – establish prices only after full-blown, trial-type proceedings that last for many months or even years. *See, e.g.*, *In re Application of MobiTV, Inc.*, 712 F. Supp. 2d 206, 209-11 (S.D.N.Y. 2010) (setting ASCAP rates after trial involving testimony from thirty fact witnesses and five experts). Here, by contrast, RMLC has put forward no evidence suggesting that

SESAC's rates, if increased, would exceed an "appropriate" price – nor has RMLC even proposed a standard by which the appropriateness of SESAC's prices might be assessed.

Unable to overcome the clear public policy against judicial price regulation, RMLC also claims that an injunction is necessary to "ensure that the public enjoys choice in radio broadcasting." RMLC Br. 15. But RMLC's only basis for that claim is that, without a freeze in SESAC rates, a single AM station in rural Texas "will likely have to *consider*" changes to its station, Souza Decl. ¶ 8 (emphasis added), and another broadcaster "*may be* forced to limit the variety of music [he] play[s] on [his] stations," MacDonald Decl. ¶ 10 (emphasis added). Such limited, equivocal statements – without any supporting detail – come nowhere near showing that an industry-wide injunction is necessary to "ensure" consumer choice, just as they come nowhere near showing a likelihood of irreparable harm. *See supra* Part II (discussing RMLC's claims of business disruption). And once again, the claim that increased SESAC fees may limit the variety of music that stations play ignores that a blanket license from SESAC entitles a station to play as much SESAC music as it wants, for a single fee.

## V. THE COURT CANNOT GRANT RMLC'S MOTION WITHOUT REQUIRING RMLC TO POST A BOND.

RMLC's motion should be denied outright, for the reasons stated above. Should the Court determine that injunctive relief is appropriate, however, RMLC must post a suitable bond. Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction . . . *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added). Issuing an injunction without security is reversible error. *See, e.g.*, *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 425-26 (3d Cir. 2010); *Frank's*

*GMC Truck Center, Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988); *Sys.*

*Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1145-46 (3d Cir. 1977).

The only exception to the security requirement – an "extremely narrow" one – arises "when complying with the preliminary injunction raises no risk of monetary loss to the defendant." *Zambelli*, 592 F.3d at 425-26. By contrast, the Third Circuit has "never excused a District Court from requiring a bond" where "an injunction prevents commercial, money-making activities." *Id.* Here, an injunction freezing SESAC's rates obviously would prevent such activities and would cause SESAC "monetary loss." *Id.* Thus, if this Court grants a preliminary injunction, it must require RMLC to post security under Rule 65(c) sufficient to cover the "costs and damages sustained by [SESAC]" if the injunction is overturned on appeal or RMLC ultimately loses on the merits.

## CONCLUSION

RMLC's motion for a preliminary injunction should be denied.

Respectfully submitted,

/s/ Joshua M. Segal
Joshua M. Segal (pro hac vice)
Matthew S. McKenzie (pro hac vice
    application to be submitted)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
Telephone: (202) 639-6089
Fax: (202) 661-4920
Email: jsegal@jenner.com

Gary A. Rosen (PA I.D. No. 40967)
LAW OFFICES OF GARY A. ROSEN P.C.
63 West Lancaster Avenue
Suite 1
Ardmore, PA 19003
Telephone: (610) 658-8790
Fax: (610) 658-8792
Email: grosen@logarpc.com

Susan J. Kohlmann (pro hac vice)
Joshua H. Rubin (pro hac vice
    application to be submitted)
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022
Telephone: (212) 891-1600
Fax: (212) 909-0821
Email: skohlmann@jenner.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of November, 2013, the foregoing Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction and accompanying Declarations of Patrick Collins and Susan J. Kohlmann were electronically filed using the CM/ECF system, and notice was given to all parties using this system.

/s/ Susan J. Kohlmann
SUSAN J. KOHLMANN (pro hac vice)