# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RADIO MUSIC LICENSE COMMITTEE, INC. | Civil Action |
| Plaintiff, | No. 2:12-cv-05807-CDJ-LAS |
| v. | Judge C. Darnell Jones, II |
| SESAC, INC., SESAC, LLC, AND SESAC HOLDINGS, INC., | Magistrate Judge Lynne A. Sitarski |
| Defendants. | **Electronically Filed**<br>**Oral Argument Requested** |

## PLAINTIFF RADIO MUSIC LICENSE COMMITTEE INC.'S
## REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Page

INTRODUCTION ....................................................................................................1

ARGUMENT ..........................................................................................................2

I.  SESAC HAS FAILED TO REBUT RMLC'S OVERWHELMING SHOWING
    OF ITS LIKELIHOOD OF SUCCESS ON THE MERITS ........................................2

   A.  RMLC Has Shown A Prima Facie Violation Of Section 2 Of
       The Sherman Act ....................................................................................3

       1.  SESAC Ignores The Abundant Direct And Indirect Evidence Of
           SESAC's Monopoly Power .............................................................3

       2.  SESAC Engaged In Wrongful Conduct To Maintain Its Monopoly ..........7

           a.  SESAC Created An Artificial Bottleneck.........................................7

           b.  SESAC Intentionally Makes It Impossible For Stations To
               Avoid Buying Its License ..............................................9

           c.  SESAC Refuses To Deal With Radio Stations On Other
               Than A Blanket Basis ...................................................10

   B.  SESAC Has Not Rebutted RMLC's Prima Facie Showing That SESAC
       Has Violated Section 1 Of The Sherman Act ........................................12

       1.  SESAC Admits That It Engages In Concerted Action With Its
           Affiliates Within The Meaning Of Section 1 ............................................12

       2.  SESAC's Per Se Argument Is Wrong.......................................................13

       3.  SESAC Cannot Survive Rule Of Reason Scrutiny Either .........................14

II.  SESAC HAS NOT REBUTTED RMLC'S CLEAR SHOWING OF
     IRREPARABLE HARM ..............................................................................17

   A.  SESAC's "Delay" Argument Is Baseless ............................................17

   B.  RMLC's Declarants Are Representative Of The Industry's
       Dealings With SESAC .............................................................................18

   C.  SESAC Cannot Avoid The Clear Irreparable Harm It Is
       Inflicting On Radio Stations .................................................................20

III.  THE BALANCE OF HARMS FAVORS RMLC .........................................................24

i

IV.    SESAC DOES NOT CREDIBLY DISPUTE THAT THE PUBLIC INTEREST
       FAVORS AN INJUNCTION .............................................................................................25

V.     RMLC SHOULD NOT HAVE TO POST A BOND, BUT WILL DO SO IF THE
       COURT DETERMINES IT IS NECESSARY .................................................................25

CONCLUSION.........................................................................................................................27

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Adams v. Freedom Forge Corp.*,
   204 F.3d 475 (3d Cir. 2000) ........................................................................... 19, 20

*Am. Motor Inns, Inc. v. Holiday Inns, Inc.*,
   521 F.2d 1230 (3d Cir. 1975) ............................................................................... 15

*Am. Needle, Inc. v. NFL*,
   560 U.S. 183 (2010) ............................................................................................. 12

*Assoc. for Fairness in Bus., Inc. v. New Jersey*,
   82 F. Supp. 2d 353 (D.N.J. 2000) ........................................................................ 19

*BMI v. CBS, Inc.*,
   441 U.S. 1 (1979) ........................................................................... 11, 13, 14, 16

*Broadcom Corp. v. Qualcomm Inc.*,
   501 F.3d 297 (3d Cir. 2007) ................................................................... 3, 4, 6, 7

*C.H. v. Payne*,
   683 F. Supp. 2d 865 (S.D. Ind. 2010) .................................................................. 19

*Chosen 300 Ministries, Inc. v. City of Phila.*,
   No. 12-3159, 2012 U.S. Dist. LEXIS 112046 (E.D. Pa. Aug. 9, 2012) ................... 20

*Cyber Promotions, Inc. v. Apex Global Info. Servs., Inc.*,
   No. 97-5931, 1997 U.S. Dist. LEXIS 15344 (E.D. Pa. Sept. 30, 1997) ................... 21

*Doe v. Banos*,
   416 F. App'x 185 (3d Cir. 2010) .......................................................................... 17

*Doran v. Salem Inn, Inc.*,
   422 U.S. 922 (1975) ............................................................................................. 21

*Eastman Kodak Co. v. Image Tech. Servs.*,
   504 U.S. 451 (1992) ............................................................................................... 7

*Elliott v. Kiesewetter*,
   98 F.3d 47 (3d Cir. 1996) ..................................................................................... 25

*Fashion Originators' Guild of Am. v. FTC*,
   312 U.S. 457 (1941) ............................................................................................. 14

*FMC Corp. v. United States*,
   3 F.3d 424 (Fed. Cir. 1993) .................................................................................. 23

*FTC v. Actavis, Inc.*,
    133 S. Ct. 2223 (2013) ................................................................................ 16

*GlaxoSmithKline Consumer Healthcare, L.P. v. Merix Pharmaceutical Corp.*,
    No. 05-898, 2005 U.S. Dist. LEXIS 30198 (D.N.J. Sept. 13, 2005) ........................................ 18

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
    423 F.3d 374 (3d Cir. 2005) ....................................................................... 5

*Highmark, Inc. v. UPMC Health Plan*,
    276 F.3d 160 (3d Cir. 2001) ....................................................................... 2

*Hinckley v. Kelsey-Hayes Co.*,
    866 F. Supp. 1034 (E.D. Mich. 1994) ............................................................ 20, 21

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
    359 U.S. 207 (1959) ............................................................................... 14

*Kos Pharm., Inc. v. Andrx Corp.*,
    369 F.3d 700 (3d Cir. 2004) ...................................................................... 20, 24

*Lanin v. Borough of Tenafly*,
    515 F. App'x 114 (3d Cir. 2013) .................................................................. 18

*LePage's, Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) ...................................................................... 16

*McCormack v. Twp. of Clinton*,
    872 F. Supp. 1320 (D.N.J. 1994) ................................................................. 26

*Meredith Corp. v. SESAC LLC*,
    No. 09-9177, 2011 WL 856266 (S.D.N.Y. Mar. 9, 2011) ...................................... 6, 13

*Minard Run Oil Co. v. U.S. Forest Serv.*,
    670 F.3d 236 (3d Cir. 2011) ...................................................................... 21

*Minard Run Oil Co. v. U.S. Forest Serv.*,
    No. 09-125, 2009 U.S. Dist. LEXIS 116520 (W.D. Pa. Dec. 15, 2009) ......................... 23

*Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*,
    69 F. App'x 550 (3d Cir. 2003) ................................................................... 2

*New Dana Perfumes Corp. v. Disney Store, Inc.*,
    131 F. Supp. 2d 616 (M.D. Pa. 2001) ............................................................ 18

*Nordetek Envtl. Inc. v. RDP Techs., Inc.*,
    677 F. Supp. 2d 825 (E.D. Pa. 2010) ............................................................ 26

iv

*Orson, Inc. v. Miramax Film Corp.*,
    836 F. Supp. 309 (E.D. Pa. 1993) ........................................................ 18

*Pharm. Care Mgmt. Ass'n v. Rowe*,
    307 F. Supp. 2d 164 (D. Me. 2004) ...................................................... 19

*Pharmacia Corp. v. Alcon Labs., Inc.*,
    201 F. Supp. 2d 335 (D.N.J. 2002) ...................................................... 18

*Research Found. of State Univ. of N.Y. v. Mylan Pharm. Inc.*,
    723 F. Supp. 2d 638 (D. Del. 2010) ..................................................... 23

*Rockland Mortg. Corp. v. S'holders Funding, Inc.*,
    835 F. Supp. 182 (D. Del. 1993) .......................................................... 18

*Singer Mgmt. Consultants, Inc. v. Milgram*,
    650 F.3d 223 (3d Cir. 2011) ................................................................... 2

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*,
    530 F.3d 204 (3d Cir. 2008) ................................................................. 15

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ................................................................. 16

*United States v. Singer Mfg. Co.*,
    374 U.S. 174 (1963) ............................................................................. 16

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) ............................................................................. 14

*W. Penn Allegheny Health Sys. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010) ................................................................... 16

*Whitfield v. Chartiers Valley Sch. Dist.*,
    707 F. Supp. 2d 561 (W.D. Pa. 2010) ................................................. 23

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) ........................................................... 11, 16

## OTHER AUTHORITIES

Bureau of Labor Statistics, U.S. Dep't of Labor, *CPI Inflation Calculator* .................................... 4

U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N,
    HORIZONTAL MERGER GUIDELINES ¶ 4.1 (2010) ........................................................ 4

## INTRODUCTION

SESAC's response to the Radio Music License Committee, Inc.'s (RMLC's) preliminary injunction motion starts with its oft-repeated mantra: small, little SESAC, which represents less than 3% of the songwriters and publishers in the U.S., cannot possibly be a monopolist or exercise market power when ASCAP and BMI represent the rest of the 97%. Thus, SESAC says, RMLC cannot establish a likelihood of success on the merits. But the size disparity between SESAC and ASCAP/BMI actually proves RMLC's point. It is undisputed that SESAC commands rates that are proportionately far in excess of what ASCAP and BMI get, and continually raises prices at will with no loss of sales. This happens precisely because, as SESAC readily admits, stations **must take a license from SESAC.** Stations cannot substitute a license from ASCAP or BMI or anyone else for a SESAC license. There could not be more clear evidence of RMLC's likelihood of success than the fact that an entity controlling only 3% of musical compositions can, without losing sales, command rates approaching (and getting closer every year to) those of entities that control 97% of works.

SESAC's fallback position is that, even if RMLC is right on the merits, this is all "just about money" so there cannot possibly be any irreparable harm. SESAC scoffs at the real world evidence from radio stations and claims that no business could possibly be irreparably injured by having to pay higher rates each year. It is easy for SESAC, sitting atop its $100+ million in annual revenue and recent $600 million private equity cash infusion, to mock the plight of the radio industry. RMLC looks forward to the opportunity to have this Court hear directly from actual radio station owners about how thin their operating margins are and how the gun that SESAC holds to their heads prevents them from operating their business in the best way they see fit. Extortion—pay whatever I demand or go bankrupt—threatens, by any definition, irreparable

harm.  That is why RMLC respectfully asks this Court to intervene and simply maintain the status quo pending the resolution of RMLC's claims.

## ARGUMENT

### I. SESAC HAS FAILED TO REBUT RMLC'S OVERWHELMING SHOWING OF ITS LIKELIHOOD OF SUCCESS ON THE MERITS

SESAC begins its attack by claiming that RMLC has not put forth sufficient evidence "to *prove* the allegations in [its] complaint."  Opp. at 4 (emphasis in original).  RMLC, of course, has no obligation to *prove* its claims to obtain a preliminary injunction, but, even if it did, RMLC has presented overwhelming evidence—which is largely undisputed—that SESAC has violated the antitrust laws.

SESAC misconstrues RMLC's burden in seeking a preliminary injunction—particularly at this early stage of the case when, due to SESAC's pending motion to dismiss, no discovery has yet taken place.  "[O]n an application for preliminary injunction, the plaintiff need only prove a **prima facie case**, not a certainty that he or she will win."  *Highmark, Inc. v. UPMC Health Plan*, 276 F.3d 160, 173 (3d Cir. 2001) (emphasis added).  The Third Circuit has held that "'likelihood' does not mean more likely than not"; it means only that the plaintiff has "a reasonable chance, or probability, of winning."  *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011).  Here, the largely undisputed evidence demonstrates far more than a prima facie case.[1]

---

[1]     SESAC criticizes RMLC for only submitting three declarations in support of its motion, but the law does not require any particular quantum of evidence to grant relief, as SESAC's own authority shows.  *Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*, 69 F. App'x 550, 554-55 (3d Cir. 2003) (upholding the grant of a preliminary injunction and citing only one witness's testimony as supporting a likelihood of success on the merits) (cited Opp. at 8).

**A.      RMLC Has Shown A Prima Facie Violation Of Section 2 Of The Sherman Act**

It is undisputed that RMLC can show a prima facie violation of Section 2 of the Sherman Act with evidence that SESAC (1) possesses monopoly power (2) that it willfully acquired or maintains "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) (quotation and citation omitted); Opp. at 9. RMLC has made more than a prima facie showing of both elements.

**1.      SESAC Ignores The Abundant Direct And Indirect Evidence Of SESAC's Monopoly Power**

SESAC's sole argument about monopoly power is that RMLC has not shown that SESAC has raised prices above "competitive levels." Opp. at 9. The Court can dispense with this argument easily.

The undisputed evidence—much of it provided by SESAC's own witness—shows that, every year for the last five years, SESAC has increased its analog and streaming prices by 8% and 20% respectively—compounded—without triggering any loss of sales. Oct. 31, 2013 Declaration of Patrick Collins (Collins Decl.) ¶ 4, Exs. 2, 5; Oct. 7, 2013 Declaration of William Velez (RMLC Decl.) ¶ 8; Oct. 7, 2013 Declaration of Kenneth H. MacDonald, Jr. (MacDonald Decl.) ¶ 9; Nov. 14, 2013 Declaration of Craig Eckert (Eckert Decl.) ¶ 5. Indeed, the price for SESAC's streaming license has *more than doubled* since 2008. Collins Decl. Ex. 5. The price of its analog (over-the-air) blanket license has increased by more than 35% in the same time frame. *Id.* Ex. 2. These rate increases eclipse the compound U.S. inflation rate of 9% during that

same period.[2]  All of this SESAC rate escalation took place during the Great Recession, which was not a growth period for the radio industry.  Nov. 14, 2013 Supplemental Declaration of William Velez (Supp. Velez Decl.) ¶¶ 5-6; Eckert Decl. ¶ 11.  In stark contrast to SESAC's 100+% and 35% rate hikes since 2008, the combined revenue of performing-rights organizations (PROs) ASCAP and BMI declined by some 40% between 2009 and 2012.[3]  Supp. Velez Decl. ¶ 6.  And as radio station owners have testified without contradiction, SESAC's rates are vastly out of proportion to those that other PROs charge.  Souza Decl. ¶¶ 3-4; Eckert Decl. ¶¶ 5-6.

Although SESAC has imposed meteoric price hikes, radio stations have not abandoned it and switched to licenses from ASCAP and BMI.  They cannot, because neither an ASCAP nor BMI license protects a station from infringement of SESAC-exclusive works.  Souza Decl. ¶ 2; MacDonald Decl. ¶ 2; Eckert Decl. ¶ 4; Collins Decl. ¶ 4 (confirming that 9,700 commercial radio stations in the U.S. have licenses from SESAC).  This is irrefutable **direct** proof that SESAC has monopoly power.  *See, e.g.*, *Broadcom Corp.*, 501 F.3d at 307 ("If a firm can profitably raise prices without causing competing firms to expand output and drive down prices, that firm has monopoly power.").  Although this alone is sufficient to prove monopoly power prima facie, there is more.

The federal antitrust agencies consider a firm to be a monopolist if it could profitably increase price by 5% without losing so many sales to interchangeable products to make the increase unprofitable.  U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines ¶ 4.1 (2010).  SESAC has profitably increased price by much more than 5% for both

---

[2]     Bureau of Labor Statistics, U.S. Dep't of Labor, *CPI Inflation Calculator*, http://www.bls.gov/data/inflation_calculator.htm (last visited Nov. 14, 2013) (based on the Consumer Price Index).

[3]     Indeed, because ASCAP and BMI are subject to a consent decree that prevents monopolistic behavior of the kind in which SESAC engages and that provides for a judicial rate-setting procedure, their rates provide a barometric indication of reasonable fees.

analog and streaming licenses each and every year for the past five years, and has not lost sales. Even the case on which SESAC relies, *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, makes clear that this result demonstrates monopoly power.   423 F.3d 374, 380 (3d Cir. 2005) (defining monopoly power as the ability to increase price above the competitive level "without inducing so rapid and great an expansion of output as to make the supracompetitive price untenable" (quotation and citation omitted)) (cited Opp. at 9).

SESAC's suggestion that its compounded rate increases are somehow nonetheless "competitive" makes no sense.  Opp. at 9.  Its prices cannot be competitive in any economically meaningful sense, because SESAC admits that it has no competitors.  SESAC stresses to radio stations that "[l]icenses with ASCAP and BMI DO NOT grant you authorization to use the copyrighted music of SESAC," warns that "those who perform copyrighted music represented by SESAC without the required permission may be . . . subject[] . . . to damages ranging up to $150,000 for each song performed," and explains that, "[s]ince a license with ASCAP and/or BMI does not grant authorization to publically perform songs in the SESAC repertory, most businesses obtain licenses with all three to obtain proper copyright clearance[.]"[4]  Supp. Velez Decl. Ex. A.  If one takes SESAC at its word, SESAC must have monopoly power because its only supposed "competitors" do not sell licenses that are substitutes for its own.  SESAC concedes that "RMLC has offered evidence showing that . . . SESAC's prices are supposedly disproportionate to those charged by ASCAP and BMI."  Opp. at 9.  SESAC produces no evidence to the contrary.

There is more evidence of SESAC's monopoly power.  SESAC has some 23,000 affiliates, but the total number of musical works in its repertory is a secret unknown to radio

---

[4]      SESAC, *Frequently Asked Questions:   General Licensing*, http://www.sesac.com/ Licensing/FAQsGeneral.aspx (last visited Nov. 14, 2013) (emphasis in original).

stations.  Supp. Velez Decl. ¶ 11; Eckert Decl. ¶ 5; Collins Decl. Ex. 7 (evidencing SESAC's obfuscation of the works it exclusively licenses).  Indeed, radio stations can neither confidently nor time-effectively determine which songs lie in SESAC's repertory.  Souza Decl. ¶ 5; MacDonald Decl. ¶ 4; Eckert Decl. ¶ 5; Nov. 14, 2013 Declaration of Steven R. Peterson (Peterson Decl.) ¶ 14.  No company in a competitive market could possibly refuse to disclose what it sells, and simultaneously sharply increase the price it demands for that product every year, without losing sales dramatically.  Peterson Decl. ¶¶ 14, 22, 38.  SESAC's price is based on threats, rather than on price- and quality-based competition.

Ultimately, SESAC does not deny and cannot escape the fact that its sharp annual rate hikes do not affect its sales.  That fact means both that those prices are supracompetitive and that SESAC has the power profitably to charge them.  *Accord Broadcom*, 501 F.3d at 307.

This direct evidence conclusively establishes SESAC's monopoly power.  But RMLC produced abundant indirect evidence as well.  Dr. Steven Peterson, who holds a doctorate in economics from Harvard, has studied the evidence, and concluded that the relevant product market is limited to SESAC's own unique repertory.[5]  Peterson Decl. ¶¶ 1, 5, 35-41.  That is because, as SESAC itself acknowledges, there is no substitute for a license to its portfolio.  *Id.* SESAC has 100% market share in that market.  *Id.*  This indirect evidence demonstrates that SESAC has monopoly power, as the Southern District of New York previously found.  *Meredith Corp. v. SESAC LLC*, No. 09-9177, 2011 WL 856266, at *5-10 (S.D.N.Y. Mar. 9, 2011) (finding, in denying a motion to dismiss, that SESAC's repertory was a plausible antitrust market

---

[5]      Unlike other, more complex antitrust cases, the facts here are so clear and the law that applies to them is so well-settled that this Court does not need an expert to explain how to define the relevant market or how to analyze SESAC's power in it.  SESAC cites no case holding that expert testimony is required, and offered no such testimony of its own.  Nonetheless, in light of SESAC's criticism of RMLC for not offering expert testimony (Opp. at 9), RMLC does so.

and that SESAC obviously had market power in it); *see also Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 481 (1992) (80% market share supports an inference of monopoly power); *Broadcom*, 501 F.3d at 315 (a factfinder may infer monopoly power when the defendant has a dominant share of the market).

### 2. SESAC Engaged In Wrongful Conduct To Maintain Its Monopoly

SESAC also argues that it created its monopoly lawfully and has not engaged in any wrongful conduct to maintain it.  Opp. at 9-10.  The evidence, again largely undisputed, belies this claim.  SESAC has (1) artificially created a strategic bottleneck via the aggregation of the works in its repertory, (2) intentionally obscured the content of its repertory so stations cannot, with confidence, program around it, and (3) refused to deal with radio stations on other than blanket license terms.  SESAC's effort to sanitize its conduct is unavailing.

### a. SESAC Created An Artificial Bottleneck

SESAC first claims that there is nothing wrong with its development of a strategic bottleneck repertory.  Opp. at 10.  But how a party comes to enjoy monopoly power matters under the antitrust laws.  *See, e.g.*, *Broadcom*, 501 F.3d at 307.  SESAC did not employ any superior "business acumen" to create its monopoly, nor is there anything creative or procompetitive about it.  SESAC merely cherry picked a collection of rights that were previously represented by BMI and ASCAP to create an artificial third toll that radio stations have to pay.  It deliberately and intentionally manufactured an *artificial* market in which it has a 100% market share precisely to be able to exercise monopoly power.  And it did so by aggregating individual licensing rights, that would otherwise be competitively available, into a collective and indispensable bundle.  It withdrew those rights from a market in which direct and other forms of licensing would have been available, and positioned itself as the sole gatekeeper to those rights.  Absent SESAC's monopolistic repackaging of those rights, the market at issue in this case would

include not only the blanket licenses currently available, but also direct licenses from SESAC affiliates and adjustable fee blanket licenses and per-program licenses. These are the licensing options that exist in the other PRO markets. RMLC Decl. ¶ 6; Supp. Velez Decl. ¶ 12; Peterson Decl. ¶¶ 11, 26.

SESAC implements its bottleneck scheme by refusing to provide discounts (known as carve-out rights) to radio stations that wish to negotiate direct licenses from its copyright-owning affiliates. Supp. Velez Decl. ¶ 13; Collins Decl. ¶¶ 4-12 (not disputing SESAC's refusal to provide carve-out rights). SESAC thus eliminates a radio station's incentive to purchase direct licenses to the few SESAC works that they play regularly, and eliminates any price competition between SESAC's affiliates. Eckert Decl. ¶ 8; Peterson Decl. ¶¶ 24-25. Having removed that option, SESAC then aggressively seeks out stations that innocently play even one SESAC work, and threatens enterprise-destroying willful copyright-infringement proceedings should they not take a license. *E.g.*, Souza Decl. ¶¶ 4-5; MacDonald Decl. ¶ 6; Eckert Decl. ¶¶ 9-10. After aggregating otherwise competitive rights, selecting those rights to make its portfolio indispensable, and ensuring that neither ASCAP nor BMI can offer a substitute license, SESAC demands ever-higher monopoly prices. Collins Decl. Exs. 2, 5; Eckert Decl. ¶ 5; Peterson Decl. ¶¶ 36-39.

Combined, this conduct is the antithesis of efficient behavior, and SESAC's conclusory claim that its monopoly power results from "a superior product" rings hollow. Opp. at 10. SESAC's blanket license is not superior to that of any other PRO. Indeed, ASCAP's and BMI's blanket licenses give radio stations permission to many more works, and thus give stations far greater value for the money. Souza Decl. ¶ 3; Eckert Decl. ¶ 5; Peterson Decl. ¶ 10; Supp. Velez Decl. ¶ 14. ASCAP and BMI also give stations an array of competition-ensuring choices of how

to license works in their repertories.  RMLC Decl. ¶ 6; Supp. Velez Decl. ¶ 12.  SESAC's licensing practices are "superior" only in that they more effectively extract supracompetitive rents from locked-in stations.  ASCAP and BMI, of course, may not engage in such conduct due to binding consent decrees.

>    **b.**    **SESAC Intentionally Makes It Impossible For Stations To Avoid Buying Its License**

SESAC next disputes that it obscures its repertory and claims that its online lookup tool adequately discloses the works in it.  Opp. at 14.  That is demonstrably false.  Anyone testing the claim could readily go online and verify that no radio station could plausibly rely upon the one-at-a-time lookup tool that SESAC offers to program around SESAC's music.

Radio stations could at least consider the option of tailoring their programming to avoid SESAC's exclusive works if SESAC provided a search function that enabled station managers efficiently and confidently to determine which works are, and are not, in SESAC's repertory.  Eckert Decl. ¶ 7.  If SESAC were truly interested in transparency, it could simply make a comprehensive list of its works available to radio stations; it does not do so, either online or otherwise.  Souza Decl. ¶ 4; MacDonald Decl. ¶ 4; Supp. Velez Decl. ¶ 9; Collins Decl. Ex. 7 (refusing to disclose exclusively licensed works to RMLC).  It does not even disclose how many works it has.  Supp. Velez Decl. ¶ 11; Collins Decl. Ex. 7.  Instead, SESAC touts a website search feature, Collins Decl. ¶ 4, that is hopelessly inadequate.  Souza Decl. ¶ 5; Peterson Decl. ¶ 14.  Beyond SESAC's telling disclaimer that it "makes no representations and/or warranties with respect to the accuracy or completeness of the information" on the site and that the "information . . . may change on a daily basis,"[6] the search function permits the user to search just one work— and even then only for one of "song," "writer," "publisher," or "artist"—at a time.  Supp. Velez

---

[6]    SESAC, *SESAC Repertory*, http://www.sesac.com/repertory/terms.aspx (last visited Nov. 14, 2013).

Decl. Ex. B.  And, of course, a station could not just check SESAC's repertory each day for each song, it would also have to check the repertories of ASCAP and BMI because some works are "shared" works and a license from ASCAP or BMI could permit the station to play the song even though it is also in SESAC's repertory.  Supp. Velez Decl. ¶ 10.

This lack of transparency is a cornerstone of SESAC's anticompetitive strategy.  SESAC knows that stations would have to engage in this laborious and time-consuming process every day if they wanted to try to avoid broadcasting works in SESAC's repertory.  *E.g.*, Eckert Decl. ¶ 7; Peterson Decl. ¶ 14.  Because this process makes it literally impossible for stations to tailor their programming with confidence to avoid SESAC's repertory, SESAC ensures that its blanket license is indispensable.  At the same time, SESAC makes the repercussions of even a single inadvertent performance of one of its exclusive works all too clear.  Souza Decl. ¶¶ 4-5; MacDonald Decl. ¶ 6; Eckert Decl. ¶ 9; RMLC Decl. ¶ 7; Supp. Velez Decl. Ex. A.

### c.  SESAC Refuses To Deal With Radio Stations On Other Than A Blanket Basis

SESAC does not dispute that it refuses to deal with RMLC's members except on a blanket license basis[7]; nor can it deny that refusing to deal is a well-recognized form of

---

[7]     SESAC claims that it has negotiated agreements with "1700" stations, but does not dispute that even for those 1700 it deals only on a blanket basis. Collins Decl. ¶ 12.  Moreover, SESAC tellingly does not specify how many entities own these 1700 stations.  Negotiations with just three entities could account for nearly 1500 of these stations alone. *See, e.g.*, Clear Channel, *Investors*, http://www.clearchannel.com/Investors/Pages/faq.aspx (last visited Nov. 14, 2013) (Clear Channel operates more than 850 stations);  Press Release, CBS Radio, *CBS Radio to Bring All-News Station to 99.1 FM in Washington, D.C.*, *available at* http://www.cbsradio.com/single-press/1392?filter=2011 (Nov. 16, 2011) (CBS Radio operates more than 120 stations); Ben Sisario, *Cumulus Media Will Buy a Radio Syndicator*, N.Y. TIMES (Aug. 30, 2013), *available at* http://www.nytimes.com/2013/08/31/business/media/cumulus-media-will-buy-a-radio-syndicator.html?_r=0 (Cumulus operates close to 500 stations).  In any event, SESAC does not even try to dispute that it deals on a take-it-or-leave-it basis with the other 8,000 stations.

exclusionary conduct.[8]  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 278-79 (3d Cir. 2012) (refusing to deal and exclusive dealing are "long recognized forms of exclusionary conduct"). Instead SESAC merely argues that its refusal to deal cannot be wrongful conduct because SESAC is merely "'excluding' its own copyright-holding affiliates."  Opp. at 11.  But that concedes the point:  SESAC's affiliates are competitors who have chosen to enter into a joint-selling arrangement in the form of SESAC.  It is hornbook law that such an organization, in licensing on behalf of its members, may not cut off direct licensing or otherwise eliminate competition among them.  *See BMI v. CBS, Inc.*, 441 U.S. 1, 23-24 (1979).  Yet, that is precisely what SESAC has done.  By ensuring that it is the sole licensor of works exclusively in its repertory, SESAC has created a bottleneck through which it alone sets licensing terms.  Contrary to SESAC's claim, RMLC's theory does not always require "that there be two sellers of licenses" to avoid violating the antitrust laws.  Opp. at 11.  A unilaterally-acting licensor may decide to license one, all, or none of its works.  But when thousands of competing licensors agree to appoint a single, common, exclusive selling agent, they cannot do so in a way that eliminates competition among them, as SESAC has done.  *See BMI*, 441 U.S. at 23-24.

SESAC does not dispute the factual accuracy of any of these practices, because it cannot. Instead, it resorts to diversion, arguing for pages that blanket licenses can be efficient.  Opp. at 1-3, 7, 10-11, 13.  But RMLC does not challenge the legality of blanket licenses; it is the refusal to offer any alternative to them, along with SESAC's accompanying conduct, omissions, and

---

[8]      SESAC disputes that it has refused to deal with RMLC as the representative of the radio industry.  Opp. at 12.  But the very email that SESAC cites shows that those 2009 discussions were not genuine negotiations by any stretch, and also shows that SESAC shut down any possibility for real compromise for at least the past four years.  Collins Decl. Ex. 7.  In any event, RMLC has made a prima facie showing of monopolization even if one could characterize SESAC's take-it-or-leave-it proposal in 2009 as an effort to "negotiate" with RMLC; there is ample other evidence of SESAC's wrongful conduct.

extortionate pricing, that form the antitrust violation.  SESAC cuts off direct licenses to the works in its repertory—thus eliminating competition between those works—takes anticompetitive steps, including concealment, to ensure that radio stations cannot avoid its repertory, threatens copyright damages of $150,000 per SESAC work played, and then exercises the monopoly power thus achieved by offering a Hobson's choice at an extortionate price.  If SESAC did not engage in this anticompetitive conduct, it could legitimately sell a blanket license, just as ASCAP and BMI do.  But that would mean sacrificing its monopoly power, so SESAC will not change its behavior voluntarily.

### B.    SESAC Has Not Rebutted RMLC's Prima Facie Showing That SESAC Has Violated Section 1 Of The Sherman Act

RMLC's prima facie proof if its Section 2 claim is enough, standing alone, to entitle it to a preliminary injunction.  But RMLC has established a prima facie Section 1 violation too. SESAC's attack on RMLC's Section 1 claim is merely a rehash of the losing arguments it has made in its pending motion to dismiss.  Because SESAC ignores RMLC's showing of how each of these arguments fails, *see* RMLC's Opposition to SESAC's Motion to Dismiss (Doc. No. 26), RMLC briefly recites that showing again here.

### 1.    SESAC Admits That It Engages In Concerted Action With Its Affiliates Within The Meaning Of Section 1

SESAC's primary argument is the falsehood that RMLC "cites no evidence at all in support of . . . an agreement," "the *sine qua non* of a Section 1 claim."  Opp. at 12-13.  But any agreement between two or more entities is sufficient to allege the two-party requirement of Section 1.  *Cf. Am. Needle, Inc. v. NFL*, 560 U.S. 183, 195 (2010) (key to finding concerted action is whether the arrangement "joins together separate decisionmakers," such that an agreement among "'separate economic actors pursuing separate economic interests . . . deprives the marketplace'" of competition among them (citation omitted)).  SESAC readily admits that it

12

and its affiliates "agree to allow SESAC to grant licenses authorizing others to perform their copyrighted works."  Opp. at 13.  *That* is the necessary predicate "agreement" under the antitrust laws.  Although SESAC ignores it, the Supreme Court has expressly held that these types of joint sales agreements via PROs "*plainly* involve concerted action in a large and active line of commerce" and are subject to Section 1 scrutiny.  *BMI*, 441 U.S. at 10 (emphasis added).  And the Southern District of New York has held not only that Section 1 applies to SESAC's operations, but that the plaintiffs in that case had stated an antitrust claim against SESAC under that provision.  *Meredith*, 2011 WL 856266, at *10-14.  There is therefore no dispute that the predicate agreement exists here.

### 2.    SESAC's Per Se Argument Is Wrong

SESAC next claims that its business practices cannot be *per se* illegal, *i.e.*, illegal regardless of its actual anticompetitive effects, because the Supreme Court has held that blanket licenses are subject to a rule of reason analysis.  Opp. at 13 (citing *BMI*, 441 U.S. at 20).  SESAC, once again, attacks a straw man.  To be sure, in *BMI*, the Supreme Court concluded that the specific blanket licenses offered by BMI and ASCAP should be analyzed under the rule of reason.   441 U.S. at 24.  But SESAC's licensing practices are quite different, so *BMI*'s rule-of-reason holding is irrelevant here.

SESAC consciously ignores the aspect of *BMI* that *is* relevant to this case.  The Supreme Court concluded that ASCAP and BMI's blanket licenses were not *per se* illegal precisely because prior antitrust consent decrees constrained ASCAP and BMI, and therefore consumers "had a real choice" between their blanket licenses and other licensing alternatives.  *BMI*, 441 U.S. at 24.  The Supreme Court emphasized the lack of "practical impediments preventing direct dealing," and observed that "[t]he individual composers" on whose behalf the PROs issue

blanket licenses never "agreed not to sell individually." *Id.* at 12, 23.  In other words, because there were "practical" alternatives to blanket licenses, offering them was not per se unlawful.

Precisely the opposite is true here:  There is no dispute SESAC refuses to offer any alternative to blanket licenses.  There is likewise no dispute that SESAC refuses to allow carve-outs, and that radio stations thus have no incentive to pursue individual licenses.  Stations have no choice at all, let alone real choice, because SESAC and its affiliates have constructed a practical and conspiratorial impediment to direct licensing.  Indeed, SESAC readily admits that it recruits affiliates precisely because they know that SESAC, unconstrained by the consent decrees that require ASCAP and BMI to offer real choice, can offer more money than those other PROs.  Collins Decl. ¶ 7 (SESAC is able to "secure license agreements that maximize the commercial value of the affiliate's intellectual property").

It has long been the law that concerted refusals to deal (or agreements to deal only on specific terms) among horizontal competitors—like SESAC and its affiliates—are *per se* illegal.  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212-13 (1959) (agreement among appliance manufacturers and distributors to deal with retailer only on highly unfavorable terms was a *per se* Section 1 violation); *Fashion Originators' Guild of Am. v. FTC*, 312 U.S. 457, 467-68 (1941) (agreement among clothing manufacturers, designers and suppliers only to sell to retailers on specific terms was *per se* unlawful under Section 1).

### 3.    SESAC Cannot Survive Rule Of Reason Scrutiny Either

SESAC devotes the bulk of its Section 1 argument to its claim that RMLC cannot show that SESAC's conduct violates the rule of reason.  Opp. at 13-15.  SESAC's argument all boils down to one point:  SESAC argues that efficiencies outweigh the anticompetitive effects of its

licensing behavior.[9]   *Id.* at 1-3, 7, 10-11, 13.   However, that would not immunize SESAC's behavior even if it were true (which it is not).   To avoid Section 1 liability, it is not enough merely to show some procompetitive benefits; a restriction on competition must be "fairly necessary" or "reasonably necessary" to achieve the claimed procompetitive benefit.   *See Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1248-49 (3d Cir. 1975).   The conduct that RMLC challenges is not remotely "necessary" to produce the pro-competitive benefits that SESAC claims.   The evidence conclusively shows that SESAC's refusal to grant direct and per-program licenses, refusal to meaningfully disclose its repertory, and decision to subject radio stations to meteoric annual rate increases backed up with the threat of willful-infringement claims cannot be "reasonably necessary" to achieve any of the benefits that flow from offering a blanket license.   That is indisputably so, because ASCAP and BMI both also issue blanket licenses, thus providing the full panoply of the efficiencies SESAC touts, without imposing such restrictions.   SESAC's unique restraints on trade have nothing to do with its ability to offer a blanket license; they exist only to achieve supracompetitive returns.   Peterson Decl. ¶¶ 25, 38, 48-49.

SESAC's opposition brief does not even try to address these facts and law.   Instead, it once again dodges, claiming that it has not harmed competition in a relevant antitrust market. Opp. at 13-14.   But raising prices, foreclosing competition and reducing consumer choice are all recognized harms to competition.   *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 226 (3d Cir. 2008) (plaintiff can prove anticompetitive effect by demonstrating "raised

---

[9]      SESAC absurdly suggests that it cannot "meaningfully affect[] competition among copyright holders" because only 23,000 copyright-owning affiliates comprise its membership. Opp. at 15.   If pooling thousands of competitors' works into a single licensor's hands, and cutting off direct licensing by licensees, cannot restrict competition, then nothing can.   Peterson Decl. ¶¶ 23-25.

prices," or the defendant's market power, and affirming jury verdict based on evidence of market power); *see also W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 100 (3d Cir. 2010) ("Anticompetitive effects include increased prices, reduced output, and reduced quality."); *LePage's, Inc. v. 3M*, 324 F.3d 141, 159-63 (3d Cir. 2003) (excluding potential competitors harms competition); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 194 (3d Cir. 2005) (reducing consumer choice is recognized competitive harm); *ZF Meritor,* 696 F.3d at 286 (market foreclosure from *de facto* exclusive dealing harms competition).  The evidence shows that SESAC has done all three—continuously increasing prices at will with no loss of sales, cutting off competition that would otherwise exist between and among its affiliates and giving stations a take-it-or-leave-it Hobson's choice of a SESAC license or bankruptcy.

Next, SESAC claims that enforcing intellectual property rights cannot be anticompetitive. Opp. at 13.  That is off-point, because RMLC is challenging SESAC's licensing practices, not its enforcement actions.  But it is not the law in any event.  The Supreme Court has consistently affirmed that firms can violate the antitrust laws in asserting patents or copyrights.  *See, e.g.*, *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2232 (2013) (citing *United States v. Singer Mfg. Co.*, 374 U.S. 174 (1963)) (competitors may not pool intellectual property rights to exclude others); *BMI*, 441 U.S. at 23-24 (it would be problematic for a PRO to make itself the sole licensor of copyrighted works in its repertory by cutting off consumer access to direct licenses).  Indeed, the Supreme Court made clear in *Actavis* that it is no defense that challenged practices do not seek to expand beyond the scope of the statutorily-conferred patent rights.  *Actavis*, 133 S. Ct. at 2232-34.

## II.   SESAC HAS NOT REBUTTED RMLC'S CLEAR SHOWING OF IRREPARABLE HARM

SESAC claims that RMLC's irreparable harm showing is too late and too little.   Neither is true.

### A.   SESAC's "Delay" Argument Is Baseless

SESAC first argues that because it has been inflicting mandatory rate increases on radio stations for a while now, it is too late for RMLC to try to hold the line.   Opp. at 15-16. Nonsense.   It is undisputed that when RMLC filed its complaint in October 2012, the radio industry was in year four of an agreed upon 5-year rate card.   Collins Decl. ¶¶ 6-7, 14, Exs. 2, 5. Thus, in October 2012, RMLC would have had to seek a mandatory injunction attempting to roll back an existing agreement, which would have been subject to the extraordinarily high burden required to obtain a mandatory preliminary injunction changing the status quo.   *See, e.g.*, *Doe v. Banos*, 416 F. App'x 185, 188 (3d Cir. 2010) ("[W]hen the preliminary injunction is directed not merely at preserving the status quo but, as in this case, at providing mandatory relief, the burden on the moving party is particularly heavy." (quotation and citation omitted)).   But because a year has passed since RMLC filed this case, the facts are now different.   The 5-year rate card will end next month and SESAC does not dispute that it is on the cusp of dictating a new 5-year take-it-or-leave-it deal to the radio industry.   It is that impending changed circumstance that makes RMLC's motion ripe now, and gives rise to RMLC's request to maintain the status quo.

SESAC's legal authorities are therefore inapposite.   Each involved a proposed injunction that would have changed rather than preserved the status quo, and none addressed a situation where, as here, the threat to the status quo only arose after the complaint was filed.   *See* cases

cited Opp. at 16.[10]   By contrast, in *GlaxoSmithKline Consumer Healthcare, L.P. v. Merix Pharmaceutical Corp.*, No. 05-898, 2005 U.S. Dist. LEXIS 30198, *26-28 (D.N.J. Sept. 13, 2005), the court granted a preliminary injunction even though the plaintiff had learned of the potentially infringing product 7 years prior to filing suit.   The court found there was no issue with the delay because the circumstances establishing the irreparable harm had developed only recently.   *Id.*   RMLC had hoped to avoid filing a preliminary injunction motion altogether, but SESAC elected to try to delay a prompt resolution of this case by filing a baseless motion to dismiss that has been pending for close to eight months.   That delay has brought the radio industry to the cusp of a new 5-year rate hike.   *Rockland Mortg. Corp. v. S'holders Funding, Inc.*, 835 F. Supp. 182, 199 (D. Del. 1993) (party did not unduly delay moving for preliminary injunction where it had hoped to avoid filing motion altogether).

## B.   RMLC's Declarants Are Representative Of The Industry's Dealings With SESAC

SESAC argues that testimony from RMLC's two radio station declarants, Kenneth MacDonald and Robert Souza, cannot justify an injunction that would apply to the entire radio industry because there is "no basis for concluding that [their] stations are similar to the many thousands of other stations."   Opp. at 17.   This is a strange argument given that SESAC itself has

---

[10]   In *Lanin v. Borough of Tenafly*, 515 F. App'x 114 (3d Cir. 2013), a borough adopted an ordinance turning what was a two-day street on which plaintiffs lived into a one-way road. Plaintiffs brought suit two years later, during which period the only new development was that the borough had begun to build a sidewalk.   *Id.* at 115-16.   In *Orson, Inc. v. Miramax Film Corp.*, 836 F. Supp. 309 (E.D. Pa. 1993), the company had refused to license movies before the complaint was brought and there was no change in factual circumstances in the intervening period.   In *Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335 (D.N.J. 2002), the plaintiff sought a preliminary injunction to prevent the use of a trademark that had been in use for over a year, but there were no allegations that the usage had changed at all during the year.   Finally, in *New Dana Perfumes Corp. v. Disney Store, Inc.*, 131 F. Supp. 2d 616 (M.D. Pa. 2001), there were no changes in factual circumstances, and the court explicitly limited its statement regarding timeliness to the trademark infringement context.

effectively admitted that 8,000 commercial radio stations are situated *exactly* like Mr. Souza's and Mr. MacDonald's stations; they all have been forced to capitulate to SESAC's take-it-or-leave contract offer with its non-negotiable rate card rates.  Collins Decl. ¶¶ 4, 12 (SESAC has negotiated with only 1700 of the 9,700 stations with which it deals).   Indeed, SESAC aggressively touts that a SESAC license is an unavoidable necessity for any radio station.  *See* Part I.A.1, above.

There is no magic number of declarants necessary to establish irreparable harm to a group.  Courts routinely grant preliminary injunctions to associations based on harm to their members without requiring a member-by-member showing that each will suffer irreparable harm.  *See, e.g.*, *Pharm. Care Mgmt. Ass'n v. Rowe*, 307 F. Supp. 2d 164 (D. Me. 2004) (granting status quo preliminary injunction to association without requiring evidence of harm as to each member); *Assoc. for Fairness in Bus., Inc. v. New Jersey*, 82 F. Supp. 2d 353 (D.N.J. 2000) (same); *C.H. v. Payne*, 683 F. Supp. 2d 865 (S.D. Ind. 2010) (same).  The Third Circuit expressly permits the court to "rest[] a preliminary injunction for many on the testimony of a few," "so long as the plaintiffs lay an adequate foundation from which one could draw inferences that the testifying plaintiffs are similarly situated—in terms of irreparable harm—to all the other plaintiffs."  *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) (cited Opp. at 17).  RMLC has laid that foundation and will do so again when its witnesses testify at the hearing on December 9th.

SESAC inexplicably dismisses the testimony of William Velez that Souza's and MacDonald's experiences with SESAC are representative of the industry's experience, even though Mr. Velez is the Executive Director of RMLC whose entire purpose is to represent the U.S. commercial radio industry in their licensing dealings with PROs.  RMLC Decl. ¶ 3; Supp.

Velez Decl. ¶ 2.  No one knows better than SESAC how broad and deep Mr. Velez's expertise is with respect to the radio industry's dealings with PROs; Mr. Velez used to be the President and COO of SESAC.  Supp. Velez Decl. ¶ 3.  But regardless, RMLC presents an additional declarant, Craig Eckert of Platte River Radio, who will testify to the same effect.  Mr. Eckert not only has more than 40 years of experience in the radio industry, he also owns five radio stations himself and is the past and current Chairman of the Nebraska Broadcasters Association, an organization that exists to promote the needs of radio and television broadcasters across the entire state.  Eckert Decl. ¶¶ 1, 10.

In the preliminary-injunction setting, the law permits witnesses to testify to the equivalent experiences of their counterparts when—as here—they have personal knowledge of their colleagues' circumstances.  *See, e.g.*, *Adams*, 204 F.3d at 487; *see also Hinckley v. Kelsey-Hayes Co.*, 866 F. Supp. 1034, 1044 (E.D. Mich. 1994) (granting preliminary injunction despite defendant's complaint that "plaintiffs have only presented an affidavit from one of the two named retirees who represent the proposed class of retirees concerning the injury that they would suffer").  Further, evidence that may not meet the admissibility requirements for summary judgment or trial is permitted at a preliminary injunction hearing, where the "procedures . . . are less formal and evidence . . . is less complete."  *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004); *Chosen 300 Ministries, Inc. v. City of Phila.*, No. 12-3159, 2012 U.S. Dist. LEXIS 112046, at *61 n.17 (E.D. Pa. Aug. 9, 2012) (considering hearsay testimony regarding likely effects of City's proposed regulation).

### C.    SESAC Cannot Avoid The Clear Irreparable Harm It Is Inflicting On Radio Stations

It is undisputed that SESAC gives radio stations a Hobson's choice:  pay whatever rate SESAC demands or face bankruptcy from copyright infringement fines and litigation costs.

SESAC tries to dismiss this as "just a dressed up complaint about higher prices."  Opp. at 21.
But SESAC is deliberately missing the point.  Mr. Souza and Mr. Eckert have testified that just
one $150,000 copyright infringement fine could put them out of business and multiple fines
could force Mr. MacDonald to declare bankruptcy.  To put that in perspective for the Court, if
Mr. Souza and Mr. Ekert were accidentally to broadcast the local high school marching band's
rendition of Neil Diamond's 'Sweet Caroline' just *one* Friday night while broadcasting the local
high school football game, their stations would be out of business.  Whether it would take one
act of infringement or five to put a given broadcaster out of business, it is clear that the power
that SESAC wields over people in the business of playing music is astounding.  It is, of course,
well settled that conduct that threatens a firm's existence constitutes irreparable harm.  *Minard
Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011) ("As a general matter, 'a
purely economic injury, compensable in money, cannot satisfy the irreparable injury
requirement,' but 'an exception exists where the potential economic loss is so great as to threaten
the existence of the movant's business.'" (citations omitted)); *see also Doran v. Salem Inn, Inc.*,
422 U.S. 922, 932 (1975) ("[R]espondents alleged . . . that absent preliminary relief they would
suffer a substantial loss of business and perhaps even bankruptcy.  Certainly the latter type of
injury sufficiently meets the standard for granting interim relief . . . ."); *Cyber Promotions, Inc.
v. Apex Global Info. Servs., Inc.*, No. 97-5931, 1997 U.S. Dist. LEXIS 15344, at *7 (E.D. Pa.
Sept. 30, 1997) ("Cyber's business will be irreparably harmed by being forced into dissolution or
bankruptcy unless it is reconnected by AGIS immediately.").

The Hobson's choice that SESAC dictates to the radio industry (which is clearly
evidenced by the fact that 9,700 stations have felt the need to take a license from SESAC) is
sufficient, by itself, to constitute irreparable harm for the preliminary injunction.  *See Hinckley*,

866 F. Supp. at 1044 (finding irreparable harm because plaintiffs, whose benefits had been cut, "will be forced to choose between paying for needed medical procedures and paying for basic necessities" and because "they would have to absorb part of the cost of the care under defendant's modified benefits plan").  But RMLC has shown more.

SESAC's brief mocks RMLC's declarants, denigrating the suggestion that its proposed license fee increases could impact the way they do business.  Opp. at 19.  SESAC's apparent lack of familiarity with the realities of how the U.S. commercial radio industry operates is surprising. These stations operate on very thin margins, with no cushion to absorb limitless price increases. Many small stations operate on shoestring budgets, paying bills month-to-month based on an unpredictable flow of advertising revenue.  Because stations must have a SESAC license, each time SESAC demands more money, they have to cut costs elsewhere to pay SESAC.  RMLC looks forward to the Court hearing directly from its witnesses about their business realities.

By focusing solely on the raw dollar amount of its proposed rate increases to individual stations, SESAC ignores that the way in which it wields its pricing power indisputably affects how station owners operate their businesses, including their programming and capital improvements decisions.  The threat of irreparable harm stems not merely from the impending 5-year rate card rate increases, but also from SESAC's ability to demand even more money from a station whenever it wants, which those stations have no choice but to pay.  Mr. MacDonald and Mr. Eckert are classic examples.  In August 2013, SESAC unilaterally concluded that Mr. MacDonald's stations had not been paying enough and demanded $10,000 in purported back payments and an increase in license payments going forward.  MacDonald Decl. ¶ 9.  In 2011, SESAC similarly threatened Mr. Eckert with a massive fee hike after arbitrarily asserting, with no evidence, that Mr. Eckert was receiving more than $40 per one-minute advertising spot (the

basis on which SESAC calculates its rates), when in reality Mr. Eckert received about $11 for such a spot. Eckert Decl. ¶ 13, Ex. A. In both instances, the stations had no recourse when they disagreed with SESAC. They were at SESAC's mercy and had to pay whatever SESAC demanded.[11] The ever present threat of SESAC showing up out of nowhere with its hand out demanding more money prevents businesses from being able to plan for the future with certainty. That is irreparable harm. RMLC Motion for Preliminary Injunction at 10-11 (Doc. No. 30-1).

Although RMLC has presented ample evidence of irreparable harm, its overwhelming showing on likelihood of success means that the Court should grant the preliminary injunction even if it concludes that the showing of irreparable harm is not as strong as the showing on likelihood of success. It is well settled that courts must "balance" the four preliminary injunction factors and that, although a movant must satisfy all four factors, an overwhelmingly strong showing on one can compensate for a slightly lesser showing on another. *Whitfield v. Chartiers Valley Sch. Dist.*, 707 F. Supp. 2d 561, 564 (W.D. Pa. 2010) (granting preliminary injunction after concluding that "[a]ll of the above factors are balanced with regard to any final decision and the strength of any one factor may affect the necessary showing with regard to another"); *Minard Run Oil Co. v. U.S. Forest Serv.*, No. 09-125, 2009 U.S. Dist. LEXIS 116520, at *62 (W.D. Pa. Dec. 15, 2009) (same); *Research Found. of State Univ. of N.Y. v. Mylan Pharm. Inc.*, 723 F. Supp. 2d 638, 646 (D. Del. 2010) ("Although these latter three factors weigh only slightly in favor of Plaintiffs, on the whole the factors the Court must consider in exercise of its discretion justify granting Plaintiffs the extraordinary relief they seek." (citing *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993), for the proposition that, "[i]f a preliminary injunction is granted

---

[11]    SESAC ultimately backed away from its increased rate demand to Mr. Eckert, but the whole experience served only to solidify to Mr. Eckert how truly at SESAC's mercy he was. Eckert Decl. ¶ 13.

by the trial court, the weakness of the showing regarding one factor may be overborne by the strength of the others")).

## III.    THE BALANCE OF HARMS FAVORS RMLC

The minimal status quo injunction RMLC seeks will greatly protect radio stations and impose no comparable burden on SESAC.  Nonetheless, SESAC claims that, even if RMLC is likely to succeed on the merits and even if radio stations are suffering irreparable harm, the Court still should not keep the status quo in place because that would "prevent SESAC from doing business the way that it pleases."  Opp. at 26.  If that were enough to defeat a preliminary injunction then no court would ever issue one.  By definition, an injunction prevents a business from doing what it otherwise would like to do.  The law, not surprisingly, does not support SESAC's position.  *Kos Pharm.*, 369 F.3d at 728 ("[A] party 'can hardly claim to be harmed [where] it brought any and all difficulties occasioned by the issuance of an injunction upon itself.'" (citation omitted)).

SESAC does not offer any evidence that an injunction would actually prevent it from doing anything.  The best that SESAC can offer is a halfhearted statement from Patrick Collins that, "[i]f SESAC receives less in radio license fees, SESAC will have less money available to pay out in royalties."  Collins Decl. ¶ 31.  But Mr. Collins does not say SESAC's extraordinary profits under the 2013 rates would be insufficient to undertake any specific business plans or to attract its desired number of new affiliates in 2014 or beyond.  With the dearth of evidence showing hardship to SESAC in continuing to charge its existing rates, and the ample evidence of serious irreparable injury to the radio industry, SESAC's hardship claim rings hollow.  Opp. at 26.

It is worth remembering how limited an injunction RMLC really seeks.  RMLC merely asks to keep the status quo in place, holding rates at the 2013 levels that SESAC itself chose and

unilaterally imposed on the industry.  Those rates are indisputably the highest that SESAC has

ever charged.  Collins Decl. Exs. 2, 5.  SESAC does not even try to argue that it is not highly

profitable at its current rates, much less that holding to the status quo will pose any threat to its

profitability.  That stands in stark contrast to the testimony of RMLC's witnesses.  *E.g.*, Eckert

Decl. ¶¶ 11-12.  The equities point in only one direction, and that is toward RMLC.

## IV.   SESAC DOES NOT CREDIBLY DISPUTE THAT THE PUBLIC INTEREST FAVORS AN INJUNCTION

Finally, SESAC resorts to an irrelevant argument to stave off an injunction, asserting that

public policy disfavors judicial rate-setting.  Opp. at 27.  But the requested injunction does not

ask the Court to engage in price regulation.  Rather, RMLC simply asks the Court to maintain the

status quo—which is highly profitable to SESAC—pending the outcome of this litigation.  Under

the proposed injunction, the license rates would stay at the level at which SESAC itself set them.

SESAC's two-page discussion of ASCAP and BMI's judicial rate-setting procedure is simply

irrelevant to the preliminary injunction analysis.  Opp. at 27-29.  To be sure, SESAC's 2013 rates

are monopolistic, and at the end of this case RMLC will ask the Court to impose a comparable

mechanism for resolving disputes over reasonable rates.  But that is not an issue presented on

this motion.

## V.   RMLC SHOULD NOT HAVE TO POST A BOND, BUT WILL DO SO IF THE COURT DETERMINES IT IS NECESSARY

Contrary to SESAC's claims (Opp. at 29-30), RMLC should not have to post a bond at

all, or should only have to post a minimal bond, to secure its sought preliminary injunction.

*Elliott v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996) ("Where the balance of . . . equities weighs

overwhelmingly in favor of the party seeking the injunction, a district court has the discretion to

waive the Rule 65(c) bond requirement.").  The amount of a bond must be limited to the amount

necessary to compensate the enjoined party if it turns out that the injunction should not have

issued.  *See Nordetek Envtl. Inc. v. RDP Techs., Inc.*, 677 F. Supp. 2d 825, 845-46 (E.D. Pa. 2010) (describing its duty as "determining what, if any, 'pecuniary injury' [defendants] are at practical risk of incurring during the pendency of this preliminary injunction"); *McCormack v. Twp. of Clinton*, 872 F. Supp. 1320, 1328 (D.N.J. 1994) (refusing to require a bond for preliminary injunction where "imposition of an injunction imposes no risk of monetary harm to defendant").  Here, it is clear that amount is zero or almost zero.  As the above discussion shows, SESAC would always have the power to raise its rates after the injunction is lifted with no risk of loss of sales.  In those circumstances, as today, radio stations would have no choice but to pay the increased rates.  If the Court grants RMLC's motion, the parties can brief the appropriate amount, if any, of a bond.

## CONCLUSION

For the preceding reasons, the Court should grant RMLC's motion for a preliminary injunction and maintain the *status quo*.

Dated:  November 15, 2013      Respectfully submitted,

               s/ Margaret M. Zwisler
               Margaret M. Zwisler (*pro hac vice*)
               Jennifer L. Giordano (*pro hac vice*)
               LATHAM & WATKINS LLP
               555 Eleventh Street, N.W., Suite 1000
               Washington, D.C. 20004-1304
               Telephone: (202) 637-2200
               Facsimile: (202) 637-2201
               Email: Margaret.Zwisler@lw.com
               Email: Jennifer.Giordano@lw.com

               Alfred C. Pfeiffer, Jr. (*pro hac vice*)
               LATHAM & WATKINS LLP
               505 Montgomery Street, Suite 2000
               San Francisco, CA 94111-6538
               Telephone: (415) 391-0600
               Facsimile: (415) 395-8095
               Email: Al.Pfeiffer@lw.com

               Peter J. Mooney
               WHITE & WILLIAMS LLP
               1650 Market Street
               One Liberty Place, Suite 1800
               Philadelphia, PA 19103-7395
               Telephone: (215) 864-7164
               Facsimile: (215) 789-7664
               Email: mooneyp@whiteandwilliams.com

               Attorneys for Plaintiff
               Radio Music License Committee, Inc.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that, on November 15, 2013, a true and correct copy of the foregoing PLAINTIFF RADIO MUSIC LICENSE COMMITTEE, INC.'S REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION was served on all counsel of record by the Court's electronic filing system (CM/ECF).

<u>s/ Margaret M. Zwisler</u>
Margaret M. Zwisler (*pro hac vice*)