

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RADIO MUSIC LICENSE | : | CIVIL ACTION |
| COMMITTEE, INC., | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | No.: 12-cv-5807 |
| | : | |
| SESAC INC., et al., | : | |
| **Defendants.** | : | |

FILED

DEC 2 3 2013

MICHAEL E. KUNZ, Clerk
By____ Dep. Clerk

## REPORT AND RECOMMENDATION

**LYNNE A. SITARSKI**                    **DATE:  December 20, 2013**
**UNITED STATES MAGISTRATE JUDGE**

        Pending before this Court is Plaintiff Radio Music License Committee, Inc.'s Motion for

a Preliminary Injunction against Defendants SESAC, Inc., SESAC, LLC, and SESAC Holdings,

Inc. (Doc. No. 30).  The instant matter was referred to this Court by the Honorable C. Darnell

Jones, II, by Order dated October 9, 2013 to prepare a Report and Recommendation.  (Doc. No.

31).  For the following reasons, this Court respectfully recommends that the motion be **DENIED**.


## I.      PROCEDURAL HISTORY

        Plaintiff Radio Music License Committee, Inc. ("Plaintiff" or "RMLC") initiated this

litigation on October 11, 2012, filing a Complaint on behalf of its members against Defendants

SESAC, Inc., SESAC, LLC, and SESAC Holdings, Inc (collectively "SESAC" or "Defendants").

(Doc. No. 1).  In their Complaint, Plaintiff alleges that Defendants have engaged in improper

conduct that violates Section 1 (Counts I and II) and Section 2 (Count III) of the Sherman Act, 15

U.S.C. §§ 1 and 2, and Section 16 of the Clayton Act, 15 U.S.C. § 26.  *See id.* at ¶ 7.  On

December 17, 2012, Defendants filed a Motion to Dismiss for Failure to state a claim.  (Doc. No.

23).

On October 7, 2013, Plaintiff filed a Motion for Preliminary Injunction, seeking to enjoin

Defendants from "imposing additional rate increases during the pendency of this litigation."

(Doc. No. 30 at 2).  On November 1, 2013, Defendants filed a Response in Opposition to

Plaintiff's Motion for a Preliminary Injunction.  (Doc. No. 34).  On November 15, 2013,

Plaintiff's filed a Reply.  (Doc. No. 43).  On December 9-11, 2013, I conducted a preliminary

injunction hearing at which testimony was taken from various fact and expert witnesses. The

parties have submitted proposed findings of fact and conclusions of law.


II.     **PROPOSED FINDINGS OF FACT**[1]

A.      **Overview of Dispute**

1.      This case involves a dispute between a "Performing Rights Organization" (PRO) and
        radio stations, represented collectively by RMLC. The parties' general relationship has
        been shaped, in large part, by the Copyright Laws.  Under the Copyright Act, a copyright
        owner has various exclusive rights over their copyrighted work. Compl. ¶ 15.
        Importantly, the rights are discrete, allowing each individual right within the "bundle" of
        rights to be "transferred or retained separately by the copyright owner." *N.Y. Times CO.
        v. Tasini*, 533 U.S. 483, 495-96, 121 S. Ct. 2381, 150 L.Ed. 2d 500 (2001).  Among these
        rights are the right to publicly perform musical works. *See* N.T. 12/9/13 Velez at 26; *see
        also* 17 U.S.C. § 106.

---

[1] In making these proposed Findings of Fact, I have relied upon the pleadings, the
evidence and testimony offered at the hearing, and the full record (including declarations
submitted with the briefs).  These Findings of Fact reflect this Court's credibility determinations.
Fed. R. Civ. P. 52; *Bimbo Bakeries USA, Inc., v. Botticella*, No. 10-0194, 2010 U.S. Dist. LEXIS
68990 at *22-23, n.1 (E.D. Pa. Feb. 9, 2010) (*citing Inwood Labs., Inc. v. Ives Labs., Inc.*, 456
U.S. 844, 855, 102 S. Ct. 2182, 72 L.Ed. 2d 606 (1982)).

2.    If a radio station wishes to publicly perform (i.e. broadcast) a musical work, it must obtain authorization from the copyright holder. N.T. 12/9/13 Velez at 27. In the case of a radio station, they usually obtain such an authorization by paying a fee for a non-exclusive license to, *inter alia*, publicly perform the song for a period of time.

3.    Copyright holders (i.e. composers) may license their public performance rights directly to radio stations, but this is rarely done.[2] N.T. 12/9/13 Velez at 27. PRO's, such as the defendant SESAC, serve as an intermediary between composers and the people who wish to play their works, including radio stations. N.T. 12/10/13 Collins Direct at 74. PROs usually operate by obtaining permission from a copyright holder to license their work, bundling together all the works they have permission to license, and then entering into licensing agreements with radio stations that allow them to perform the entire bundle of works. The licensing practices of SESAC generally follow this model, and are being contested in this litigation.

**B.    The Relevant Parties**

4.    Plaintiff RMLC is a 501(c)(6) non-profit Tennessee corporation with a principal place of business in Tennessee. Compl. ¶ 11. William Velez is the executive director of RMLC and responsible for the day-to-day operations of the organization. N.T. 12/9/13 Velez at 18. Mr. Velez testified that RMLC represents the interests of around 10,000 radio stations by, *inter alia*, negotiating the licenses that allow radio broadcasters to publicly perform copyrighted works.[3] *Id.* at 22. RMLC's mission is to negotiate such licenses at a fee that will benefit its members and the commercial radio industry in general. *Id.* at 24. RMLC obtains authority to negotiate licenses on behalf of radio stations by sending out forms that stations complete and return to RMLC, authorizing RMLC to negotiate on

---

[2]    "It would be extraordinarily time-consuming and expensive . . . if each music user (such as a radio station) had to negotiate a separate agreement with the holder of the copyright in each work the user wished to perform." Def. Resp. at 2. Indeed, Plaintiff's expert Dr. Peterson testified that a PRO's ability to provide "one stop" shopping for desired musical rights reduces the transaction costs associated with obtaining rights to perform copyrighted music. Peterson Decl. ¶ 9. In other words, using a PRO for licensing purposes is more efficient and cost-effective.

[3]    While RMLC represents around 10,000 radio stations, only 6,500 are "direct" members. N.T. 12/9/13 Velez at 23. The remaining 3,500 stations are not members, but still have to pay fees for RMLC's operational expenses. *Id.* at 24. These stations are referred to as "bound" stations, and must pay fees as a result of a court order that was issued to stop "freeloading" by non-members; that is: non-members receiving the benefits of RMLC despite not paying any of their operational expenses. *Id.*

their behalf.[4]  *Id.* at 25.

5.    SESAC is a for-profit "Performing Rights Organization;" an organization that represents
      song composers who themselves own copyrighted works.[5] *See* 17 U.S.C. §
      114(d)(3)(E)(ii) (a performing rights society is an "association or corporation that licenses
      the public performance of . . . musical works on behalf of the copyright owner"). SESAC
      does not own copyrights itself. Rather, it licenses rights held by songwriters and
      publishers (collectively "affiliates") and distributes certain fees from those licenses
      ("royalties") to those affiliates. N.T. 12/9/13 Velez at 19. Thus, Radio Broadcasters must
      pay for licenses from SESAC in order to publicly perform copyrighted works of SESAC
      affiliates.

6.    Including SESAC, there are three major PROs in the United States. N.T. 12/9/13 Velez
      at 29. The American Society of Composers, Authors and Publishers ("ASCAP") and
      Broadcast Music, Inc. ("BMI") are the other two PROs; they are not parties to this
      litigation. *Id.* at 20.

7.    ASCAP is a non-profit membership association. N.T. 12/9/13 Velez at 33. Copyright
      owners who enter into agreements with ASCAP to allow them to license their public
      performance right are referred to as "members." N.T. 12/9/13 Velez at 28. ASCAP has
      around 435,000 members. *Id.* ASCAP's repertory contains around 8.5 million
      copyrighted works.[6] *Id.*

8.    BMI is a for-profit corporation that operates like a non-profit. N.T. 12/9/13 Velez at 34.
      In other words, their operating model is similar to ASCAP's in that their operating
      expenses are taken off the top of their total revenue and the remaining portion is
      distributed back to their writers and publishers. *Id.* Copyright owners who enter into
      agreements with BMI to allow them to license their public performance right are referred
      to as "affiliates." *Id.* at 28. BMI has around 600,000 affiliates and 7.5 million works in
      their repertory. *Id.* at 33; *see also* Compl. ¶ 20.

9.    In 1941, the U.S. Department of Justice brought antitrust lawsuits against ASCAP and
      BMI, alleging antitrust violations on account of their use of blanket licensing. *See United
      States v. ASCAP*, 1940-43 Trade Cases ¶ 56,104 (S.D.N.Y. 1941); *United States v.*

---

      [4] Prior to 2009, RMLC had never sought permission from radio stations to represent
them in negotiations with SESAC. N.T. 12/9/13 Velez at 26.

      [5] RMLC's suit is against SESAC, Inc.; SESAC, LLC; and SESAC Holdings, Inc. RMLC
and Defendants refer to the defendants collectively as "SESAC," this Court shall do the same.

      [6] In this context, a "repertory" constitutes the PRO's collection of compositions that fall
under the PRO's representation. N.T. 12/10/13 Collins Direct at 75.

*Broadcast Music Inc.*, 1940-43 Trade Cases ¶ 56,096 (E.D. Wis. 1941). Both ASCAP and BMI entered into antitrust consent decrees with the government to end the cases. The consent decrees have been modified numerous times, but endure to this day. N.T. 12/9/13 Velez at 35. ASCAP's consent decree was last amended in 2001, while BMI's was last amended in 1994. *ASCAP*, 2001 WL 158999 (S.D.N.Y. June 11, 2001); *BMI*, 1994 WL 90162 (S.D.N.Y. Nov. 18, 1994). The consent decrees subject ASCAP and BMI to certain antitrust constraints and regulatory oversight, such as judicial review of their rates ("rate courts") and certain restrictions on their relationships with their affiliates. N.T. 12/9/13 Velez at 35-36.

10. SESAC is the smallest of the three PROs. N.T. 12/10/13 Collins Direct at 75. Unlike the other two PROs, SESAC is a for-profit corporation. SESAC has around 30,000 affiliates and 250,000 to 400,000 songs in their repertory. N.T. 12/10/13 Collins Direct at 79; N.T. 12/10/13 Collins Cross at 9.

### C.   Licensing Music in the Radio Industry

#### 1.   Types of Music Usage by Radio

11. Radio stations publicly perform music they are licensed to use in various ways. Featured usage occurs when stations broadcast a song and it is meant to be the prime focus of the listener. N.T. 12/9/13 Velez at 27. Music is also contained in commercials that radio stations play. *Id.* Stations also broadcast "ambient music, which might occur when a radio station broadcasts a high school football game and the high school band is playing in the background." *Id.* at 27; *see e.g.* N.T. 12/9/13 Eckert at 141. Other broadcasts include "bumpers," which is incidental music coming in and out of commercials, and radio program "theme songs." *Id.*

11. Importantly, a radio station needs a public performance license to play a musical piece for any reason, including those listed above. *Id.*

12. The amount of control stations have over the music they broadcast varies. Generally, stations can decide for themselves what feature music they play. N.T. 12/10/13 Peterson at 63; Peterson Decl. ¶ 14. However, some feature music is played by "syndication." N.T. 12/9/13 MacDonald at 56. In that case, music selection is done by a syndicator – a person who offers radio stations pre-selected programming via a satellite. *Id.*; *see also* N.T. 12/10/13 Schmalensee at 39-40.

13. Radio stations earn a majority of their income by playing commercial advertisements on the radio. *See* 12/9/13 Eckert at 143. As a practical matter, they have no control over the music played in commercials, unless the radio station itself produced the commercial. N.T. 12/9/13 MacDonald at 62. For the most part, advertisements come to a radio station

from a third party, such as an advertising agency hired by a client. *Id.* Stations cannot control what music is played in these commercials, and often cannot identify certain music, such as advertising jingles. *Id*; N.T. 12/9/1 Velez at 92; N.T. 12/10/13 Schmalensee at 40.

14.    Radio stations cannot control ambient or background music that is played while a station broadcasts unscripted events (i.e. a football game). N.T. 12/9/13 Velez at 96.

### 2.    Types of Licenses Offered by PROs

15.    PROS can offer a number of different types of licenses. Compl. at ¶ 18.   The standard license offered by PROs is the blanket license.  A blanket license gives the music user (the licensee) the right to perform all of the works in the repertory of that particular PRO for a pre-determined license fee (i.e. without regard for how many musical works are actually publicly performed). N.T. 12/10/13 Collins Direct at 77.

16.    A "per-program" license, also known as a "program-period license," is an alternative to the blanket license.  This type of license accommodates stations that play less ASCAP and BMI music during particular programs. N.T. 12/9/13 Velez at 32.  It allows certain stations (i.e. stations airing talk and/or news shows) to pay less in licensing fees than they would pay for blanket licensing. *Id.*  Unlike a blanket license, a station must report their actual music usage to the PRO. *Id* ASCAP and BMI offer these types of licenses.[7]  For ASCAP and BMI, the current per-program license rate is .2985% of revenue, which is around a 82.6% discount from the blanket license fee, which is 1.7% of station revenue. *Id.* at 51.

17.    Another licensing option is the "direct license."  In direct licensing, a licensee bypasses the relevant PRO and purchases a license directly from the copyright owner. N.T. 12/9/13 Velez at 30.  All three PROs permit their affiliates to enter into direct licensing agreements. *See* N.T. 12/10/13 Collins Cross at 5.  Although technological innovation continues to make it more feasible for the music user to consider direct licensing on a larger scale, few stations today obtain direct licenses from composers. N.T. 12/9/13 Velez at 49.

18.    An "adjustable-fee blanket license" (AFBL) is a blanket license that has been discounted to take into account any direct licenses that the station may have obtained.  N.T. 12/9/13 Velez at 38.  Currently, none of the three PROs offer this type of license. *Id.* at 48.

---

[7] SESAC offers an "all talk" amendment for stations that have a news talk format.  This license provides a 75% discount on the blanket license fee. 12/9/13 Velez at 60.  In contrast to the ASCAP and BMI per-program licenses, stations do not have to report the amount of music used.

19.    Licenses also differ on the types of platforms on which musical compositions may be played. ASCAP and BMI's standard blanket license allows a radio station to perform the songs in their repertory on analog (on air), digitally, or on a website. *See* PX 12-13 (ASCAP and BMI licenses).   In contrast, SESAC's standard license covers only analog broadcasting. *See* N.T. 12/9/13 Velez at 59.  SESAC offers separate addenda authorizing performance of SESAC music on websites or via digital broadcasts. *See* N.T. 12/9/13 MacDonald at 71.

### 3.    Radio Stations Licensing Practices

20.    Radio stations typically obtain blanket licenses from all three PROs.  N.T. 12/9/13 MacDonald at 66; N.T. 12/9/13 Eckert at 146.  This is due, in part, to their lack of control over broadcasting ambient music and music played in commercials.  Thus, stations typically procure a blanket license from all three PROs, to ensure that the station does not subject itself to a copyright infringement suit. *See* Souza Dep. at 73-74.

21.    Kenneth MacDonald, Jr., is the owner and Chief Executive Officer of MacDonald Broadcasting.  MacDonald Decl ¶. 1.  MacDonald Broadcasting owns and operates eight radio stations in Lansing, Saginaw, and Bay City, Michigan.  N.T. 12/9/13 MacDonald at 50.  Seven of those radio stations primarily broadcast feature music most of the day, along with commercials.  Each of these seven stations has a blanket license from all three PROs. *Id.* at 66.  MacDonald Broadcasting also has an all talk station: WILS. *Id.* at 70. WILS also has a blanket license from SESAC, but qualifies for the "all talk" amendment, meaning that the blanket license is discounted by 75%. *Id.*; *see also* PX-4 ("WILS talk license from SESAC").  Additionally, WILS streams their programming on their website, and thus also holds a website license from SESAC. *Id.* at 71.  MacDonald Broadcasting does not have a separate website license from BMI and ASCAP because the ASCAP and BMI blanket licenses cover website streaming. *Id.* at 72.

22.    Craig Eckert is part-owner, Vice President and General Manager of Platte River Radio ("Platte River").[8]  N.T. 12/9/13 Eckert at 129.  Platte River consists of five radio stations in Nebraska.  Two of Platte River's stations (KLIQ and KKPR) broadcast predominantly feature music and commercials. *Id.* at 133-134.  Two of Platte River's stations (KXPN and KICS) are all-talk stations that simulcast syndicated ESPN sports talk and broadcast local high school sports near each station's respective location.[9] *Id.* at 139-40.  Platte River's fifth station (KAHS) plays a variety of programming, ranging from news and information to sports to music. *Id.* at 137.  Each Platte River station also has a website. *Id.* at 146.  All five stations have agreements with ASCAP, BMI and SESAC. *Id.*  The

---

[8]  Mr. Eckert is also the chairman of the Nebraska Broadcaster's Association.

[9]  Simulcast means that the same programming that is aired on KXPN is also aired on KICS.

three stations that play full length feature songs (KLIQ, KKPR, and KAHS) have blanket licenses from all three PROs. The two stations that are predominantly sports talk stations (KXPN and KICS) have the talk or per program version that each PRO offers. *Id.* at 149; *see also* DX-53 (SESAC-KXPN License Agreement for all talk station amendment). Additionally, all five stations have a license from SESAC that permits them to play SESAC material on their websites. *Id.* at 151; *see also* DX-45 (SESAC Website Addendum for KHAS).

23. Robert Souza is the part-owner and managing partner of KCKM, a radio station in Texas that plays predominantly country music songs and commercials, but recently has begun airing more news and talk programs *See* Souza Dep. at 66, 97. KCKM is the smallest of the radio stations who are represented in the current record. KCKM has a blanket license with ASCAP and a per-program license with BMI. Souza Dep. at 66. KCKM has a blanket license from SESAC. *Id.* at 42. KCKM also has a SESAC web site addendum authorizing performance of SESAC music on its web site. Souza Dep. at 45.; *see also* PX 40 (SESAC-KCKM Webs Site Addendum)

### D.   SESAC's Business Methods

#### 1.   SESAC's Affiliates and Repertory

24. Patrick Collins is the President and Chief Operating Officer of SESAC. N.T. 12/10/13 Collins Direct at 73. Mr. Collins testified that SESAC is the only "selective" PRO, meaning that SESAC "selects" its affiliates. *See* N.T. 12/10/13 Collins Cross at 12. Unlike ASCAP and BMI, SESAC is entitled to – and does – regularly turn down affiliates when SESAC believes the copyright is not "compelling." *Id.* at 16. SESAC chooses its affiliates by going into the market place and identifying the songwriters and composers with exceptional skill. N.T. 12/10/13 Collins Direct at 79.

25. SESAC competes for songwriters and composers with ASCAP and BMI. N.T. 12/10/13 Collins Direct at 75. SESAC offers an array of benefits that differ from ASCAP and BMI. For example, SESAC pays royalties to their affiliates monthly, as opposed to quarterly. *Id.* at 79. SESAC also attempts to pay more to their affiliates than what market intelligence tells them ASCAP and BMI are paying to their affiliates. *Id.* SESAC's relatively small size also offers certain advantages. For example, SESAC executives and employees are available to their affiliates, and SESAC encourages the growth of their songwriters by conducting songwriter workshops and showcases. *Id.* at 80.

26. SESAC has seen the number of affiliates it represents increase by over 10% annually. *See id* at 76. Likewise, the number of copyrighted works SESAC has in its repertory also regularly continues to increase. *Id.*

27.  SESAC's affiliates do not have any input into SESAC's licensing decisions, and are not informed about the terms (or identities) of SESAC's licensing agreements with other affiliates and radio stations. However, SESAC's affiliates may enter into their own direct licenses with radio stations. N.T. 12/10/13 Collins Cross at 14. Plaintiff argues that SESAC is the "exclusive" licensor of works in its repertory, but this argument is not supported by the factual record. Notably, SESAC's licensing agreement with its affiliates contains specific provisions that allow for direct licensing, and mandates that an affiliate must inform SESAC if they directly license a work. *Id.* When an affiliate does directly license their works, SESAC deducts the royalty the affiliate would otherwise receive from the direct licensee in order to avoid double paying the affiliate. *Id.* Additionally, sometimes SESAC provides advance payments to it's affiliates. *Id.* at 15. When an affiliate has been given an advance, any fee it receives from a direct license will go to SESAC to repay them for the advance.

28.  In theory, SESAC's website permits a station to search the contents of its catalogue if it is aware of the artist, writer, publisher, or song title. N.T. 12/9/13 Velez at 90. In practice, this website is not an efficient or reliable means of determining the songs in SESAC's repertory. Indeed, SESAC expressly disclaims that its repertory database is accurate, even though it is reportedly updated on a daily basis. *See* N.T. 12/9/13 Velez at 92; *see also* PX 14. Notably, SESAC's own CEO could not provide the exact number of songs in SESAC's repertory, and could only provide a range for SESAC's repertory of 250,000-400,000, a difference of 150,000 songs. N.T. 12/10/13 Collins Cross at 18.

29.  In addition to licensing the right to publicly perform songs as described herein, SESAC also enforces their affiliates' rights by filing infringement suits against those who use their works without a proper license. N.T. 12/10/13 Collins Direct at 102. Infringement suits are rarely filed and are only pursued as a "last resort," but the threat of an infringement suit often motivates radio stations to take SESAC licenses. *Id.* For example, Mr. Souza was potentially infringing SESAC's copyrights by broadcasting SESAC works on his website without a website license. Souza Dep. at 114. SESAC did not file a suit against Souza, but warned him that he might be subject to an infringement suit. Thereafter, Souza entered into a website licensing agreement with SESAC. *Id.*

### 2.    SESAC's Licensing

30.  SESAC generally licenses its works to radio stations through a blanket license at a pre-set fixed fee.[10] N.T. 12/10/13 Collins Direct at 77. This license covers only analog

---

[10] Prior to 2009, RMLC had negotiated licensing fees with ASCAP and BMI that also used a fixed fee for blanket licenses. N.T. 12/10/13 Velez at 45. The RMLC negotiated this fixed fee under the assumption that stations' revenue would continue to grow, and thus would pay a lesser percentage of their revenue on licensing fees as revenue grew. *Id.* at 45. However, when the economic recession hit, stations actually saw their revenue fall; thus, they were soon

broadcasts. The term of the license is one year; the license automatically renews unless either party terminates the license at least 90 days prior to the renewal date. *Id.* at 83; *see also* DX 3 ("SESAC Radio Licensing Agreement").

31. The amount of the blanket license fee is determined by two factors: (1) a station's market classification and (2) the stations highest one minute spot rate. *See* DX-4 ("SESAC's Schedule of Annual Performance License Fees for Commercial Radio Stations Analog for 2009-2013").

32. The market classification factor accounts for the size of the station's audience. N.T. 12/10/13 Collins Direct at 88. There are ten separate categories of market classifications ranging from the largest market (AAA), to group H, which consists of stations with less than 10,000 listeners. *Id.* A third party group, Arbitron, often determines a station's market classification. *Id.* at 87.

33. The "High One Minute Spot Rate" is the highest rate a radio station charges for one minute of advertising. *Id.* at 88. This factor is determined by the radio station, and they are responsible for reporting it to SESAC every January. *Id.* To ensure the accuracy of the station's reported spot rates, the licensing agreement permits SESAC to conduct an "audit" where they verify the report and information presented to SESAC by the station. *Id.*; *see also* DX-3. As of October 31, 2011, SESAC had used the auditing process 200 times, although the time frame during which those 200 audits occurred is unclear. *See* PX-34; *see also* N.T. 12/10/13 Collins Cross at 22.

34. To determine the applicable blanket license fee payable to SESAC, a radio station must consult the grid that is provided with the SESAC fee schedule. The grid contains the ten potential market classifications (see *supra* ¶ 32) on the horizontal axis and certain ranges for High One Minute Spot Rates (*see supra* ¶ 33) on the vertical axis. The intersection of the applicable market classification and High One Minute Spot Rate provides the stations with it's applicable fee. *See* N.T. 12/10/13 Collins Direct at 91.

35. SESAC determines the monetary amounts of their fees (i.e. the amounts inside the grid) by considering the growth of their repertory, the growth of their affiliates, and the growth of performances on the radio. N.T. 12/10/13 Collins Cross at 8. SESAC does not consider the rates that ASCAP and BMI charge for their blanket licenses, nor do they consider their costs. *Id.* at 10. Similarly, if SESAC negotiates individually with a station,

---

paying a greater percentage of revenue in licensing fees. *Id.* As a result, the RMLC sought and obtained from ASCAP and BMI blanket license fees that are a percentage of a PRO's revenue, so that dollars paid to ASCAP and BMI for licensing fees increase as revenue increases, but decrease as revenue decreases. *Id.* Pursuant to the consent decrees, the rate courts in the Southern District of New York determined the appropriate percentage for the new licensing period. *Id.* at 39.

they do not consider the relative size of SESAC's operations, compared to ASCAP or BMI. *Id.* at 9-10. They do not look at the rates that ASCAP and BMI charge for their blanket licenses, nor do they set their rates based on their costs.

36.    From 2009-2012, SESAC's income doubled. *Id.* at 10. From 2009-2012 SESAC's analog rates increased 8% annually (or 32% gross) while their website license rates have increased by 20%. N.T. 12/10/13 Collins Cross at 13. Over that same time period, the rates charged by ASCAP and BMI decreased by around 40%. N.T. 12/9/13 Velez at 64. Despite the fact that during that period radio stations saw their incomes drop, the number of stations that had licensing agreements with SESAC stayed the same.

37.    SESAC's general practice has been to issue fee schedules in five year increments. SESAC's most recent rate schedule covers only one year: 2014. *See* DX-33 (Schedule of Performance License Fees for Analog Commercial Radio Stations for the year 2014). In 2014, radio stations in the two smallest market classifications (which encompass Messrs. Souza and Eckert's stations) will see no increase in their fees. N.T. 12/10/13 Collins Direct at 98. Stations in the eight larger market classifications will see their fees rise by around 7%. *See id.* at 96.

38.    As noted above, SESAC also offers a discount to the blanket license in the form of an all talk amendment for stations that air predominantly talk shows. N.T. 12/10/13 Collins Direct at 92. For stations that qualify for the all-talk amendment, they receive a 75% discount off the applicable blanket license fee. *Id.* Like the blanket license, the all-talk amendment is not related to how much music stations actually play. N.T. 12/10/13 Collins Cross at 21.

39.    If a station wishes to broadcast digitally, or provide programming through their website, SESAC provides digital and website licensing agreements. There is a separate fee schedule for the website license that operates in the same manner as the analog fee schedule. N.T. 12/10/13 Collins Direct at 94; *see* DX7 (Schedule of annual performance fees for radio station websites). For digital licenses, a station must pay either a minimum of $139 or 5% of the station's applicable analog fee, whichever is higher. *Id.* at 94; *see also* DX-6 ("SESAC radio performance license for digital radio")

40.    There are about 1,700 radio stations that have negotiated analog licensing agreements with SESAC that differ from the standard blanket license fees. *See* N.T. 12/10/13 Collins Direct at 84. Additionally, religious broadcasters (represented by the National Religious Broadcast of Music Licensing Committee), colleges (non-commercial radio stations), and Latina stations pay fees pursuant to a unique fee agreement. *Id.*; *see also* DX-62 ("Schedule of annual performance license fees for Spanish language format stations").

41.    In 2008, SESAC and RMLC engaged in negotiations regarding an industry-wide license. N.T. 12/9/13 Velez Cross at 42-43. SESAC made a proposal to RMLC. RMLC rejected

it without submitting a counterproposal. *Id.* at 44. SESAC also invited RMLC to make a proposal for the 2014 period, which they did not do. *See id.*

### E.     Expert Testimony regarding SESAC's Licensing Practices

42.     RMLC offered the testimony of economic expert Dr. Steven Peterson. Dr. Peterson offered his expert opinion on the relevant market in which SESAC sells its blanket license and addressed whether SESAC had substantial market power or monopoly power. N.T. 12/10/13 Peterson at 5.

43.     SESAC offered the testimony of economic expert Dr. Richard Schmalensee. Dr. Schmalensee offered his analysis of Dr. Peterson's assessment of market definition, market power, and the implications thereof. N.T. 12/10/13 Schmalensee at 29.

### 1.     Market Definition

43.     Dr. Peterson testified that the starting point for analyzing whether a firm has market power is to first determine the relevant market. N.T. 12/10/13 Peterson at 11. He explained that the relevant market helps categorize the factors that help constrain the prices of the firm that is under analysis. *Id.* A relevant market contains both a geographic and product component, and defining the relevant market requires addressing both components.

44.     The relevant product market is determined by analyzing the substitute products that one can turn to in order to avoid a price increase. *Id.* at 15. Dr. Peterson determined that there are no substitutes for SESAC's blanket license. *Id.* This means that "there aren't products that radio stations could turn to that would confer the same benefits as a SESAC license, should SESAC attempt to raise its price above the competitive level." *Id.* at 18.

45.     Dr. Peterson also looked to the hypothetical monopolist test to determine whether there were substitutes for a SESAC license. *Id.* at 19. The hypothetical monopolist test is a test used to decide what products are included in the relevant market. *Id.* The test proceeds by evaluating whether it would be profitable for a hypothetical monopolist to raise a price by a small but significant non-transitory amount ("SSNIP"). If raising the price by a SSNIP is not profitable because customers can shift their consumption to other (substitute) products, the candidate market is considered to be too small, and more things are added to it. *Id.* That process repeats until there is a set of products for the product market that form a profitable monopoly; meaning that a hypothetical monopolist, controlling a product and all of its substitutes, could profitably raise the price charged, and customers could not escape to other products. *Id.* at 20.

46.     Dr. Peterson conducted interviews with a limited number of radio station owners and executives to determine how they would respond to a price increase by SESAC that was

above the competitive level. *Id.* at 20. Dr. Peterson testified that turning to a substitute (such as ASCAP and BMI) for SESAC music would require a station to stop playing SESAC music. *Id.* However, he also noted that radio stations do not have control over some music they play, such as music in commercials. *Id.* For music they could control, stations could not reliably determine whether such music was SESAC music or not. *Id.* at 22. Therefore, stations could not turn to a substitute if SESAC were to elevate its prices above the competitive level by a SSNIP. *Id.* This opinion finds support in the record. Indeed, Mr. MacDonald testified that he would buy a SESAC license even if the price increased by $50,000. N.T. 12/9/13 MacDonald at 127-28.

47.    However, Dr. Peterson's application of this test is given reduced weight, as he was unable to identify a competitive level of fees. *See* N.T. 12/10/13 Schmalensee at 63 (noting that hypothetical monopolist test requires a comparison of the level of price with the competitive level).

48.    Dr. Peterson complimented his substitutability analysis with other facts from the record. Specifically, Dr. Peterson found that from 2009 to 2012, the rates for ASCAP and BMI fell by about 40%, while SESAC's rates steadily increased (by a total of around 32%). *Id.* at 23. Despite the increase in their rates, SESAC did not lose customers to ASCAP and BMI. *Id.*

49.    Based on the lack of substitutes for SESAC's license, Dr. Peterson opined that the relevant product market was the market for SESAC's blanket license. *Id.* at 24.

50.    Dr. Schmalensee agreed that ASCAP and BMI licenses were not substitutes for SESAC's license. However, he disagreed with Dr. Peterson's market definition. Dr. Schmalensee testified that a station's inability to control what music it plays meant that it essentially needed licenses for all musical works to ensure compliance with copyright laws. *Id.* at 64. On that basis, Dr. Schmalensee testified that the market should be much broader, and encompass the rights to all musical works likely to be broadcast. *Id.* at 67. As discussed *infra*, Dr. Schmalensee's broader market does not appropriately account for stations inability to determine what music is in the SESAC repertory.

51.    The relevant geographic market is defined by the group of alternative suppliers for the products in the relevant product market. N.T. 12/10/13 Peterson at 25. Dr. Peterson examined whether SESAC's affiliates could be an alternative source of rights to radio stations. *Id.* Dr. Peterson opined that SESAC's affiliates were not an alternative source of supply. This testimony is credible; stations are foreclosed from substituting a SESAC blanket license for a bundle of direct licenses for the underlying works because they cannot reliably determine all the music in SESAC's repertory. In other words, SESAC is the sole supplier of the bundle of rights covered by its blanket license.

### 2. Market Power

52. Dr. Peterson testified that market power can be proven by indirect or direct evidence of market power. N.T. 12/10/13 at 27. Direct evidence of market power usually occurs when a firm raises its price, but there is not a corresponding improvement in the quality or cost of making the product. Indirect evidence of market power is found when firms have a large share of the relevant market. *Id.* at 27. Because SESAC has a 100% share of the relevant market, Dr. Peterson opined that there was indirect evidence of market power. *Id.* at 27-28.

53. Dr. Schmalensee testified that there was not indirect evidence of market power because the market was broader and encompassed all works. Therefore, SESAC had only a 13% share of the market for all musical works and thus did not have market power. *Id.* at 68.

54. Dr. Schmalensee also testified that because stations needed licenses for all musical works, individual composers could not compete with each other; thus, SESAC's conduct did not restrict competition among its affiliates. *Id.* at 67.

### 3. Radio Stations Must Buy a SESAC License or Run the Risk of Infringing[11]

55. I accept Dr. Peterson's opinion that there are no substitutes for a SESAC license and the relevant market is the market for SESAC's blanket license. The record shows that a typical radio station could not realistically consider foregoing a SESAC license due to the combination of two factors: an inability to exercise total control over what they play, and an inability to determine what songs are in SESAC's repertory. The two factors work in tandem.

56. As noted above, radio stations cannot control the music that is broadcast in commercials from third parties, nor can they control ambient music that is played during broadcasts of live events. *See supra* P.5. However, broadcasting this music without a license constitutes a "public performance," and subjects a station to potential infringement suits. N.T. 12/9/13 Velez at 26. The inability to control all the music that is played requires a station to obtain licenses for all the works that could potentially be broadcast on their

---

[11] The facts in this section are relevant in the substantive analysis of Plaintiff's Sherman Act claims. Namely, the facts relate to the determination of the relevant market, which is a "deeply fact-intensive inquiry." *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001). Although the relevant market is a question of fact, I will analyze the correct market in my legal analysis of Plaintiff's Section 1 and Section 2 claims. *See infra* § (III)(A)(1). The testimony of Plaintiff's and Defendants' experts will also be further discussed in connection with my analysis of the relevant market.

stations in order to avoid infringing.

57.     For all practical purposes, the repertories of the three PROs constitute 100% of the music that stations play. Souza Dep. at 74; *see also* PX. 16.[12] Consequently, a radio station must obtain licenses that cover the works contained in the repertories of all three PROs. N.T. 12/10/13 Schmalensee at 64.  Generally, this can be achieved by obtaining blanket licenses from the PROs, or by obtaining direct licenses from the composer for the individual works contained within the PROs' repertories.

58.     A station cannot bypass a SESAC license by obtaining bundle of direct licenses for all of the works in SESAC's repertory because they cannot accurately and reliably determine the content of SESAC's repertory. Peterson Decl. ¶ 40. The only means with which a stations can try to determine the content of SESAC's repertory is through their "online search tool."  However, this does not provide a reliable means for determining what is SESAC's repertory.[13]  *See supra* ¶ 28; N.T. 12/9/13 Velez at 90; *see also* Souza Dep. at 80. Given that stations must obtain licenses for all works they broadcast to avoid copyright infringement. N.T. 12/10/13 Schmalensee at 64, the inability to determine what works are in SESAC's repertory exclusively means that stations are left with only one licensing option: SESAC's blanket license. Peterson Decl. ¶ 40.

59.     The two factors discussed in the foregoing two paragraphs work in tandem, with the practical result being that a radio station must buy a SESAC license. By way of example, if a radio station could determine all the songs in SESAC's library, it could then attempt to forego a SESAC license by obtaining direct licenses for those songs. Because stations cannot control what they play, they would still need to directly license all the works in SESAC's repertory to ensure they comply with the copyright laws. Nevertheless, they would still have a substitute for a SESAC blanket license. *See* 12/10/13 Schmalensee at 59.

### F.      The Effect of SESAC's Licenses on Radio Stations

60.     Radio stations operate on thin budgets. *See* Souza Decl. ¶¶ 3-4.  Moreover, the recent economic recession has led to a decrease in radio advertising budgets which, in turn, has

---

[12]  Admittedly, it is conceivable that there exists, somewhere, some composer who has chosen to eschew all three PROs, and direct license their works. However, no evidence of any such an anomaly has been presented.

[13]  As noted above, SESAC's online search tool expressly disclaims that it is accurate, advises stations that it could change on a daily basis, and limits the user to 100 searches per session. N.T. 12/9/13 Velez at 90. N.T. 12/9/13 Eckert at 166. However, we also acknowledge that SESAC does give permission to exceed this 100-search limit, on a case-by-case basis. N.T. 12/10/13 Collins Direct at 101.

resulted in decreased revenues for radio stations. Velez Supp. Decl. ¶ 5. In response, radio stations are forced to make difficult cost-cutting decisions. Meanwhile, SESAC has continued to raise its rates, which forces companies to further cut costs in other areas. *Id.* ¶ 6; Eckert Decl. ¶ 12.

61.    SESAC charges rates that are disproportionate to the number of works that it licenses in comparison to ASCAP and BMI. Specifically, as noted *supra*, ASCAP has 8.5 million works in its repertory, BMI has 7.5 million works in its repertory, and SESAC has 250,000 to 400,000 songs in its repertory. Thus, SESAC represents around 2.5% of the total works that are licensed. *See* N.T. 12/9/13 Velez at 58. However, radio stations pay more than 2.5% of their total licensing fees to SESAC.

62.    *[Paragraph filed separately Under Seal].*

63.    *[Paragraph filed separately Under Seal].*

64.    Plaintiffs argue that SESAC's fee increases forces radio stations to re-evaluate their businesses, and lessens the control they have over their business operations. This argument is not supported by the record. As noted above, the amount of SESAC's fees are a small portion of radio stations' expenses. Indeed, all three broadcasters who testified at the hearing incur costs greater than their licensing fees, and these other costs have also increased over the years.

65.    *[Paragraph filed separately Under Seal].*

## III.   CONCLUSIONS OF LAW

The primary purpose of a preliminary injunction is the maintenance of the status quo until a decision on the merits of a case is rendered. *Kos Pharmaceuticals, Inc. v. Andrx Corporation*, 369 F.3d 700, 708 (3d Cir.2004). "Status quo" is defined as the last, peaceable, non-contested status of the parties. *Id.* To prevail on a motion for preliminary injunctive relief, the moving party must demonstrate that each of the following factors favors the requested relief: (1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the

16

nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public

interest. *Rogers v. Corbett,* 468 F.3d 188, 192 (3d Cir. 2006) (*quoting Kos Pharmaceuticals*, 369

F.3d at 708); *McNeil Nutritionals, LLC v. Heartland Sweeteners*, 511 F.3d 350, 356-357 (3d Cir.

2007)(*quoting Shire U.S. v. Barr Labs. Inc.*, 329 F.3d 348, 352 (3d Cir. 2003)).  Preliminary

injunctive relief is "an extraordinary remedy" and "should be granted only in limited

circumstances." *Kos Pharmaceuticals*, 369 F.3d at 708 (*quoting American Tel. & Tel. Co. v.

Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)); *Nutrasweet Company

v. Vit-Mar Enterprises, Inc.*, 176 F.3d 151, 153 (3d Cir.1999).

 The burden lies with the moving party to establish every element in its favor. *P.C.

Yonkers, Inc. v. Celebrations, the Party and Seasonal Superstore, LLC.*, 428 F.3d 504, 508 (3d

Cir.2005).  An injunction cannot issue if either of the fundamental requirements - likelihood of

success on the merits and probability of irreparable harm if relief is not granted - are absent.

*McKeesport Hospital v. Accreditation Council for Graduate Medical Education*, 24 F.3d 519,

523 (3d Cir.1994).

 Plaintiff seeks to preliminarily enjoin Defendants from imposing rate increases on

RMLC's members pending the outcome of this case.  Mot. for Prelim. Injunc. at 1, ECF Doc.

No. 30.

 For the reasons that follow, I conclude that RMLC is not entitled to preliminary

injunctive relief, and I respectfully recommend that the Motion for Preliminary Injunction be

**DENIED.**

### A. Likelihood of Success on the Merits

"To demonstrate a likelihood of success on the merits, a plaintiff need only prove a prima

17

facie case, not a certainty that he or she will win." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001) (internal quotations and citation omitted). A "likelihood" means a "reasonable probability of success on the merits" and does not rise to the level of "more likely than not." *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (emphasis added). While the plaintiff must offer proof beyond the unverified allegations of the Complaint, the burden does not rise to the level of conclusiveness, that is: "raising sufficiently serious questions going to the merits to make them a fair ground for litigation" will suffice. *Bascom Food Products Corp. v Reese Finer Foods, Inc.*, 715 F. Supp. 616, 624 n.14 (D.N.J. 2011) (citations omitted).

### 1. The Relevant Market

Addressing claims brought under Section 1 or 2 of the Sherman Act requires a definition of the relevant market. *See Meredith v. SESAC*, No. 09-9177, 2011 U.S. Dist. LEXIS 24517, at *2 (S.D.N.Y. Mar. 8, 2011) (beginning analysis of motion to dismiss complaint asserting violations of both sections 1 and 2 by defining the relevant market); *see also* 2010 Stan. Tech. L. Rev. 4 (2010) ("defining the market is a determinative step in antitrust analysis"). "Defining a relevant market is a question of fact, and the plaintiff bears the burden of proof." *Kickflip, Inc. v. Facebook, Inc.*, No. 12-1369, 2013 U.S. Dist. LEXIS 138733, at *15-16 (D. Del. Sept. 27, 2013); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) (defining the relevant market is a "deeply fact-intensive inquiry"). While the inquiry is factually intensive, the Third Circuit has noted that at preliminary stages such as this, "detailed economic analysis . . . is seldom before the court and cannot be expected." *Allis-Chambers Manufacturing Company v. White Consolidated Industries, Inc.*, 414 F.2d 506, 520-21 (3d Cir. 1969). Furthermore, the

18

possibility that permanent relief may be decided adversely to the movant does not preclude the grant of temporary relief based on the limited record before the Court on a Motion for Preliminary Injunction. *Id.* (citing *Bergen Drug Co v. Parke-Davies Co.*, 307 F.2d 725, 727 (3d Cir. 1962)).  With those principles in mind, I will address the likelihood of success on the merits solely on the limited record before me.  Of course, I am also mindful that for present purposes, Plaintiff need only establish a prima facie case; my recommendation says nothing about the ultimate merits of this case. *See id.*

The relevant competitive market consists of product and geographic market components. *See United States Horticultural Supply v. Scotts Co.*, 367 Fed. Appx. 305, 309 (3d Cir. 2010) (non-precedential) (citing *Gordon v. Lewistown Hosp.* 423 F.3d 184, 210 (3d Cir. 2005).  The burden of defining both components lies with Plaintiff. *Id.* (citing *Pastore v. Bell Tele. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994)).

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 436 (3d. Cir. 1997) (cited cases omitted).  Interchangeability implies that one product is roughly equivalent to another for the use to which it is put. *Id.*  When assessing reasonable interchangeability, factors to be considered include price, use, and qualities. *Id.*.  Reasonable interchangeability is usually present when there is "cross-elasticity of demand" between the product itself and the substitutes for it.  Cross-elasticity of demand is present when the rise in the price of a good would cause the demand for substitutable goods to increase. *Id.* at 438.  Additionally, "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities

19

faced by consumers." *Id.* at 436.

In the instant case, and as summarized above, Plaintiff offered the testimony of economics expert Dr. Steven Peterson. Dr. Peterson defined the relevant product market as containing "the performance rights that SESAC offers to radio stations covering the entire SESAC repertory." Peterson Decl. ¶ 41. Framing the concept of "reasonable interchangeability" in terms of the instant dispute, Dr. Peterson explained that "the relevant product market for the bundle of performance rights that SESAC licenses includes the other performance rights that radio stations view as good substitutes for a SESAC license." Peterson Decl. ¶ 35.

Peterson focused his analysis by determining whether the blanket licenses of ASCAP and BMI were substitutes for SESAC's blanket license. Both parties' experts agreed that the blanket licenses of ASCAP and BMI were not substitutes for SESAC's. *See* N.T. 12/10/13 Peterson at 16; N.T. 12/10/13 Schmalensee at 51. Thus, because ASCAP and BMI's blanket licenses were not substitutes for SESAC's blanket license, Dr. Peterson opined that the market was that of SESAC's repertory.

Dr. Peterson also applied the "hypothetical monopolist test" to determine if SESAC's blanket license was the applicable product market. As the Honorable Judge Brody explained, the application of this test proceeds as follows: "start with a particular product. The market containing that product is the smallest set of products "including that very product, of course" such that a hypothetical [monopolist] selling all of those products with no competition could profitably impose a 'small but significant and nontransitory increase in price ["SSNIP"]."[14]

---

[14] As the Honorable Judge Brody explained, this test incorporates both "reasonable interchangeability" and "cross-elasticity of demand." Specifically, as to reasonable interchangeability:

*Babyage.com, Inc. v. Toys "R" Us., Inc.*, 558 F. Supp. 2d 575, 581 (E.D. Pa. 2008) (Brody, J.);

*see also* N.T. 12/10/13 Peterson at 19-20. Again, Dr. Peterson concluded that the relevant

product market was the performance rights to broadcast the works in SESAC's repertory because

stations "cannot substitute non-SESAC performance rights for SESAC performance rights if

SESAC charges above-competitive license fees." Peterson Decl. ¶ 36.

The relevant geographic market is defined by the group of alternative suppliers for the

products in the relevant product market. N.T. 12/10/13 Peterson at 25. Dr. Peterson found that

SESAC was the sole supplier of the unique collection of rights covered by its blanket license.

Based on the current factual record, this Court finds that RMLC has produced sufficient

evidence to make a prima facie showing that the relevant product market is the market for

SESAC's blanket license. In *CBS, Inc. v. BMI*, 400 F. Supp. 737, 782-83 (S.D.N.Y. 1975)

> If the hypothetical market-wide monopolist could profitably
> impose a small price increase on all the in-market products
> simultaneously, it must be because consumers are captive;
> they are not venturing outside the market to make purchases
> when prices in the market go up. This in turn means that
> those out-of-market products are not reasonably
> interchangeable with the in-market products; otherwise
> consumers would be buying them instead of the in-market
> products to take advantage of the lower price.

*Babyage.com*, 558 F. Supp. 2d at 581. Similarly, as to the test's incorporation of the principle of cross-elasticity of demand:

Suppose the hypothetical market-wide monopolist increased the price on only one
of the in-market products. Then the demand for the rest of the in-market products
would increase. After all, they are interchangeable with the now-higher-priced
product, and they are now cheaper than that product. This shows that in-market
products have high cross-elasticity of demand.

*Id.*

(*"CBS I"*) (aff'd at *CBS, Inc. v. ASCAP.*, 620 F.2d 930 (2d Cir. 1980) (*"CBS Remand"*), CBS

brought an antitrust suit against BMI and ASCAP over their use of blanket licenses. Like

RMLC, CBS argued that the relevant market was the market for BMI's and ASCAP's blanket

licenses. *Id.* at 782. The Court rejected CBS's argument, finding that a bundle of direct licenses

acquired on an individual transaction basis would be interchangeable with a blanket license,

permitting the use of exactly the same music. *Id.* On that basis, the court defined the relevant

market as including the market for performance license to all the works at issue, regardless of

which PRO's repertory they were in. *Id.* at 784.

The instant case is distinguishable from *CBS I* because the SESAC blanket license is the

sole source of the performance rights that radio stations need. This is because radio stations are

unable to obtain a bundle of direct licenses acquired on an individual transaction basis for the

music in SESAC's repertory because they cannot determine what such a bundle would entail.[15]

That is: only SESAC knows each and every song that comprises its repertory.

Dr. Schmalensee admits that radio stations do not completely control the music they play;

thus, radio stations need licenses to perform basically all non-trivial works to ensure it complies

---

[15] In practice, a station would only need the direct licenses to works that are "exclusive" to SESAC. The copyrights of many songs are owned by multiple people, who may each independently license their work, either directly or through the PRO of their choosing. N.T. 12/9/13 Velez at 30. Thus, many songs are represented by multiple PROs. *Id.* A radio station only needs a license from one PRO to play such songs. *Id.* Thus, in practice, a station could substitute a SESAC blanket license with a bundle of direct licenses for songs that are "exclusive" to SESAC, as licenses from other PROs would be sufficient for the non-exclusive songs. The record does not contain any evidence of how a user might determine if a song is "exclusive" to SESAC (or to any other PRO). Thus, the distinction makes little difference for purposes of our analysis.

with the copyright laws.[16] Schmalensee Decl. ¶¶ 42-43. On the record before it, this Court accepts that premise, as a station would need licenses covering all the songs in the market if they could not control what music they play because they could conceivably (and unknowingly) play any song, particularly in the context of ambient music. However, the inability of radio stations to conclusively determine what songs are SESAC songs precludes them from obtaining individual licenses from the composers, and foregoing a SESAC license. In other words, a SESAC blanket license is not reasonably interchangeable with a bundle of direct licenses permitting the use of SESAC's repertory because the individual songs in SESAC's repertory cannot be conclusively determined. While SESAC permits direct licensing by its affiliates, it is the entire bundle that a radio station needs to avoid infringement, and what constitutes the entire bundle is unknown.

Dr. Schmalensee also opines that "[a]s a general matter, we should be extremely skeptical of claims that a single firm constitutes the entire market." Schmalensee Decl. ¶ 14. To be sure,

---

[16] Dr. Schmalensee did not conduct his own market analysis, and did not offer an opinion as to the relevant market. In this regard, I note that both parties initially indicated that they would not introduce expert testimony at the injunction hearing. However, RMLC had a change of heart on this point, and included expert opinion from Dr. Peterson in it's Reply Brief. *See* Pl. Reply, Ex. A, ECF NO. 43-1. Not surprisingly, SESAC also had a change of heart, and retained Dr. Schmalensee to rebut Dr. Peterson. Dr. Schmalensee was required to prepare a report under extremely strict time constraints. Nevertheless, Dr. Schmalensee was deposed, testified at the hearings, and provided an insightful analysis of Dr. Peterson's report. We acknowledge that time constraints precluded Dr. Schmalensee from doing little more than critiquing Dr. Peterson's report, and we would expect that SESAC will provide additional expert testimony in future proceedings.

As the Third Circuit noted, at preliminary stages "detailed economic analysis . . . is seldom before the court and cannot be expected." *See Allis-Chambers*, 414 F.2d at 520-21 (quoted case omitted). For present purposes, we consider the full record before us, and conclude that RMLC has sufficiently put forward a *prima facie* case. Of course, this conclusion does not preclude a different finding at later stages of this case, after full discovery and careful expert analysis.

such skepticism is not unfounded, especially as courts dealing with antitrust claims against PROs rarely define the market so narrowly. However, there are markets that comprise one firm who is the sole supplier of a unique product. *See Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992) (when consumers are faced with the commercial reality that there are no substitutes for a unique product, the unique product can constitute its own market); *see also National Collegiate Athletic Assn.*, 468 U.S. 85, 111-112 (1984) (when a joint selling agency is the only seller of a unique product with no substitutes, there is a separate market for that unique product); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297,296, 315-16 (3d Cir. 2007) (when a unique product is necessary to comply with a standard, and cannot be obtained by any other source, the scope of the relevant market is narrowed to that of the unique product). Notably, the Supreme Court recognized that because of certain unique characteristics, blanket licenses are " . . . to some extent, a different product." *BMI v. CBS*, 441 U.S. 1, 22 (1999) ("*BMI*"); *see also National Cable Television Ass'n v. BMI*, 772 F. Supp. 614 (D.C. 1991) (blanket license is a package product that no individual could offer). On the current record, where the identity of the works covered by the SESAC license are not fully known, the unique qualities of SESAC's blanket license are even more profound.

Finally, I consider Dr. Peterson's market definition in the context of cross-elasticity of demand. *See Queen City Pizza,* 124 F.3d at 436 (the boundaries of the market are determined by examining reasonable interchangeability and cross-elasticity of demand between a product and its substitutes). "Cross-elasticity of demand is present when the rise in the price of a good would cause the demand for substitutable goods to increase." *Id.* at 438. Here, there is no record evidence that the recent annual increases in SESAC's prices has seen a corresponding increase in

24

the demand for any other products.  Stated another way, there is no evidence of record to support the conclusion that SESAC's price increase has driven radio stations away from SESAC,  to some other alternative.

Accordingly, based on the limited record before this Court, Plaintiff has made a sufficient *prima facie* showing that the relevant market is the SESAC blanket license.  Specifically, Plaintiff has defined the relevant market with regards to reasonable interchangeability and cross-elasticity of demand.  *See Queen City Pizza*, 124 F.3d at 436.  Plaintiff's market definition also accounted for certain commercial realities faced by consumers, namely, the inability of stations to: (1) control the songs they play, and (2) determine all the songs in SESAC's repertory.  *See id.*

Thus, because there are no substitute products that are reasonably interchangeable or exhibit cross-elasticity of demand with SESAC's blanket license, I find that Plaintiff has put forth sufficient evidence to make a *prima facie* showing that the relevant market is the SESAC blanket license.

### 2.    Violation of Section 1

In Counts I and II, RMLC claims that SESAC has violated Section 1 of the Sherman Act. In order to succeed on the merits of a Section 1 claim, "an antitrust plaintiff must plead the following two elements: (1) that the defendant was a party to a contract, combination ... or conspiracy and (2) that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (internal quotations and citations omitted).

#### a.    An Agreement

The central requirement for a Section 1 agreement is concerted action.  The Third Circuit

defines "concerted action" as "unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme." *Burtch v. Milberg Factors, Inc.*, 662 F.3d at 221 (citations omitted). Importantly, unilateral action regardless of the motivation, is not a violation of Section 1. *Id.* (citation omitted).

Agreements generally take one of two forms: agreements among horizontal competitors or "hub and spoke" agreements, which involve numerous vertical agreements between a central "hub" and numerous horizontal "spokes."[17] Defendant argues that Plaintiff cannot establish that SESAC and its affiliates constitute either form of agreement. Defendants assert that SESAC and its affiliates are not horizontal competitors and thus do no comprise a horizontal agreement. Defendants also argue that Plaintiff cannot establish a "hub and spoke conspiracy" because there is no evidence of an agreement among the affiliates, or a "rim" as is required for the prototypical "hub and spoke" conspiracy.

The evidence of record shows that SESAC, like all PROs, acts as a type of intermediary between users (radio stations) and rights-holders (i.e. composers). *See BMI*, 441 U.S. at 11 ("ASCAP and BMI originated to make possible and to facilitate dealings between copyright owners and those who desire to use their music."). SESAC obtains non-exclusive performance rights through independent agreements with each of its affiliates. It then packages these

---

[17] As stated by the Third Circuit, a Hub and Spoke conspiracy:

involves a hub, generally the dominant purchaser or supplier in the relevant market, and the spokes, made up of the distributors involved in the conspiracy. The rim of the wheel is the connecting agreements among the horizontal competitors (distributors) that form the spokes.

*Howard Hess Dental Labs, Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010).

26

performance rights together and sells them as a single blanket license.  While SESAC's affiliates

can sell direct licenses, and thus compete with SESAC in the sale of performance rights, such

direct licensing currently is quite rare, due to various factors, such as high transaction costs.

Therefore, the SESAC-affiliate arrangement is not the prototypical horizontal agreement between

main competitors, but more closely resembles that of an intermediary or "joint selling agent."

However, to the extent SESAC's independent agreements with its affiliates are vertical, there is

no evidence of an agreement among affiliates, as is required under a hub and spoke theory.  *See*

*Howard Hess*, 602 F.3d at 255.

Although SESAC may not fall neatly into either category, the Supreme Court has clearly

stated that the aggregation of performance rights by intermediaries like SESAC "involve[s]

concerted action in a large and active line of commerce . . . . " *BMI v. Columbia Broadcasting*

*System, Inc.*, 441 U.S. 1, 10 (1979) ("BMI") (1979).  Accordingly, this Court is satisfied that, for

present purposes,  Plaintiff has established a likelihood of success in proving "concerted

action."[18]

### b.      Unreasonable Restraint on Trade

"The rule of reason is the accepted standard for testing whether a practice restrains trade

in violation of Section 1.[19]  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877

---

[18]  Defendants' argument that it is not an agreement among "direct competitors" is
somewhat inconsistent with evidence in the record that shows that its affiliates are permitted to
directly license their works and have done so in some instances.  *See* N.T. 12/10/13 Collins Cross
at 13.

[19]  The "unreasonable restraint on trade" element is "analyzed under either the per se
standard or the rule of reason standard." *Burth,* 662 F.3d at 222.  The question of which standard
to apply is a question of law for the court.  *Behrend v. Comcast Corp.*, No. 03-6604, 2012 U.S.
Dist. LEXIS 51889, at *10 n.1 (E.D. Pa. Apr. 12, 2012).  Plaintiff argues that the SESAC's

885-86, 127 S. Ct. 2705, 168 L. Ed. 2d 623 (2007). Under this rule, the fact-finder weighs all of

the circumstances of a case in deciding whether a restrictive practice should be prohibited as

imposing an unreasonable restraint on competition. *Id.* The plaintiff has the initial burden of

showing "that the alleged 'agreement produced an adverse, anticompetitive effect within the

relevant geographic market." *Burtch*, 662 F.3d at 222 (citation omitted). As the Supreme Court

observed:

> Appropriate factors to take into account include specific
> information about the relevant business and the restraint's
> history, nature, and effect. Whether the businesses
> involved have market power is a further, significant
> consideration. It its design and function the rule
> distinguishes between restraints with anticompetitive effect
> that are harmful to the consumer and restrains stimulating
> competition that are in the consumer's best interest."

*Leegin*, 551 U.S. at 885-86. In conducting the rule of reason analysis, this Court must weigh the

anti-competitive effects of SESAC's conduct against its pro-competitive effects.[20]

As to the pro-competitive effects of SESAC's conduct, it is well-settled that blanket

---

conduct is per se unlawful. However, the Supreme Court has made clear that the conduct that
Plaintiff attacks here (offering only blanket licenses at a unilaterally set price) is more
appropriately addressed pursuant to the rule of reason. *See BMI*, 441 U.S. at 19-10; *see also
Meredith Corp*, 2011 U.S. Dist. LEXIS 24517, at \*35 (applying Supreme Court's decision in
*CBS* to require "that SESAC's blanket license . . . should be subject to the more discriminatory
analysis of the rule of reason"). *Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 317 (3d Cir. 2010)
("if "restraint at issue is sufficient different from the per se archetypes to require application of
the rule of reason" the per se theory fails).

[20] I note that the issues presented in the instant motion appear to have a somewhat
different focus than past cases asserting antitrust challenges against PROs. In past cases, it seems
that the plaintiffs' motivation in obtaining licenses was to have the right to play music. *See BMI*,
441 U.S. at 22. In comparison (and at least as presently cast), the current case seems focused on
the stations' desire to obtain a SESAC blanket license to avoid copyright infringement. *See e.g.*
Souza Dep. at 114..

licenses bring great benefits to the music industry; they greatly reduce transaction costs, increase efficiency, and allow for "great flexibility in the choice of musical material." *BMI*, 441 U.S. at 22; *see also* N.T. 12/10/13 Schmalensee at 42-43.

In examining the anti-competitive effects of PRO's blanket licensing practices, courts often look at the evidence of alternatives to blanket licences to determine whether the rule of reason is violated. *See CBS Remand*, 620 F.2d at 936 (". . . the opportunity to acquire a pool of rights does not restrain trade if an alternative opportunity to acquire individual rights is fully available")*; Buffalo Broadcasting Co v. ASCAP*, 744 F.2d 917, 925 (2d Cir. 1984) (same). Here, there is simply no practical choice but for radio stations to obtain blanket licenses. While SESAC does not preclude radio stations from directly licensing works from composers, they do not adequately disclose their repertory so that radio stations can know exactly who they need licenses from, to fully insulate themselves from copyright infringement.[21]

Moreover, there is no evidence to support the conclusion that SESAC's blanket license has been the customer's preferred choice in the face of available alternatives. To the contrary, SESAC's blanket license is the user's <u>only</u> choice. *See NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 104 S. Ct. 2948, 82 L. Ed. 2d 70 (1984) (finding a collection of rights agreement violated section 1 because there was no realistic alternative for

---

[21] Plaintiff argues that a radio station has little incentive to obtain direct licenses because they would still need a blanket license, and thus would be double paying for any work they directly licensed. The Second Circuit rejected a similar argument in *Buffalo Broadcasting* because stations could avoid double payment by foregoing a blanket license. 744 F.2d at 929. However, in this case, where the focus is more on obtaining rights sufficient to ensure compliance with the copyright laws (as opposed to obtaining rights merely to fulfill music playing needs), stations cannot forego a blanket license, because they cannot fully control the music they play, and cannot discern the full library of songs for which they need to obtain direct licenses.

29

individual negotiations); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 194 (3d Cir. 2005)

(elimination of choice among dealers is competitive harm). Indeed, the only representative

broadcaster who attempted to forego SESAC's blanket license was threatened with an

infringement suit by SESAC before eventually agreeing to the license. *See* Souza Dep. at 114.

Furthermore, the current record suggests there is <u>no</u> restriction on SESAC's ability to

raise its prices. This ability, coupled with SESAC's 100% market share of the unique product –

the collection of songs in it's repertory – further supports a finding that the challenged conduct

has produced anticompetitive effects in the relevant market.[22] *See Toledo Mack Sales & Serv v.*

*Mack Trucks, Inc.*, 530 F.3d 204, 204, 226 (3d Cir.2008) (anticompetitive effects can be shown

by market power and ability to raise prices above competitive level). As noted above, the use of

blanket licenses by PROs has consistently withstood antitrust challenges because of the pro-

competitive benefits it provides. However, all of these challenges were brought in a context

where the price of such licenses was regulated pursuant to consent decrees. *See BMI*, 441 U.S. at

11. The current record is devoid of evidence of any mechanism that regulates SESAC's prices.

Indeed, Plaintiff's CEO testified that SESAC sets its prices without regard to its cost, or the costs

of ASCAP's and BMI's licenses. N.T. 12/10/13 Collins Cross at 8-9. Moreover, SESAC has

annually raised its prices by around 7 or 8 percent per year and has not seen any loss of

_____

[22] Neither party has stated what a "competitive price" for a SESAC blanket license might
be. However, both experts agreed with the economic principle that a seller with 100% market
power would price its product above the competitive level in the absence of any restrictions on
pricing. *See* N.T. 12/9/13 Peterson at 48-49. Because of the inability of either party to conduct a
more searching analysis on the issue due to the expedited nature of discovery, this Court will
accept this principle for purposes of this motion. However, I reiterate that this is a factually
complex case and the current record is limited; the ultimate merits will be determined at the
appropriate stage of proceedings. *See Allis-Chalmers*, 424 F.2d at 511.

customers. In fact, Mr. Collins admits there is nothing stopping SESAC from setting its price as high as it pleases. *Id.* at 24-25. Unlike the blanket licenses offered by ASCAP and BMI, users have no mechanism to challenge SESAC's prices. *See BMI*, 441 U.S. at 24 ("the substantial restraints placed on [PROs] by the consent decree must not be ignored")

In sum, radio stations have no choice but to purchase SESAC's blanket license as a cost of doing business. SESAC has 100% of the market power over the unique collection of works in their repertory and there are no "real" alternatives to SESAC's blanket license. *See Buffalo Broadcasting*, 744 F.2d at 926. Unlike other PROs, there is nothing stopping SESAC from pricing their license at whatever price they choose. Because users have no choice but to buy a blanket license from SESAC, and SESAC can set its prices without restriction, I find that Plaintiff has made a prima facie case of a rule of reason violation of section 1.

### 3. Violation of Section 2

Plaintiff claims that SESAC has violated Section 2 of the Sherman Act by using "*de facto* exclusive contracting practices to create a market artificially insulated from competition." Pl. Memo at 4.

"Liability under section 2 requires: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Broadcom Corp.*, 501 F.3d at 307 (internal quotations omitted)

### a. Possession of monopoly power in the relevant market

Monopoly power is the "power to control prices or exclude competition in the relevant market." *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). Monopoly power

31

can be proven by direct or indirect evidence. Direct evidence of monopoly power takes the form of "supracompetitive prices and restricted output." *Carpenter Tech. Cor. v. Allegheny Techs., Inc.*, No. 08-2907, 2011 U.S. Dist. LEXIS 112556 at *19 (E.D. Pa. Sept. 30, 2011) (quoting *Broadcom*, 501 F.3d at 307).

Monopoly power can also be proven indirectly, by looking to the "structure and composition of the relevant market." Specifically, a plaintiff typically must prove that a "firm has a dominant share in a relevant market, and that significant entry barriers protect that market."[23] *Broadcom*, 501 F.3d at 307 (citation omitted). "Courts within the Third Circuit have held a defendant has significant market share supporting an inference of monopoly power if the defendant possess sixty percent or more market share in the relevant market." *Royal Mile Co. v. UPMC*, No. 10-1609, 2013 U.S. Dist. LEXIS 138678, at *97 (W.D. Pa. Sept. 27, 2013) (collecting Third Circuit cases). Here, SESAC possesses 100% of the relevant market. Thus, Plaintiff has established a likelihood that SESAC has monopoly power. *See Eastman Kodak*, 504 U.S. at 481 (monopoly power may exist where evidence the defendant controls nearly 100% of the market with no readily available substitutes).

### b.    Anticompetitive conduct

The second element of a section 2 claim focuses on the conduct in obtaining and/or possessing its monopoly power; specifically, "the acquisition or possession of monopoly power must be accompanied by some anticompetitive conduct on the part of the possessor." *Broadcom Corp.* 501 F.3d at 309 (citation omitted).

---

[23] If direct evidence of monopoly power is present then defining the relevant market is not needed. *Broadcom Corp.* 501 F.3d at at 307 n.3.

32

As noted above in the discussion of Section 1, SESAC's practice of offering only blanket licenses without any real alternatives and setting prices without any restriction is anticompetitive. To be sure, the fact that radio broadcasters cannot control what they play is not due to any action by SESAC. However, SESAC's lack of transparency capitalizes on this industry reality, with the result being that stations must buy their licenses.

Therefore, SESAC has engaged in exclusionary conduct by failing to disclose its repertory and ensuring that users have no alternatives but to purchase their licenses. *See Meredith Corp.*, 2011 U.S. Dist. LEXIS 24517, at *48 (finding plaintiff adequately pled the conduct element of section two based on the same conduct advanced under their section 1 claim).

### B.   Irreparable Harm

We next consider whether Plaintiff will suffer irreparable harm if an injunction is not issued. "Harm is irreparable when it cannot be adequately compensated in damages, either because of the nature of the right that is injured, or because there exists no certain pecuniary standards for the measurement of damages." *National Business Services, Inc. v. Wright,* 2 F.Supp. 2d 701 (E.D. Pa. 1998) (citing *Albert E. Price, Inc. v. Metzner,* 574 F. Supp. 281, 289 (E.D. Pa. 1983)). The inquiry examines whether Plaintiff will suffer irreparable harm at the time a preliminary injunction would issue.

The evidence in the record shows that radio stations operate on thin budgets. *See* Souza Decl. ¶¶ 3-4. Moreover, the recent economic recession has led to a decrease in radio advertising budgets which, in turn, has resulted in decreased revenues for radio stations. Velez Supp. Decl. ¶ 5. In response, radio stations are forced to make difficult cost-cutting decisions. Meanwhile, SESAC has continued to raise its rates, which forces companies to further cut costs in other

33

areas. *Id.* ¶ 6; Eckert Decl. ¶ 12

Additionally, SESAC's licensing agreement permits it to "audit" a radio station whenever it chooses, to evaluate the accuracy of the station's reported "high one spot advertising rate." If the reported spot rate is found to be too low, the station will have to pay increased fees. This "auditing" ability injects a measure of uncertainty into the radio station's ability to project it's operating costs. Eckert Decl. ¶ ¶ 12-13.

At the hearing, Plaintiff's primary argument was that irreparable injury is present because radio stations are faced with a "Hobson's Choice:" either sign the blanket licensing agreement or face onerous copyright fines. *See* N.T. 12/11/13 Zwisler Closing at 52; *see also* Pl. Findings and Concl. ¶ 95. This Court finds that the alleged "Hobson's Choice" faced by radio stations is not determinative of the instant motion. "[A] preliminary injunction must be the only way of protecting the plaintiff from harm." *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989). Here, it is unclear how radio stations would be protected from the identified Hobson's Choice by an injunction "preventing SESAC from imposing additional rate increases during the pendency of this litigation." Pl. Mot. at 2. Even if the Court should enjoin the rate increase, the stations would still be faced with the same "take it or leave it" choice that they have always faced. In other words, the only effect that granting Plaintiff's motion would have on the alleged "Hobson's Choice" is that licensing fees for 2014 would remain at their current rate, rather than a new, higher rate.

Similarly, Plaintiff argues that irreparable harm is present due to SESAC's ability to conduct an audit at any time and demand money (i.e. back payments) which radio stations have no choice but to pay. *See* Pl. Findings and Concl. ¶ 67. This "auditing," which can be done in

34

the middle of a contract period, causes harm by preventing the stations from planning for the future with certainty. The instant motion does not address this situation, as the requested injunction would not enjoin SESAC's auditing ability.[24] Even if this Court were to grant Plaintiffs's requested injunction, and enjoin the 2014 rate increase, SESAC would not be prohibited from auditing a station to determine whether their reported "High One Minute Spot Rate" is accurate. Furthermore, the "fear of audit" is speculative: there is no evidence that SESAC intends to ramp up audit efforts, and there is no evidence that any future audits will necessarily establish that One Minute Spot Rates have been under-reported by any radio station.[25] *See EUSA Pharma (US), Inc. v. Innocoll Pharms., Ltd.*, 594 F. Supp. 2d 570, 581 (E.D. Pa. 2009) ("Establishing a risk of irreparable harm is not enough") (quotations omitted). Thus, this Court's analysis will focus on the conduct that Plaintiff seeks to enjoin: additional rate increases. *See* Pl. Mot. at 2

The harm Plaintiff seeks to enjoin is the loss of money due to SESAC's rate increases. It is well-settled that harm is not irreparable where the claimed injury is solely a monetary loss. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 802 (3d Cir. 1989); *Ortho*

---

[24] SESAC's auditing power derives from the terms of the current licensing agreement. If this Court were to grant the requested relief, and maintain the status quo by enjoining the increase of rates in the 2014 rate card, it would not have any effect on the other (non-price) terms of the licensing agreement, such as the ability to conduct audits.

[25] We cannot overlook the fact that Plaintiff waited almost a year after filing of the Complaint to file the instant motion, despite the fact that SESAC has always been entitled to unilaterally conduct an audit (which may result in additional fees). This delay weighs heavily against a finding of irreparable harm, *See Lanin v. Borough of Tenafly*, 515 Fed. Appx. 114, 117-18 (3d Cir. 2013) (non-precedential) (district court properly relied on delay in filing preliminary injunction motion as proof that risk of irreparable harm did not exist). Moreover, the delay further highlights that the "harm" targeted by this motion is the upcoming rate increase, not SESAC's auditing power, and/or the uncertainty it may cause.

*Boitech Prods., L.P. v. Amgen, Inc.*, No. 05-4850, No. 05-4850, 2006 U.S. Dist. LEXIS 85331, at

\*25-26 (D.N.J. Nov. 21, 2006) (plaintiff could not prove irreparable harm for antitrust violations

when the alleged harm flowed solely from a loss of money that could be recouped).

Additionally, the possibility of adequate compensatory damages or other corrective relief weighs

heavily against a finding of irreparable injury. *Acierno v. New Castle County*, 40 F.3d 645, 653

(3d Cir. 1994). Notably, the antitrust statute provides for triple damages for violations of

antitrust laws.

Furthermore, when monetary loss is present, Third Circuit precedent establishes that

irreparable harm may be found if the business in question will be forced to shut down. *See*

*Franks GMC Truck Center, Inc. v. G.M.C.,* 847 F.2d 100, 102 n.4 (3d Cir. 1988) (no irreparable

harm despite loss of twenty-six percent of business's profits because, *inter alia*, its continued

business survival was not in serious jeopardy). In the present, there is no evidence that radio

stations are in jeopardy of anything besides paying more money to SESAC. *See Instant Air,* 882

F.2d at 801-02 (finding no irreparable harm even though movant argued that it would have to lay

off 70 percent of its employees and its business would be destroyed, because there was no

evidence the business would have to shut down); *see also Eberspraecher North Am., Inc. v. Van-*

*Rob, Inc.*, 544 F. Supp. 2d 592 (E.D. Mich. 2008) (maker of auto exhaust products would not

suffer irreparable harm if it were required to pay price increases for product, despite movant's

contention that it could not obtain mufflers anywhere else and would incur millions of dollars in

penalties).

Moreover, the actual amount of the rate increase further supports the conclusion that it

will not cause irreparable harm. *[Remainder of paragraph filed separately Under Seal (includes*

36

*footnote 26)].*

Finally, according to the evidence adduced at the hearing, SESAC's fees account for a relatively small portion of the stations' overall annual expenses. *[Sentence filed separately Under Seal].* *Id.* at 115. There is no evidence that the SESAC rate increase would force any station out of business.

Accordingly, I conclude that Plaintiff has failed to establish irreparable harm sufficient to justify a preliminary injunction.[27] Therefore, I respectfully recommend that the instant motion be denied.[28] *See McKeesport Hosp. v. Accreditation Council for Graduate Medical Educ.*, 24 F.3d 519, 523 (3d Cir. 1994) (preliminary injunction cannot order if the two fundamental perquisites of likelihood of success and irreparable harm are absent).

## C.    Conclusion

The use of blanket licenses by PROs has a faced a long history of antitrust challenges. It

---

[27]   Plaintiff also argues that their overwhelming showing of success on the merits lessens the burden of demonstrating irreparable harm. To begin, the Third Circuit has not adopted the "sliding scale" approach to injunction standards. In this Circuit, irreparable harm must always be present for an injunction to issue. *See Conestoga Wood Specialities Corp. v. Sec'y of United States HHS*, No. 13-1144, 2013 U.S. App. LEXIS 2706, at *6 (3d Cir. Feb. 7, 2013) (noting that the Third Circuit has not embraced the "sliding scale" in issuing injunctions, and examining whether plaintiff has met their burden as to each element).

Additionally, although I conclude – based on the current record – that Plaintiff has established a likelihood of success, this showing certainly was not "overwhelming." Indeed, this is a complex case and the current record is far from comprehensive; discovery was expedited and Defendants' expert was retained with little time in which to offer an opinion on critical matters such as the relevant market. Regardless, it is well settled that the failure to establish irreparable harm precludes injunctive relief; Plaintiff's showing of likelihood of success cannot cure the absence of irreparable harm. *See McKeesport Hosp.*, 24 F.3d at 523.

[28]   Because of the failure to establish irreparable harm, the final two factors (balance of harms and public interest) need not be addressed . *See AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994) (noting that "[the] latter two factors should be taken into account only when they are relevant").

is well recognized that this practice produces certain efficiencies, because it greatly reduces transaction costs associated with dealing separately with each composer/affiliate. *See* Richard A. Posner, Antitrust Law 30 (2d ed. 2001) ("the effect of [PROs] is to eliminate price competition among the members of each association but at the same time to eliminate the prohibitive costs to the performing entities of dealing separately with each composer"). The goal has always been to obtain a balance between the economic efficiency brought by blanket licenses with the anticompetitive effects of blanket licensing. By offering only blanket licenses and failing to provide any alternatives or opportunity to avoid those licenses by obtaining direct licenses, SESAC's conduct shifts the balance too far. Accordingly, I find that there is a likelihood of success on the merits.

However, the Third Circuit has emphasized that a preliminary injunction cannot be issued unless Plaintiff establishes both a likelihood of success on the merits and irreparable harm resulting from the denial of the injunction. *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197 (3d Cir. 1990) ("to obtain a preliminary injunction, the moving party must demonstrate both a likelihood of success on the merits and the probability of irreparable harm if relief is not granted") (emphasis in original) (quoted case omitted). Here, Plaintiff has failed to establish that the expected rate increase constitutes irreparable harm. Accordingly, because Plaintiff has failed to establish this fundamental requirement, I respectfully recommend that the Motion for Preliminary Injunction be DENIED.

Therefore I make the following:

# RECOMMENDATION

FILED

DEC 2 3 2013

MICHAEL E. KUNZ, Clerk
By____ Dep. Clerk

AND NOW, this __20th__ day of December, 2013, **IT IS RESPECTFULLY**

**RECOMMENDED** that Plaintiff's Motion for a Preliminary Injunction against Defendants

(Doc. No. 30) be **DENIED**.

BY THE COURT:

ENTERED

DEC 2 3 2013

CLERK OF COURT

_Lynne A. Sitarsh_

LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE

12/23/13 mail:
Mc Kenzie

39

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

12/23/13

RE:   RADIO MUSIC LICENSE COMMITTEE, INC., VS SESAC, INC. ET AL
         CA No. 12-5807

## NOTICE

Enclosed herewith please find a copy of the Report and Recommendation filed by United States Magistrate Judge Sitarski , on this date in the above captioned matter.  You are hereby notified that within fourteen (14) days from the date of service of this Notice of the filing of the Report and Recommendation of the United States Magistrate Judge, any party may file (in duplicate) with the clerk and serve upon all other parties written objections thereto (See Local Civil Rule 72.1 IV (b)). **Failure of a party to file timely objections to the Report & Recommendation shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court Judge.**

In accordance with 28 U.S.C. §636(b)(1)(B), the judge to whom the case is assigned will make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  The judge may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge, receive further evidence or recommit the matter to the magistrate judge with instructions.

Where the magistrate judge has been appointed as special master under F.R.Civ.P 53, the procedure under that rule shall be followed.

MICHAEL E. KUNZ
Clerk of Court

By: _____
Joseph Lavin , Deputy Clerk

cc:  Courtroom Deputy to Judge Jones

civ623.frm
(11/07)