UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

-------------------------------------------------------:
                       :
Radio Music License Committee,       :
                       :
         Plaintiff,         :
                       :
         v.            :        No. 2:12-cv-05807-CDJ-LAS
                       :
SESAC, Inc., SESAC, LLC, and SESAC :
Holdings, Inc.,              :
                       :
         Defendants.      :
                       :
-------------------------------------------------------:

**DEFENDANTS' OBJECTIONS TO THE REPORT AND RECOMMENDATION
ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

<u>TABLE OF CONTENTS</u>

INTRODUCTION ...........................................................................................................................1

BACKGROUND ...........................................................................................................................1

ARGUMENT ................................................................................................................................4

I.     BECAUSE RMLC PLAINLY HAS SHOWN NO IRREPARABLE
       HARM, THE COURT SHOULD NOT ADOPT THE R&R'S
       CONCLUSIONS AS TO RMLC'S LIKELIHOOD OF SUCCESS ON
       THE MERITS. ....................................................................................................................4

II.    RMLC HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE
       MERITS. .............................................................................................................................9

       A.     The Report and Recommendation Erred in Finding a Likelihood of
              Success as to the Concerted-Action Element of a Section 1 Claim.........................9

       B.     The Report and Recommendation Erred in Finding a Likelihood of
              Success as to a Rule-of-Reason Section 1 Claim...................................................12

       C.     The Report and Recommendation Erred in Finding a Likelihood of
              Success as to a Section 2 Claim. ...........................................................................17

CONCLUSION.............................................................................................................................22

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Needle, Inc. v. Nat'l Football League,*
  560 U.S. 183 (2010)................................................................................................9

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
  472 U.S. 585 (1985)..........................................................................................12, 18

*Bakery, Confectionery, Tobacco Workers and Grain Millers v. Bulova Techs., LLC,*
  Civil Action No. 08-5828, 2009 WL 497705 (E.D. Pa. Feb. 26, 2009) (Jones, J.) .................6

*Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.,*
  784 F.2d 1325 (7th Cir. 1986) ..............................................................................13

*Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic,*
  65 F.3d 1406 (7th Cir. 1995) (Posner, J.) ................................................................15

*Brantley v. NBC Universal, Inc.,*
  675 F.3d 1192 (9th Cir. 2012) ..............................................................................16

*Broadcom Corp. v. Qualcomm Inc.,*
  501 F.3d 297 (3d Cir. 2007)..................................................................................18

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.,*
  485 U.S. 717 (1988)............................................................................................14

*Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.,*
  724 F.3d 377 (3d Cir. 2013)....................................................................................6

*Deutscher Tennis Bund v. ATP Tour, Inc.,*
  610 F.3d 820 (3d Cir. 2010)..................................................................................12

*ECRI v. McGraw-Hill, Inc.,*
  809 F.2d 223 (3d Cir.1987)....................................................................................4

*EUSA Pharma (US), Inc. v. Innocoll Pharm. Ltd.,*
  594 F. Supp. 2d 570 (E.D. Pa. 2009) ........................................................................5

*Gordon v. Lewistown Hosp.,*
  423 F.3d 184 (3d Cir. 2005)..................................................................................12

*Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.,*
  602 F.3d 237 (3d Cir. 2010)..................................................................................11

*In re Ins. Brokerage Antitrust Litig.,*
  579 F.3d 241 (3d Cir. 2009)..................................................................................11

*In re Insurance Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010)...............................................................................12

*Int'l Transp. Mgmt. Corp. v. Brooks Fitch Apparel Grp., LLC*,
   No. 11-CV-1921 (DMC), 2011 WL 1466334 (D.N.J. Apr. 18, 2011) ......................................7

*InterVest, Inc. v. Bloomberg, L.P.*,
   340 F.3d 144 (3d Cir. 2003)...............................................................................12

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984)........................................................................................16

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007)..................................................................................12, 16

*LePage's Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003)...............................................................................18

*Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*,
   562 F.3d 553 (3d Cir. 2009)................................................................................7

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).......................................................................................10

*Med. Mktg. Consultants, LLC v. Cardiac Telecom Corp.*,
   Civ. Action No. 06-00274, 2007 WL 1811188 (W.D. Pa. May 31, 2007).....................................7

*Minard Run Oil Co. v. U.S. Forest Serv.*,
   670 F.3d 236 (3d Cir. 2011).................................................................................5

*Nutrasweet Co. v. Vit-Mar Enters., Inc.*,
   176 F.3d 151 (3d Cir. 1999).................................................................................6

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
   555 U.S. 438 (2009).......................................................................................18

*State Oil Co. v. Khan*,
   522 U.S. 3 (1997).........................................................................................14

*T & L Redemption Ctr. Corp. v. Phoenix Beverages, Inc.*,
   752 F. Supp. 64 (E.D.N.Y. 1989) ............................................................................9

*U.S. Horticultural Supply, Inc. v. Scotts Co.*,
   Civil Action No. 04-5182, 2009 WL 89692 (E.D. Pa. Jan. 13, 2009)......................................13

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
   92 F. Supp. 2d 349 (S.D.N.Y. 2000)..........................................................................2

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005)..................................................................................18

*United States v. Microsoft Corp.*,
    147 F.3d 935 (D.C. Cir. 1998) ..............................................................................17

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981)................................................................................................7

*Whitfield v. Chartiers Valley Sch. Dist.*,
    707 F. Supp. 2d 561 (W.D. Pa. 2010)...................................................................5

## STATUTES

15 U.S.C. § 1 ....................................................................................................................12

15 U.S.C. § 2 ....................................................................................................................17

17 U.S.C. § 106................................................................................................................14

## INTRODUCTION

Plaintiff Radio Music License Committee (RMLC) has moved for a preliminary injunction that seeks to prevent defendant SESAC[1] from adopting its 2014 fee schedule for commercial radio stations.  That fee schedule will result in no increases for stations in the smallest markets, and increases of approximately seven percent for stations in all other markets. In her Report and Recommendation ("R&R"), Judge Sitarski has correctly recommended that this Court deny the requested preliminary injunction because RMLC has failed to make the required showing of irreparable harm.  This Court should adopt the R&R's conclusions regarding the absence of irreparable harm, and should deny RMLC's motion on that basis alone.

SESAC respectfully objects, however, to the R&R's conclusion that RMLC is likely to succeed on the merits of its claims, and requests that this Court not adopt that conclusion.  *First*, the complete absence of irreparable harm necessarily requires that the motion be denied outright, so whether RMLC is likely to succeed on the merits is irrelevant, and it is therefore unnecessary for the Court to address that question.  That is particularly true in light of this case's factual and legal complexity.  *Second*, the R&R's conclusions as to RMLC's likelihood of success do not follow from its factual findings.  To the contrary, those factual findings actually foreclose any conclusion that RMLC is likely to succeed on the merits of its antitrust claims.

## BACKGROUND

Under the Copyright Act, any entity that wishes to "perform" a copyrighted musical composition – for instance, by broadcasting it over the airwaves – needs authorization from the

---

[1] The complaint names as defendants SESAC, Inc.; SESAC, LLC; and SESAC Holdings, Inc.  These objections, like the complaint, refer to the defendants collectively as "SESAC."

copyright owner.  R&R ¶ 2.[2]  Performing a composition without such authorization constitutes copyright infringement and exposes the infringer to liability.  R&R ¶ 20.  A copyright holder is free to deny authorization to perform the composition, and is also free to license the work on whatever terms he or she sees fit, including price.  R&R ¶¶ 1-3; *see, e.g.*, *UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349, 352 (S.D.N.Y. 2000).

Defendant SESAC is the smallest of three "performing rights organizations" (PROs) that license the right to perform copyrighted musical compositions.  R&R ¶¶ 5-6, 10.  SESAC, like the two other PROs (ASCAP and BMI), does not own copyrights itself.  Rather, it licenses performance rights held by approximately 30,000 songwriters and publishers – SESAC's "affiliates" – and distributes royalties to those affiliates.  R&R ¶¶ 5, 10.  Despite receiving these royalties, SESAC's affiliates have no role in any of SESAC's business or licensing decisions.  R&R ¶ 27.

Radio stations perform music and need to obtain the rights to any music they play.  R&R ¶ 2.  The standard PRO license is a fixed-fee "blanket license," which entitles a licensee (such as a radio station) to perform any of the songs in the PRO's repertory without fear of copyright infringement.  R&R ¶ 15.  Blanket licensing avoids the massive transaction costs that stations would incur if they had to negotiate a separate agreement with the copyright holder of each song the station wished to perform.  R&R pp. 28-29; *see id.* ¶ 2 n.2 (stating that "using a PRO for licensing purposes is more efficient and cost-effective").  Stations generally obtain blanket licenses from each of the three PROs.  R&R ¶ 20.  Seldom do they obtain performance licenses directly from copyright holders (so-called "direct licenses").  R&R ¶¶ 3, 17.

---

[2] The R&R lists its findings of fact by paragraph number but does not do the same for its conclusions of law.  Accordingly, these Objections use "R&R ¶ __" to refer to particular paragraphs of the R&R's findings of fact, and use "R&R p. __" to refer to particular pages of the R&R's conclusions of law.

The R&R found that, for reasons that have nothing to do with SESAC, radio stations do not have control over substantial amounts of the music that they play.  R&R ¶¶ 12-14. According to the R&R, some stations broadcast feature music selected by third-party syndicators, stations cannot control or identify music in advertisements produced by third-parties, and stations cannot control so-called "ambient" or background music in unscripted programming.  *Id.*  The R&R also found that, because stations cannot control the music they play, they need the rights to all songs in SESAC's repertory to avoid the risk of copyright infringement.  R&R ¶ 56 ("The inability to control all the music that is played requires a station to obtain licenses for all the works that could potentially be broadcast on [its] stations in order to avoid infringing."); *id.* ¶ 59 ("Because stations cannot control what they play, they would still need to directly license all the works in SESAC's repertory to ensure they comply with the copyright laws.").

In October 2012, RMLC, an association purporting to represent the multi-billion-dollar commercial radio industry, filed this suit against SESAC, alleging that its licensing practices violate Section 1 and Section 2 of the Sherman Act.  SESAC's motion to dismiss the case in its entirety remains pending.  In October 2013 – one year after filing its complaint – RMLC moved for a preliminary injunction.  This Court referred the motion to Judge Sitarski, who issued an R&R containing, inter alia, the following conclusions of law:

- RMLC has not made the showing of irreparable harm necessary to obtain preliminary injunctive relief.  R&R pp. 33-37.

- With respect to the concerted-action element of a claim under Section 1 of the Sherman Act, RMLC has shown a likelihood of success on the merits.  R&R p. 27.

- RMLC has shown a likelihood of success on the merits of a Section 1 rule-of-reason claim, essentially because stations have no alternative but to purchase SESAC's blanket license.  R&R pp. 27-31.

- RMLC has shown a likelihood of success on the merits of a Section 2 monopolization claim because SESAC has monopoly power and has engaged in anticompetitive conduct by "failing to disclose its repertory and ensuring that users have no alternatives but to purchase [its] licenses."  R&R pp. 31-33.

SESAC objects to each of these conclusions other than the first.  Because the motion can be denied solely on the basis of the absence of irreparable harm, SESAC respectfully requests that the Court either (a) decline to adopt the R&R's conclusions as to RMLC's likelihood of success on the merits; or (b) conclude, as an independent and alternative basis for denying the preliminary injunction, that RMLC is *not* likely to succeed on the merits.

## ARGUMENT

## I.   BECAUSE RMLC PLAINLY HAS SHOWN NO IRREPARABLE HARM, THE COURT SHOULD NOT ADOPT THE R&R'S CONCLUSIONS AS TO RMLC'S LIKELIHOOD OF SUCCESS ON THE MERITS.

The R&R's conclusion regarding RMLC's failure to make the "clear showing of immediate irreparable injury" necessary to obtain a preliminary injunction is indisputably correct.[3]  *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987) (quoting *Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980)); *Whitfield v. Chartiers Valley Sch. Dist.,* 707 F. Supp. 2d 561, 564 (W.D. Pa. 2010) ("A *clear showing* of an imminent irreparable

---

[3] Following the hearing, SESAC submitted detailed proposed findings of fact and conclusions of law, to which SESAC respectfully refers the Court for a more complete articulation of RMLC's inability to show irreparable harm or to satisfy any of the other requirements for preliminary injunctive relief.

injury is an *absolute necessity* in obtaining injunctive relief."  (emphasis added)).  Judge Sitarski appropriately considered, and rejected, each potential source of irreparable harm that RMLC identified.[4]

*First*, any harm caused by SESAC's 2014 fee increases is plainly monetary.  The R&R correctly concluded that these increases will not irreparably harm stations because they will not threaten the existence of any station's business.  R&R p. 36; *see Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011) (noting that "[a]s a general matter, a purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement," but that a limited "exception exists where the potential economic loss is so great as to threaten the existence of the movant's business" (internal quotation marks omitted)).  Stations in the smallest markets will not see *any* increase in their scheduled SESAC fees.  R&R ¶ 37.  Meanwhile, for stations whose fees *will* increase under SESAC's 2014 fee schedule, the R&R appropriately concluded that SESAC's fee increases will not even remotely threaten any station's business.[5] R&R pp. 36-37.

---

[4] The testimony of RMLC's Executive Director, William Velez, confirms that RMLC's motivation in seeking this preliminary injunction was not actually to avert irreparable harm supposedly associated with increased SESAC fees.  Mr. Velez testified that "six months after filing [this] suit in October, we expected that case to be well along.  And then we woke up a couple months ago and said, you know, this is going on a year now, without any action from the Court.  And if SESAC holds to past patterns, we're going to be looking at another rate increase at the end of this year.  So we need to do something."  PI Tr. 12/9/13 a.m. 102:3-10 (Velez Direct).

[5] By the same logic, SESAC's fee increases are too small to result in the sort of business disruption that could be capable of supporting injunctive relief.  *See, e.g.*, *EUSA Pharma (US), Inc. v. Innocoll Pharm. Ltd.*, 594 F. Supp. 2d 570, 576, 582 (E.D. Pa. 2009) (identifying irreparable harm from losing "a unique, non-replicable business opportunity" if the defendant oversaw the development of a novel product for which the plaintiff had an option and right of first refusal to commercialize).  Indeed, the broadcaster witnesses testified that SESAC's 2014 fee schedule would have no effect on the regular business planning that each station conducts. PI Tr. 12/9/13 p.m. 115:16-116:4 (MacDonald Cross) (statement about "reevaluat[ing]" his business refers merely to the "kind of thing [he does] all the time in response to rising expense");

*Second*, the R&R correctly rejected RMLC's suggestion that, if SESAC's rates increased for 2014, stations would be irreparably harmed by confronting a supposed "Hobson's choice" between risking copyright infringement, on one hand, and paying SESAC's license fees, on the other.  As the R&R noted, stations would face this choice regardless of how much, or how little, SESAC charged for its licenses.  R&R p. 34.  Accordingly, granting the injunction and freezing SESAC's rates would have no effect on that harm.  Regardless of whether SESAC charges 2014 fees, 2013 fees, or some other level of fees, radio stations still would be faced with the same choice between infringing copyright and paying SESAC's license fees.[6]

Because RMLC has not shown irreparable harm, there is no need for the Court to reach the merits.  As the Third Circuit has explained, "a plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate."  *Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 724 F.3d 377, 389 (3d Cir. 2013) (quoting *Nutrasweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999)); *Bakery, Confectionery, Tobacco Workers and Grain Millers v. Bulova Techs., LLC*, Civil Action No. 08-5828, 2009 WL 497705, at *2 (E.D. Pa. Feb. 26, 2009) (Jones, J.) (citing *P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005)).  In particular – and as the R&R itself recognized, *see* R&R p. 37 & n.27 – "[i]n the absence of irreparable injury, no preliminary injunction would lie, even if the other three elements . . . were found."  *NutraSweet*, 176 F.3d at 153.  Thus, if the plaintiff has not made the requisite showing

---

DX64 (Souza Dep. 64:9-15) (acknowledging that KCKM will not have to consider significant operational changes in business due to SESAC's 2014 license fees).

[6] For the same reasons, the R&R also correctly concluded that the prospect that SESAC might conduct an audit of one of its radio station licensees cannot constitute irreparable harm sufficient to warrant an injunction.  R&R pp. 34-35.

of irreparable harm, the court must deny the motion and need not address the likelihood-of-

success prong of the preliminary injunction standard.  *See Liberty Lincoln-Mercury, Inc. v. Ford*

*Motor Co.,* 562 F.3d 553, 557-58 (3d Cir. 2009); *Int'l Transp. Mgmt. Corp. v. Brooks Fitch*

*Apparel Grp., LLC,* No. 11-CV-1921 (DMC), 2011 WL 1466334, at *7 (D.N.J. Apr. 18, 2011)

("Since a preliminary injunction cannot issue unless Plaintiff establishes irreparable harm, this

Court need not address the other factors."); *Med. Mktg. Consultants, LLC v. Cardiac Telecom*

*Corp.*, Civ. Action No. 06-00274, 2007 WL 1811188, at *9 (W.D. Pa. May 31, 2007) ("Because

the Plaintiffs have failed to establish a likelihood of imminent irreparable harm, the court need

not reach the remaining factors to be weighed in conjunction with a request for preliminary

relief."  (citing *Adams v. Freedom Forge Corp.,* 204 F.3d 475, 484 (3d Cir. 2000))).  Given that

the absence of irreparable harm makes preliminary injunctive relief so clearly inappropriate, the

Court should decline to adopt Judge Sitarski's conclusions regarding RMLC's likelihood of

success on the merits – which, in the end, amount merely to an advisory opinion.[7]  Indeed, in

declining to reach the balance-of-equities and public-interest prongs of the preliminary

injunction standard, the R&R itself recognized that the absence of irreparable harm was an

independently sufficient basis for denying the injunction.  *See* R&R p. 37 n.28.

---

[7] Findings and conclusions at the preliminary injunction stage, of course, generally are
not binding at a later stage of the litigation.  *See, e.g.*, *Univ. of Tex. v. Camenisch*, 451 U.S. 390,
396-98 (1981) (holding that preliminary injunction proceedings did not obviate need for full trial
on the merits because of the "haste characteristic of a request for a preliminary injunction").  In
the same vein, the R&R disclaimed any view on the "ultimate merits" of this case.  R&R p. 30
n.22.  Nonetheless, a decision to adopt the R&R's conclusions regarding RMLC's likelihood of
success on the merits could prejudice SESAC by coloring future decisions in this case (should it
proceed past the pending motion to dismiss).  With that said, SESAC's decision to object to only
certain components of the R&R does not mean that SESAC necessarily agrees with the
remainder.  Nor does SESAC waive its right to challenge any of the R&R's findings or
conclusions at a later stage of proceedings.

Declining to reach the merits would be particularly appropriate in this case. For one thing, SESAC's motion to dismiss this action in its entirety remains pending. A likelihood-of-success ruling here has the potential to prejudicially predetermine the disposition of that motion. SESAC is entitled to a full and fair hearing on its motion to dismiss, rather than one colored by the peculiarities of a highly expedited preliminary injunction proceeding.

As the R&R recognized repeatedly, moreover, this is a complex case, both factually and legally, and the evidentiary record was truncated by necessity. *See* R&R p. 30 n.22 ("I reiterate that this is a factually complex case and the current record is limited; the ultimate merits will be determined at the appropriate stage of proceedings."); *id.* p. 37 n.27 ("[T]his is a complex case and the current record is far from comprehensive; discovery was expedited and Defendants' expert retained with little time in which to offer an opinion on critical matters such as the relevant market."); *see also id.* p. 19 (stating that "my recommendation says nothing about the ultimate merits of this case").

With respect to expert testimony in particular, SESAC had less than three weeks, spanning the Thanksgiving holiday, to retain an expert and have him prepare a report. That was because, although RMLC initially disclaimed an intent to present expert testimony at the preliminary injunction hearing, it then submitted an expert declaration as part of its reply papers. As the R&R explained:

> [B]oth parties initially indicated that they would not introduce expert testimony at the injunction hearing. However, RMLC had a change of heart on this point, and included expert opinion from Dr. Peterson in [its] Reply Brief. Not surprisingly, SESAC also had a change of heart, and retained Dr. Schmalensee to rebut Dr. Peterson. Dr. Schmalensee was required to prepare a report under extremely strict time constraints.

R&R p. 23 n.16 (internal citation omitted); *see id.* ("We acknowledge that time constraints precluded Dr. Schmalensee from doing little more than critiquing Dr. Peterson's report."). Judge

Sitarski admitted that her conclusion on the merits of the case might change after "careful expert analysis." *Id*. (further noting that the Court's "conclusion does not preclude a different finding at later stages of this case, after full discovery"). These are further reasons for which the Court should refrain from adopting the R&R's conclusions as to RMLC's likelihood of success on the merits.

## II.   RMLC HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS.

If the Court nonetheless elects to consider the likelihood-of-success prong here, it should conclude that RMLC is *not* likely to succeed on the merits with respect to either Section 1 or Section 2 of the Sherman Act.

### A.   *The Report and Recommendation Erred in Finding a Likelihood of Success as to the Concerted-Action Element of a Section 1 Claim.*

Section 1 of the Sherman Act, 15 U.S.C. § 1, provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." Section 1 does not reach unilateral conduct by a firm; rather, "an arrangement must embody concerted action in order to be a 'contract, combination . . . or conspiracy' under § 1." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 191 (2010) (alteration in original). The R&R erred in its conclusion that RMLC was likely to succeed on the merits with respect to this concerted-action element – and consequently erred in its ultimate conclusion regarding RMLC's likelihood of success on its Section 1 claim. *See, e.g.*, *T & L Redemption Ctr. Corp. v. Phoenix Beverages, Inc.*, 752 F. Supp. 64, 67-68 (E.D.N.Y. 1989) (rejecting likelihood of success on Section 1 claim for want of proof as to concerted-action element).

Without reference to any finding of fact, the R&R relied solely on the Supreme Court's statement in *BMI v. CBS* that PROs "involve concerted action," 441 U.S. 1, 10 (1979), to support

its likelihood-of-success conclusion as to the concerted-action element.  R&R p. 27.  This was

erroneous.  The *BMI* case did not involve SESAC at all; it involved ASCAP and BMI.  The

Supreme Court surely did not mean to exempt plaintiffs suing PROs from the burden of showing

concerted action with evidence relating to the specific defendant they have sued.  *See, e.g.*,

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986) (requiring

evidence of concerted action).  Any conclusion that RMLC is likely to succeed on the merits

must flow from the record in *this* case – which, in any event, included no evidence that SESAC's

structure resembles that of ASCAP or BMI.

Here, the uncontroverted evidence at the hearing made clear that SESAC's challenged

practices constitute unilateral conduct, rather than concerted action.  There was no evidence, nor

did the R&R find as fact, that *any* of SESAC's challenged practices result from anything other

than unilateral business decisions by SESAC.  As SESAC's President and Chief Operating

Officer testified without contradiction or challenge, SESAC makes its own licensing decisions

without discussing any of its licensing practices with its affiliates.  PI Tr. 12/10/13 a..m. 81:2-

82:2.  Indeed, the R&R itself found that "SESAC's affiliates *do not* have any input into SESAC's

licensing decisions, and *are not* informed about the terms (or identities) of SESAC's licensing

agreements with other affiliates and radio stations."  R&R ¶ 27 (emphasis added).  This finding

forecloses any conclusion that RMLC can satisfy the concerted-action element of a Section 1

claim.

Nor can the R&R's conclusion regarding concerted action be supported by the mere fact

that each of SESAC's affiliates authorizes SESAC to grant performance licenses on the

affiliate's behalf.  Simply put, those are not agreements to undertake any of the conduct of which

RMLC complains.  In the absence of any nexus with that conduct, the mere grant of licensing

authorization by an affiliate to SESAC cannot form the basis for antitrust liability.  *Cf. In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 267 (3d Cir. 2009) (plaintiff must prove that the "concerted actions were illegal").

Even if RMLC *had* shown such a nexus, moreover, it still could not establish a likelihood of success on the concerted-action element.  That is because RMLC's complaint alleges a "hub-and-spoke" conspiracy, with SESAC as the "hub" and its various supplier-affiliates the "spokes."  Section 1 liability cannot attach for such a conspiracy unless the entities that constitute the spokes have agreed with each other, not just with the hub.  *See Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010).  Thus, to establish concerted action, RMLC must present evidence that SESAC's affiliates have agreed *among themselves*, not just with SESAC.

The R&R concluded specifically that there was no evidence of an agreement among SESAC's affiliates.  R&R p. 27.  Not only that, but the R&R's findings confirm that each SESAC affiliate has an *independent* interest in licensing through SESAC:

> SESAC offers an array of benefits that differ from ASCAP and BMI.  For example, SESAC pays royalties to [its] affiliates monthly, as opposed to quarterly.  SESAC also attempts to pay more to [its] affiliates than what market intelligence tells [it] ASCAP and BMI are paying to their affiliates.  SESAC's relatively small size also offers certain advantages.  For example, SESAC executives and employees are available to [its] affiliates, and SESAC encourages the growth of [its] songwriters by conducting songwriter workshops and showcases.

R&R ¶ 25 (internal citations omitted).  In light of that independent interest, the fact that many copyright holders choose to affiliate with SESAC by no means permits an inference of agreement *among* those copyright holders.  In *Dentsply*, for instance, the defendant's various dealers may each have taken actions supporting the defendant's anticompetitive conduct – yet the Third Circuit held that "simply because each Dealer, on its own, might have been

11

economically motivated to exert efforts to keep Dentsply's business and charge the elevated

prices Dentsply imposed does not give rise to a plausible inference of an agreement among the

Dealers themselves."  602 F.3d at 255; *see In re Insurance Brokerage Antitrust Litig.*, 618 F.3d

300, 327-28 (3d Cir. 2010) (holding that "one cannot plausibly infer a horizontal agreement

among a broker's insurer-partners from the mere fact that each insurer entered into a similar

contingent commission agreement with the broker," because "each insurer had an obvious

incentive to enter into the 'strategic partnerships' offered by the defendant brokers, irrespective

of the actions of its competitors").

> B.    The Report and Recommendation Erred in Finding a Likelihood of Success as to a
>       Rule-of-Reason Section 1 Claim.

Even if the R&R were correct about RMLC's likelihood of success as to the concerted-

action element, "[t]he rule of reason is the accepted standard for testing whether [concerted

action] restrains trade in violation of § 1." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,

551 U.S. 877, 885 (2007).  A threshold requirement is that RMLC show that the practice harms

competition in a relevant antitrust market.  *See, e.g.*, *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d

144, 159 (3d Cir. 2003); *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 829-30 (3d

Cir. 2010); *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005).  In theory, there are

two kinds of competition that SESAC could potentially harm – competition among SESAC's

affiliates, and competition between SESAC's affiliates and SESAC itself.  As set forth below,

the R&R's conclusion that RMLC has established a likelihood of success on its rule of reason

claim is foreclosed by the R&R's factual findings, which lead to the inescapable conclusion that

SESAC has not harmed competition.[8]

---

[8] The absence of any cognizable harm to competition equally forecloses the conclusion
that RMLC has established a likelihood of success on its Section 2 claim.  *See Aspen Skiing Co.
v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) (explaining that in evaluating a

As to competition among SESAC's affiliates, the R&R found that, for reasons having nothing to do with SESAC, stations need rights to *all* works in SESAC's repertory that could potentially be broadcast.  R&R ¶ 59; *see* R&R ¶ 56 (explaining that "stations cannot control the music that is broadcast in commercials from third parties, nor can they control ambient music that is played during broadcasts of live events"); *id.* p. 33 (acknowledging that "the fact that radio broadcasters cannot control what they play is not due to any action by SESAC").  The fact that stations need rights to *all* such works in SESAC's repertory means that they are not in a position to choose between one work and another work on the basis of price.  Thus, the owners of those works could not possibly compete against each other, regardless of anything that SESAC does.  *See U.S. Horticultural Supply, Inc. v. Scotts Co.*, Civil Action No. 04-5182, 2009 WL 89692, at *19 (E.D. Pa. Jan. 13, 2009) (reasoning that because "distributors need to carry a full line of products in order to compete effectively," "distributors cannot substitute one product for another in response to an increase in the wholesale price"); PI Tr. 12/10/13 p.m. 121:2-8 (testimony by Dr. Peterson that, if stations need the rights to multiple works, those rights are complements, not substitutes for one another); *cf. Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1337 (7th Cir. 1986) (holding that because complementary products did not compete with each other, merger between firms offering the products "did not change conditions of competition in the market").  Because no competition among affiliates could exist in the first place, SESAC's actions cannot logically be said to have *harmed* any such competition.

As to competition between SESAC and its affiliates, the R&R expressed concern that SESAC's practices somehow prevent stations from purchasing a substitute for (or alternative to) its blanket license.  R&R pp. 29-30.  The alternative that the R&R identified, however, was a set

Section 2 claim, a court must consider whether conduct "has impaired competition in an unnecessarily restrictive way").

of direct licenses encompassing all works in SESAC's repertory that stations might potentially broadcast.  R&R ¶¶ 57-58; *id.* pp. 22-23, 38.  In other words, stations would have to reach agreements with every rightsholder with works in SESAC's repertory (each of whom has the right under copyright law to deny a license, or to insist on a high price for a license).  The R&R's focus on this kind of substitute does not accord with the law or with the record evidence.

Focusing on a full set of direct licenses does not accord with the law because SESAC's affiliates are its suppliers, not its competitors (even if the terms of their agreements with SESAC do not prohibit them from issuing licenses directly to radio stations), and the antitrust laws impose no obligation on a firm to compete with its own suppliers.  *Cf. Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 n.4 (1988) (observing that "all anticompetitive effects are by definition horizontal effects"); *State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997) (stressing that the antitrust laws' "primary purpose" is "protect[ing] interbrand competition").  Not only that, but each of SESAC's affiliates, by operation of copyright law, is the holder of a lawful monopoly in his or her own works.  17 U.S.C. § 106.  Antitrust law cannot be said to require two sellers of a product (SESAC and its copyright-holding affiliate) when, under the copyright laws, there is to be just one.  Put differently, if each of SESAC's affiliate copyright holders simply licensed on its own – rather than through a PRO – stations would still need rights to *all* of those copyright holders' works (because they cannot control the music they play), and would have no choice but to purchase a license from each of them.

Focusing on a full set of direct licenses as a "substitute" for SESAC's blanket license does not accord with the record evidence, either.  There was no evidence that any station would *want* to employ, as a substitute for SESAC's blanket license, a bundle of direct licenses from all SESAC-affiliated copyright holders whose music the station might potentially broadcast.  *Cf.*

14

R&R ¶ 10 (noting that SESAC has "around 30,000 affiliates").  And there certainly was no evidence that any station would have the *ability* to do so on terms agreeable both to the station and to copyright holders.  Indeed, one broadcaster admitted that it would take a "small army" to determine information necessary to license all of its music directly.  PI Tr. 12/9/13 p.m. 123:19-124:5; *see id.* at 122:25-123:14, 181:13-20 (broadcasters conceding lack of knowledge of how to direct license).

The reason why there was no such evidence is that it is implausible, if not impossible, that a station could profitably employ a complete set of direct licenses as a substitute for SESAC's blanket license.  A station with perfect information about the content of SESAC's repertory still would have to make contact with each relevant copyright holder; would have to negotiate a license agreement with each one; would have to ensure that the license agreement is entered into on favorable terms; and would have to ensure that what it pays the copyright holders, combined with the costs associated with this hugely cumbersome process, did not exceed the price of a blanket license from SESAC.  Indeed, the R&R itself found that "[i]t would be extraordinarily time consuming and expensive . . . if each music user (such as a radio station) had to negotiate a separate agreement with the holder of the copyright in each work the user wished to perform."  R&R ¶ 3 n.2; *see also id.* pp. 28-29 ("[I]t is well-settled that blanket licenses bring great benefits to the music industry; they greatly reduce transaction costs [and] increase efficiency.").

The R&R was incorrect to suggest that competition could be harmed simply by the absence of a restriction on SESAC's ability to raise its prices.  R&R p. 30.  Regardless of whether such a restriction exists, it is well-settled that the antitrust laws do not prohibit a firm from charging high prices.  *See Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*,

65 F.3d 1406, 1411-12 (7th Cir. 1995) (Posner, J.).  As such, proof of high prices alone,

untethered to any competitive harm, cannot establish harm to competition.  *See, e.g.*, *Leegin*, 551

U.S. at 895-97; *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012) (even if

agreements result in higher prices, they are legal "absent a showing of actual anticompetitive

effect"); *cf. Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984) (distinguishing

between "exploitation of market power by merely enhancing the price of the tying product,"

which does not harm competition, and "attempting to impose restraints on competition in the

market for a tied product," which does).  Here, as noted above, the R&R's factual findings

actually *foreclose* a conclusion that competition has been harmed in any cognizable manner.

Finally, the R&R recognized correctly that the rule of reason requires the fact-finder to

balance a challenged practice's procompetitive and anticompetitive effects.  R&R p. 28.  But the

R&R did not conduct any actual balancing, as the test requires.  On one hand, as explained

above, the R&R's factual findings foreclose the possibility that SESAC's practices have harmed

competition.  A proper application of the balancing test would have concluded that SESAC's

blanket licensing practices cannot violate the rule of reason because there is nothing to balance

on the anticompetitive side of the ledger.

On the other hand, the R&R itself noted that "the use of blanket licenses by PROs has

consistently withstood antitrust challenges because of the pro-competitive benefits it provides."

R&R p. 30; *see also id.* pp. 28-29, 38 (discussing efficiencies created by blanket licensing).  In

support of this conclusion, the R&R cited the testimony of Dr. Schmalensee, who testified that

he was "struck by the enormity" of the transaction costs in a world without blanket licensing.  PI

Tr. 12/10/13 p.m. 42:7-16; *see id.* at 41:4-15 (testimony that with "10,000 radio stations,

hundreds of thousands of rights holders, that's 10,000 times 100,000 contracts to be negotiated,

16

enforced.  It's mind boggling the level of . . . transaction costs that would be required to, if you will, replicate the performance of the current system.").

Yet rather than giving these procompetitive effects their appropriate weight in the rule of reason's balancing test, the R&R dismissed them, in part, because of the absence of a mechanism to regulate SESAC's prices, such as the rate courts provided by the ASCAP and BMI consent decrees.  R&R p. 30.  SESAC respectfully submits that the absence of rate regulation is not relevant here.  Rate regulation is an extraordinary remedial measure; the fact that ASCAP and BMI voluntarily agreed to it many years ago says nothing about whether the antitrust laws require it.  *See generally United States v. Microsoft Corp.*, 147 F.3d 935, 946 (D.C. Cir. 1998) (noting that "an antitrust consent decree cannot be read as though its animating spirit were solely the antitrust laws").  Although stations likely *prefer* rate regulation, it puts the cart before the horse to suggest that its absence indicates an antitrust violation.

C.   The Report and Recommendation Erred in Finding a Likelihood of Success as to a Section 2 Claim.

Section 2 of the Sherman Act makes it unlawful to "monopolize . . . any part of the trade or commerce among the several States."  15 U.S.C. § 2.  Despite this broad language, however, possessing monopoly power is not in and of itself unlawful.  Indeed, the Supreme Court has recognized that the pursuit of monopoly power is precisely what can, and should, spur firms to compete vigorously in the market.  As the Court explained in *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko*:

> The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system.  The opportunity to charge monopoly prices – at least for a short period – is what attracts "business acumen" in the first place; it induces risk taking that produces innovation and economic growth.

540 U.S. 398, 407 (2004).

What Section 2 bars is only "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 447-48 (2009) (internal quotation marks omitted).   For a firm's conduct to potentially trigger liability under Section 2, it must be "exclusionary," "anticompetitive," or "predatory."  *See, e,g.*, *Trinko*, 540 U.S. at 407 ("To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of *anticompetitive conduct.*" (emphasis added)); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) (stressing the importance of the "question whether the challenged conduct is fairly characterized as '*exclusionary*' or '*anticompetitive*' – to use the words in the trial court's instructions – or '*predatory*,' to use a word that scholars seem to favor" (emphasis added)); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007) ("[T]he acquisition or possession of monopoly power must be accompanied by some *anticompetitive conduct* on the part of the possessor." (emphasis added)); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005) ("Unlawful maintenance of a monopoly is demonstrated by proof that a defendant has engaged in *anti-competitive* conduct that reasonably appears to be a significant contribution to maintaining monopoly power."  (emphasis added)); *LePage's Inc. v. 3M*, 324 F.3d 141, 152 (3d Cir. 2003) (liability under Section 2 requires that a defendant "engage[] in *exclusionary or predatory conduct* without a valid business justification" (emphasis added)).

Even assuming that SESAC has monopoly power, the R&R's findings foreclose any conclusion that such power results from exclusionary conduct by SESAC.  At the hearing, RMLC devoted considerable effort to demonstrating that stations need to purchase SESAC's blanket license if they are to avoid copyright infringement.  The R&R, in turn, found that – for

reasons having nothing to do with any conduct by SESAC – stations cannot control much of the music that they play, and therefore need rights to all significant works in SESAC's repertory. The upshot of that finding is that, to the extent that stations cannot react to an increase in SESAC's fees by purchasing alternative rights instead, that has absolutely nothing to do with any conduct by SESAC.  *See* R&R p. 33 (acknowledging that "the fact that radio broadcasters cannot control what they play is not due to any action by SESAC").  Rather, under the R&R's findings, this state of affairs results from the fact that (a) stations cannot control the music they play; and (b) that music is copyrighted.  Stations may not like the obligations that copyright law imposes upon them, but that is not a reason to find an antitrust violation.

The R&R concluded, however, that SESAC had engaged in exclusionary conduct by supposedly failing to provide information sufficient to permit a station to determine whether particular works are in SESAC's repertory.  R&R p. 33.  This conclusion was mistaken.  As an initial matter, the R&R provided no basis for a conclusion that SESAC's repertory disclosure practices are deficient.  The R&R did not find that SESAC had intentionally obscured the contents of its repertory, or that SESAC had somehow taken affirmative steps to make its online repertory search unusable.  At most, it suggested that a station might be dissatisfied with SESAC's online repertory search function – yet it pointed to no respect in which SESAC could plausibly improve that function.  And although the R&R noted that SESAC disclaims the accuracy of the information available on its website, *see* R&R ¶ 28, it provided no reason why SESAC should assume whatever liability results from a radio station's performance of copyrighted material; certainly, we are aware of no case holding that responsibility for avoiding

copyright infringement rests with anyone other than the user.[9]  Characterizing SESAC's repertory disclosure practices as "willful" maintenance of monopoly power cannot be squared with the fact that, at most, SESAC has not bent over backwards to help its customers avoid its product.

Even if SESAC's repertory disclosure practices were somehow inadequate, moreover, the R&R provided no basis to conclude that those practices have unlawfully contributed to any monopoly power that SESAC possesses.  The R&R suggested that SESAC's repertory disclosure practices make it impossible for a station to replace a SESAC blanket license with a complete set of direct licenses.[10]  R&R p. 29.  As explained above, however, focusing on this kind of "substitute" for SESAC's product does not accord with the law or with the facts.  As to the law, potential sellers of direct licenses are SESAC's suppliers, not its competitors – and RMLC has cited no case holding that a firm has an antitrust obligation to compete against its suppliers, especially when the copyright laws have granted each supplier a lawful monopoly in his or her own works.  *See supra* pp. 14-15.  Put differently, although the R&R describes SESAC's conduct as "exclusionary," the only sellers that SESAC  could possibly be "excluding" are its own supplier-affiliates.  It is incongruous to conclude that they have been "excluded" by a

---

[9] Indeed, the record contained undisputed evidence that both ASCAP and BMI make similar disclaimers in connection with their own websites' respective repertory search functions. *See* DX28 (BMI website); DX29 (ASCAP website).

[10] To be clear, the R&R did *not* suggest that the supposed inadequacy of SESAC's repertory disclosure prevents stations from scrubbing their programming of SESAC music.  Any such suggestion would be inconsistent with the R&R's finding that stations cannot control the music they play and therefore need rights to all songs that could potentially be broadcast.  *See* R&R ¶¶ 56, 59.  Given this lack of control, even perfect information about what works SESAC licenses would not eliminate a station's need to acquire the rights to all works in SESAC's repertory.

distributor that, according to the R&R itself, enables them to earn a greater profit than they otherwise would.  *See* R&R ¶ 25.

As to the facts, once again, there was no evidence that any station would even want (let alone have the ability) to purchase a complete set of direct licenses as a substitute for SESAC's blanket license.  *See supra* pp. 15-16.  Given the obvious enormity of any effort to negotiate contracts with many thousands of SESAC rightsholders, *see, e.g.,* PI Tr. 12/10/13 p.m. 41:4-15, 42:7-16 (Schmalensee Direct), it is implausible that a station could profitably employ a complete set of direct licenses as an alternative to SESAC's one-stop, fixed-fee blanket license.[11]

Alternatively, the R&R suggested that SESAC had engaged in exclusionary conduct simply by charging high prices.  R&R p. 33.  That conclusion cannot be squared with the well-settled legal principles governing liability under Section 2: a firm does not violate Section 2 by possessing or exercising monopoly power.  A firm can violate Section 2 only by taking exclusionary steps to acquire or maintain such power.  *See supra* pp. 17-19.  The record forecloses any conclusion that SESAC has done this.

*       *       *

With respect to the merits, the R&R evidently viewed stations as facing an unappealing predicament:  they frequently play music; that music is copyrighted; they accordingly need authorization to play that music; and (in the R&R's view) their lack of control over the music deprives them of some amount of leverage when it comes to purchasing such authorization.  Stations may not like this, but it is not a problem that has anything to do with SESAC, and it is

---

[11] Although the R&R also stated that SESAC had engaged in exclusionary conduct by "ensuring that users have no alternatives but to purchase [its] licenses," R&R p. 33, the alternative that the R&R identified was a complete set of direct licenses for works in SESAC's repertory.  *Id.* ¶ 58; *id.* p. 23.  And the only way the R&R claimed that SESAC had "ensure[d]" stations could not purchase this sort of alternative, in turn, was by making inadequate disclosure of the contents of its repertory.

not an antitrust problem.  It is just a function of the copyright laws' requirement that a performer of copyrighted material obtain authorization.

## **CONCLUSION**

The Court should adopt the R&R's conclusion that RMLC has not met its burden of showing irreparable harm, and deny the preliminary injunction motion on that basis alone.  The Court should decline to adopt the R&R's conclusions as to RMLC's likelihood of success or, as an alternative and independent basis for denying the motion, should conclude that RMLC is not likely to succeed on the merits.


Dated: January 6, 2014                              Respectfully submitted,

                                                    /s/ Susan J. Kohlmann_____
Gary A. Rosen (PA I.D. No. 40967)                   Susan J. Kohlmann (pro hac vice)
LAW OFFICES OF GARY A. ROSEN P.C.                   Michael W. Ross (pro hac vice)
63 West Lancaster Avenue, Suite 1                   Joshua H. Rubin (pro hac vice)
Ardmore, PA 19003                                   JENNER & BLOCK LLP
Telephone: (610) 658-8790                           919 Third Avenue
Fax: (610) 658-8792                                 New York, NY 10022
                                                    Telephone: (212) 891-1600
                                                    Fax: (212) 909-0821

                                                    Joshua M. Segal (pro hac vice)
                                                    Matthew S. McKenzie (pro hac vice)
                                                    JENNER & BLOCK LLP
                                                    1099 New York Avenue, NW
                                                    Suite 900
                                                    Washington, DC 20001-4412
                                                    Telephone: (202) 639-6089
                                                    Fax: (202) 661-4920

                                                    *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of January, 2014, the foregoing Defendant's

Objections to the Report and Recommendation on Plaintiff's Motion for a Preliminary Injunction

were electronically filed using the CM/ECF system, and notice was given to all parties using this

system.

/s/ Susan J. Kohlmann
SUSAN J. KOHLMANN (pro hac vice)