**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RADIO MUSIC LICENSE** | : | |
| **COMMITTEE, INC.,** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION NO.:** |
| | : | |
| **v.** | : | |
| | : | **2:12-CV-5807-CDJ** |
| **SESAC, INC., et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**<u>MEMORANDUM</u>**

**Judge C. Darnell Jones, II**                                    **June 26, 2014**

Pending before the court is a motion to dismiss, (Doc. No. 23), filed by defendants SESAC Holdings Inc., SESAC Inc., and SESAC LLC, (collectively "SESAC") seeking dismissal of Count I (Horizontal Price Fixing), Count II (Group Boycott/Refusal to Deal), and Count III (Monopolization) of the complaint on various grounds. First, defendant moves to dismiss Counts I and II on the ground that plaintiff failed to adequately allege that SESAC's purportedly anticompetitive conduct flowed from an agreement between SESAC and its affiliates. Defendant argues in the alternative that, even if the court does find an agreement between SESAC and its affiliates, the alleged conduct is not unlawful *per se* or under the rule of reason. Finally, defendant seeks dismissal of Count III on the ground that plaintiff failed to adequately plead exclusionary conduct or harm to competition. Plaintiff filed a response to the motion on February 8, 2013, (Doc. No. 26), defendant filed a reply on March 6, 2013, (Doc. No. 29), and the court heard oral argument on March 18, 2014. After a thorough review of the record, the court will **GRANT** the motion **IN PART AND DENY IN PART**.

**BACKGROUND**

This case arises out of SESAC's allegedly anticompetitive copyright licensing practices. SESAC is one of three performing rights organizations ("PROs") that operate in the United States, the two others being the American Society of Composers, Authors and Publishers ("ASCAP") and Broadcast Music, Inc., ("BMI").[1] (Compl. at 6-7.) The three PROs serve an important role in the music industry by "acting as intermediaries between customers and [the holders of copyrights to musical works] and offering 'one-stop-shop' licenses for the public performance of works." (Compl. at 5-6.) Their utility derives from federal copyright law, which prohibits the public performance of a copyrighted work without a license and punishes unauthorized performances by fine of $750 to $30,000 for each infringement and up to $150,000 for willful violations. 17 U.S.C. §106(4) (bestowing upon copyright holder exclusive right to publicly perform musical work); 17 U.S.C. §504(c) (setting statutory damages).[2] PROs provide two important services to the music industry: efficient licensing and effective oversight. By obtaining, cataloging, and (in many cases) bundling copyrights into composite licenses, they offer consumers the opportunity to purchase the rights to thousands of musical works without the costly and time consuming process of negotiating the terms and conditions of each individual performance. (Compl. at 5-6.) Furthermore, PROs police the music industry by investigating and prosecuting unauthorized users – those who publicly perform copyrighted works without a license – an otherwise costly prospect for copyright owners. Therefore, they provide valuable services to the music industry.

---

[1] Although irrelevant for purposes of defendants' motion to dismiss, it is worth noting that SESAC is a for-profit corporation while BMI and ASCAP are non-profits. (Compl. at 4-5, 7.)
[2] As an alternative to statutory damages, a copyright holder may recover "actual damages and any additional profits of the infringer." 17 U.S.C. §504(a)(1).

Plaintiff RMLC is a 501(c)(6) non-profit organization[3] that since 1935 has negotiated "public-performance-right licenses" on behalf of radio stations in the United States.[4] (Compl. at 8, 24.) "RMLC seeks to obtain fair and reasonable license fees on behalf of radio stations,

---

[3] Organizations designated 501(c)(6) are "business leagues, chambers of commerce, real estate boards, boards of trade and professional football leagues, which are not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual." *Business Leagues*, INTERNAL REVENUE SERVICE (Apr. 24, 2014), http://www.irs.gov/Charities-&-Non-Profits/Other-Non-Profits/Business-Leagues.     A business league, also known as a trade association, "is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit." *Id.*

[4] Plaintiff contends that RMLC has standing to sue on behalf of its member radio stations because RMLC negotiates their licenses and has agreed to sue on their behalf. Plaintiff alleges:

> 69.  RMLC is a trade association whose objective is to achieve fair and reasonable license fees from PROs (including ASCAP, BMI, and SESAC) on behalf of its radio station members. As such, RMLC has standing to bring the present action on behalf of its members
>
> 70.  RMLC's members consist of approximately 6,500 U.S. radio stations involved in the business of terrestrial radio broadcasting. Another 3,500 stations have agreed to be "bound" by the terms of the RMLC-negotiated licenses with ASCAP and BMI and, thereby, to pay the RMLC court-mandated fees to assist with operational expenses. RMLC's membership is open to all U.S. terrestrial radio stations or groups of radio stations "under direct or indirect common control." RMLC's member stations pay court-mandated dues to RMLC and have the right to resign their membership. . . .
>
> 76.  RMLC's claims do not require the individual participation of each of its members to obtain the relief that it seeks. RMLC seeks only injunctive relief, not damages. SESAC violated the antitrust laws by employing common licensing practices that affect all RMLC members. RMLC can establish the illegality of these practices through evidence of SESAC's conduct that is common to its members.

(Compl. at 23-25.)

Plaintiff also alleges, "all of RMLC's members have signed an authorization form that permits RMLC to 'institute . . . in the name of all authorizing stations proceedings to establish reasonable fees and terms for such licenses.'" (Compl. at 25.) Because defendant has not challenged RMLC's standing, however, the court will address the matter no further.

negotiates for per-program and blanket-license carve outs that allow stations to achieve further fee discounting, and aims to achieve the broadest possible licenses covering new-media applications, including HD multicasting and streaming." (Compl. at 8.) Thousands of terrestrial radio stations partner with RMLC to obtain music licenses from ASCAP and BMI. (Compl. at 8.) SESAC, however, has refused to do business with RMLC, forcing RMLC member stations to obtain SESAC licenses on their own. (Compl. at 8.)

SESAC is the only PRO in the United States that is not subject to a consent decree concerning its licensing practices. (Compl. at 8.) In 1941, the Department of Justice (DOJ) brought an antitrust claim against ASCAP, alleging that its blanket license was an illegal restraint of trade under §1 of the Sherman Act. *See Meredith Corp. v. SESAC LLC*, --- F.Supp.2d ----, 2014 WL 812795, *11 (S.D.N.Y. March 3, 2014) (recounting DOJ claims in *United States v. ASCAP*, 13-CV-95 (S.D.N.Y. 1941)). In 1966, the DOJ brought similar claims against BMI "alleg[ing] that BMI constituted a combination both to restrain trade and to monopolize, and was thereby able to artificially depress rates and coerce composers to join BMI, harming competition." *See id.* at *13 (summarizing DOJ claims in *United States v. BMI*, 1966 Trade Cases ¶ 71,941 (S.D.N.Y. 1966)). ASCAP and BMI ultimately settled their claims with the DOJ by signing consent decrees, which mandate that they:

> (i) must accept all qualified music composers and producers as affiliates; (ii) must not enter into exclusive contracts with their affiliates;[5] (iii) must not insist that consumers take a blanket license; (iv) must offer consumers a genuine economic choice between a per-program license and a blanket

---

[5] "Exclusive dealing occurs when a seller agrees to sell, license or lease all or a substantial portion of its output of a product or service exclusively to a particular buyer, or when a buyer similarly agrees to purchase, license or lease all or a substantial portion of its requirements of a product or service exclusively from a particular seller." WILLIAM HOLMES & MELISSA MANGIARACINA, ANTITRUST LAW HANDBOOK, Exclusive Dealing §2:19 (2013).

license;[6] (v) must offer consumers who apply in writing for licenses access to
their repertories without exposure to copyright infringement, even in the
absence of agreement on the license fees; and (vi) must accept the district
court's determination of a reasonable fee in the event that they cannot agree
upon a fee within 60 days.

(Compl. at 9.)

Because SESAC is not subject to a consent decree or other licensing regulation,

plaintiff avers that it has a competitive advantage in the music licensing industry and has

engaged in unlawful, anticompetitive licensing practices. First, it offers its repertory to

customers exclusively in blanket license format and allegedly "refuses to offer any viable

alternative to its blanket license." (Compl. at 20.) Moreover, SESAC obscures the works in its

repertory, thereby making it impossible for radio stations to determine whether the music

they air is part of SESAC's license. (Compl. at 11.) Although SESAC's website contains a list of

its works, it disclaims "SESAC, Inc. makes no representations and/or warranties with respect

to the accuracy or completeness of the information," and plaintiff alleges that the database "is

updated regularly and may change on a daily basis." (Compl. at 11-12.) Moreover, the search

feature does not scan for "advertising jingles (e.g., the five-note McDonald's advertising

jingle), all of which effectively renders the search feature useless." (Compl. at 11, 12.) Even if

the list were accurate, plaintiff points out, SESAC only allows "search[es] for one work at a

time and requires the user to know the precise name of the song, writer, publisher, or artist

for a given work." (Compl. at 11.) "Entering the name of a single writer or publisher, for

example, can return numerous results and require further review of multiple levels of data

---

[6] A blanket license gives the purchaser the right to broadcast any music in a PRO's repertory
for the time period set by the license agreement. (Compl. at 6.) A per-program license, on the
other hand, "permits a licensee to use all songs in a PRO's repertory, but only for the purpose
of specific radio programming." (Compl. at 6.)

and/or numerous additional confirmatory searchers to find a specific work or to attempt to determine that it is not listed." (Compl. at 11.)

Plaintiff also alleges that SESAC has compiled a critical mass of must-have, copyrighted works that radio stations cannot avoid broadcasting as a practical matter, so radio stations are forced to purchase the blanket license, regardless of price.[7] (Compl. at 1-2, 7, 10-12, 13, 16, 21.) The obscurity of SESAC's repertory combined with large copyright infringement fines, up to $150,000, and radio stations' lack of control over what music they air makes the SESAC license a virtual necessity for most stations. Finally, RMLC alleges that SESAC has entered into unlawful *de facto* exclusive licensing agreements[8] with its affiliates

---

[7] Radio stations cannot avoid playing many of SESAC's songs because "they do not control the non-feature music played in the programs and commercials that they air. SESAC leverages jingles and other non-feature, locked-in content to coerce RMLC's members (many of which rely on advertising revenue to survive) to pay for a blanket license." (Compl. at 12.)

[8] Plaintiff explains:

> 58.     Because SESAC refuses to offer any viable alternative to its blanket license, no radio station has an incentive to acquire individual licenses directly from copyright holders. Absent a carve-out right, any direct license that a consumer acquired would have no effect on SESAC's blanket-license fee, but would entail an additional royalty burden on the consumer. When radio stations purchase blanket licenses from SESAC, therefore, they necessarily lack any incentive to acquire direct licenses from SESAC affiliates. As alleged in Paragraph 32, it is not possible for radio stations to obtain licenses directly from SESAC affiliates and to forego dealing with SESAC. By acquiring licensing rights over handpicked, indispensable musical works, and by foreclosing any direct licensing between its affiliates and consumers, or any prospect for a carve-out discount, SESAC achieves *de facto* exclusive licensing rights.

(Compl. at 20.)

by refusing to offer its customers carve-out rights[9] and refusing to pay royalties to affiliates who directly license musical works to radio stations.[10] (Compl. at 10, 13, 15, 18, 19, 20.) In other words, SESAC will not discount the price of its blanket license for radio stations that have otherwise legally obtained a copyright license that is part of SESAC's repertory.

Plaintiff contends that SESAC's licensing practices are anticompetitive in a number of ways. First, SESAC's strategy of bundling together must-have works makes the SESAC license indispensable. Its blanket license has allegedly generated monopolistic synergy: the blanket license is more indispensable to customers than the sum of its parts. Plaintiff argues that SESAC's affiliates are unwilling to directly license to stations because they can earn a greater profit by licensing through SESAC. Moreover, SESAC's reliance on *de facto* exclusive dealing arrangements all but ensures that its affiliates will continue to license exclusively through SESAC. Therefore, SESAC's actions allegedly destroy competition between SESAC and its affiliates.

RMLC also alleges that SESAC's licensing policies destroy competition between SESAC and other PROs. (Compl. at 14.) Because BMI and ASCAP are subject to consent decrees, they "must accept all qualified music composers and producers as affiliates" and must offer consumers a genuine choice between a blanket license and a per-program license. (Compl. at 9.) Most importantly, BMI and ASCAP are subject to rate regulation and, unlike SESAC, cannot

---

[9] Carve-out rights "entitle licensees to discounts if they secure separate permissions directly from the copyright owners to musical works subsumed within the blanket license." (Compl. at 6.)

[10] It appears from the face of the complaint that SESAC withholds royalties from affiliates on a *pro rata* basis, deducting royalties based on how many and which songs an affiliate directly licenses. (Compl. at 20.) Plaintiff states: "SESAC requires its affiliates that directly license to 'notify SESAC in writing within 10 days of the license being granted and also provide a copy of the license. Royalties that are otherwise payable will not be paid to performances that are direct licensed.'" (Compl. at 20.)

charge supracompetitive licensing fees. Therefore, they cannot match SESAC's high royalty rates and are unable to compete for SESAC's affiliates. (Compl. at 2.) Plaintiff states:

> 38.  Second, SESAC neither creates nor adds to inter-platform competition between performing rights organizations. By withdrawing its members from the pool of copyright holders from whom consumers can obtain direct licenses, SESAC eliminates, and does not promote, competition. ASCAP and BMI cannot compete to obtain licensing authority on behalf of SESAC affiliates because SESAC can distribute part of its monopoly profits to its affiliates, which neither ASCAP nor BMI can comprehensively match on account of the consent decrees to which they are subject. SESAC admits that less than one percent of its affiliates have ever left for another PRO.

(Compl. at 14.)

In this vacuum of competition, plaintiff alleges that SESAC has been able to raise the price for its blanket license considerably in the past several years without expanding the size or enhancing the quality of its repertory. (Compl. at 16, 24.) Since 2009, SESAC has increased the price of the blanket license by a compounded rate of 8% to 20% a year for analog and web-site broadcasting. (Compl. at 24.) As for digital radio broadcasting, SESAC has raised prices by at least 5% a year. (Compl. at 24.) Plaintiff claims, "[n]one of the fee increases that RMLC's members have been forced to pay is tied to growth in the size or popularity of the SESAC repertory." (Compl. at 24.) These price increases have allegedly harmed terrestrial radio stations by forcing them to allocate an ever-expanding portion of their revenue to pay for SESAC's license. (Compl. at 22-23.)

RMLC filed the above-captioned lawsuit on October 11, 2012, seeking declaratory and injunctive relief on behalf of its member radio stations under §1 and §2 of the Sherman Antitrust Act (15 U.S.C. §§1 & 2) and §16 of the Clayton Act (15 U.S.C. §26). (Doc. No. 1.) The complaint sets forth three counts: Horizontal Price Fixing (Count I), Group Boycott/Refusal to Deal (Count II), and Monopolization (Count III). (Doc. No. 1.) On December 17, 2012,

defendant SESAC filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), (Doc. No. 23), and plaintiff filed a response on February 8, 2013. (Doc. No. 26.) Plaintiff subsequently filed a motion for preliminary injunction, (Doc. No. 30), which this court denied. (Doc. No. 68.) Defendant's motion to dismiss has been fully briefed and is ripe for disposition.[11]

## STANDARD OF REVIEW

In deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation and citation omitted). After the Supreme Court's decision in *Bell Atl. Corp. v. Twombly*, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

## DISCUSSION

Given the relative complexity of this case, it is worth clarifying at the outset the specific conduct that plaintiff condemns as unlawful under §1 and §2 of the Sherman Act. The complaint is somewhat vague in this department. At oral argument, defendant argued that plaintiff's principal allegations target SESAC's blanket license. (Transcript of Oral Argument at 8.) Plaintiff disagreed:

---

[11] The court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 and 15 U.S.C. §26 because plaintiff's claims fall under §1 and §2 of Title 15 of the United States Code.

> The first thing I'd like to clarify is, we did not allege that the blanket license generally is illegal. That is not what we alleged. We alleged that SESAC undertook willful conduct in creating its version of the blanket license . . . in amassing essential copyrights – what they called in the trial compelling copyrights – and then precluding the radio stations from being able to tell what was in the repertory so they can't avoid the license. That's the violation. It's not the blanket license itself.

(Transcript of Oral Argument at 26-27.)

After thoroughly reviewing the complaint, the court believes that plaintiff's §1 and §2 claims are based on the confluence of four of SESAC's licensing practices: SESAC's blanket license (and its refusal to offer other licensing options), its procurement of a critical mass of must-have works, its *de facto* exclusive dealing contracts with its affiliates and its lack of transparency as to the works in its repertory.

## COUNT I: SHERMAN ACT §1 (PRICE FIXING/GROUP BOYCOTT/REFUSAL TO DEAL)

SESAC moves to dismiss Counts I and II of the complaint on alternative grounds, the first being that plaintiff has failed to allege an agreement between and among SESAC's affiliates and the second being that plaintiff has failed to plead that, even if there was an agreement, the object of that agreement was unlawful. Because plaintiff has failed to plausibly allege agreement, the court will not reach the merits of the second matter.

### A.) Agreement

Section 1 of the Sherman Act provides, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. §1. Section I "does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775 (1984)). "[T]he crucial question is whether the

10

challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Id.* (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)). "While a showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, it falls short of conclusively establishing agreement or . . . itself constituting a Sherman Act offense." *Id.* (quoting 467 U.S. at 540-41). "Even conscious parallelism, a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions is not in itself unlawful." *Id.* at 553-54 (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)).

Of course, the Federal Rules require a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. The Supreme Court stated in *Twombly*, "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." 550 U.S. at 556. In reconciling the Federal Rules with the *Twombly* Court's jurisprudence concerning conscious parallelism, courts must be mindful of false inferences:

> The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. . . . Accordingly, we have previously hedged against false inferences from identical behavior at a number of points in the trial sequence. An antitrust conspiracy plaintiff with evidence showing nothing beyond parallel conduct is not entitled to a directed verdict . . . proof of a §1 conspiracy must include evidence tending to exclude the possibility of independent action . . . and at the summary judgment stage a §1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently.

*Id.* at 555.

Count I of the complaint states a horizontal price fixing claim under §1 of the Sherman Act. (Compl. at 25.) The Third Circuit has defined horizontal price fixing as an agreement between "competitors at the same market level . . . to fix or control the prices they will charge for their respective goods or services." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 356 (3d Cir. 2004). The term "horizontal price fixing" designates a price agreement between direct competitors, not successive entities in a supply chain, as in the case of an agreement between manufacturer and retailer. *Texaco Inc. v. Dagher*, 547 U.S. 1, 6 (2006). The relevant inquiry, therefore, is whether SESAC entered into an agreement with its affiliates, either express or tacit, the object of which was to fix the price of SESAC's blanket license. As for Count II, a group boycott or refusal to deal is "a concerted refusal to deal on particular terms with [customers]." *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458 (3d Cir. 1986).

Plaintiff argues that SESAC has conceded in its brief in opposition that it had an agreement with its affiliates. To be sure, SESAC does acknowledge that it had licensing agreements with its affiliates: "SESAC and each affiliate do agree, of course, that SESAC may license the affiliate's copyrights." (Pl. Brief at 15-16.) However, plaintiff's §1 claims are based on more than barebones licensing agreements. *See supra* at 9-10. The complaint alleges price fixing and group boycott violations, and neither party seriously contends that licensing agreements in their most basic form constitute price fixing or group boycotts.  Therefore, plaintiff is incorrect that defendant has conceded agreement under §1 the Sherman Act.

In this case, plaintiff argues that SESAC orchestrated a hub-and-spoke conspiracy, a form of agreement in which one party – the hub – facilitates agreement among a number of other parties – the spokes – which are usually organizations in the hub's supply chain. (Pl.

Brief at 17-21.) A hub-and-spoke conspiracy requires agreements between each spoke and the hub and between and among each of the spokes themselves. *Howard Hess Dental Labs., Inc. v. Dentsply Intern., Inc.*, 602 F.3d 237, 255 (3d Cir. 2010) ("In other words, the 'rim' connecting the various 'spokes' is missing."). After reviewing the allegations of agreement and the parties' respective briefs, the court has concluded that plaintiff has failed to allege sufficient facts from which the court can draw a plausible inference of a hub-and-spoke conspiracy between and among SESAC and its affiliates. In particular, the court agrees with defendants that plaintiff has failed to plead the rim of a hub-and-spoke conspiracy by failing to plausibly allege agreements among SESAC's affiliates.

Plaintiff relies primarily on *In re Insurance Brokerage Antitrust Litigation* to support its hub-and-spoke claim. 618 F.3d 300 (3d Cir. 2010). In that case, the Third Circuit held that allegations that each spoke had a similar agreement with the hub was insufficient, standing alone, to infer that the spokes had agreed amongst themselves. *Id.* at 327. The court held that there must be allegations of a "plus factor" that permits the court to infer that the identical agreements between the hub and each spoke reflect concerted action among the spokes themselves instead of merely indicating parallel conduct of entities that happen to perceive the market in a common light. *Id.* at 321-22. One such plus factor – and the one on which plaintiff relies here – is "evidence that the defendant acted contrary to its interests." *Id.* at 322. Plaintiff states, "it is against SESAC's affiliates' self-interest to force RMLC's members to enter into blanket licenses with SESAC. . . . [t]he affiliates' self-interest should be to maintain maximum flexibility to negotiate the best possible license fee for their work, including the ability to negotiate direct licenses with individual RMLC members." (Compl. at 19.)

Plaintiff's plus-factor argument fails for two reasons. First, it incorrectly presumes that SESAC's affiliates prefer licensing flexibility over the high royalty and efficient licensing benefits that SESAC offers its affiliates. SESAC's licensing agreements, even when viewed in the light most favorable to plaintiff, do not appear to be against the affiliates' self-interest. PRO licensing generally provides a number of economic benefits over direct licensing, as noted by the Supreme Court in *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*:

> The blanket license, as we see it, is not a "naked restraint of trade with no purpose except stifling of competition," *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963), but rather accompanies the integration of sales, monitoring, and enforcement against unauthorized copyright use. *See* L. SULLIVAN, HANDBOOK OF THE LAW OF ANTITRUST §59, p. 154 (1977). As we have already indicated, ASCAP and the blanket license developed together out of the practical situation in the marketplace: thousands of users, thousands of copyright owners, and millions of compositions. Most users want unplanned, rapid, and indemnified access to any and all of the repertory of compositions, and the owners want a reliable method of collecting for the use of their copyrights. Individual sales transactions in this industry are quite expensive, as would be individual monitoring and enforcement, especially in light of the resources of single composers. Indeed, as both the Court of Appeals and CBS recognize, the costs are prohibitive for licenses with individual radio stations, nightclubs, and restaurants, 562 F.2d, at 140, n. 26, and it was in that milieu that the blanket license arose.
>
> A middleman with a blanket license was an obvious necessity if the thousands of individual negotiations, a virtual impossibility, were to be avoided. Also, individual fees for the use of individual compositions would presuppose an intricate schedule of fees and uses, as well as a difficult and expensive reporting problem for the user and policing task for the copyright owner. Historically, the market for public-performance rights organized itself largely around the single-fee blanket license, which gave unlimited access to the repertory and reliable protection against infringement. When ASCAP's major and user-created competitor, BMI, came on the scene, it also turned to the blanket license.

441 U.S. 1, 20-21 (1979)

Even apart from the larger benefits of PROs, SESAC offers its affiliates higher profits and greater exclusivity than they could achieve through alternative forms of licensing.[12] Plaintiff acknowledges that SESAC "can afford to pay its affiliates a greater average royalty than either ASCAP or BMI," (Compl. at 2), and that, while musicians normally choose which PRO to affiliate with, "SESAC strategically selects who they will admit." (Transcript of Oral Argument at 36-37.) As such, profit, exclusivity and efficiency offer alternative rationales for the parallel conduct of SESACs affiliates and are more consistent with conscious parallelism than concerted action.

Moreover, although plaintiff alleges that SESAC enters into *de facto* exclusive dealing agreements with its affiliates (indicating they are contractually precluded from direct licensing), a deeper investigation into plaintiff's allegations demonstrates that SESAC's affiliate agreements do not preclude direct licensing. First, plaintiff alleges that SESAC withholds royalties from affiliates that license directly. Second, plaintiff claims that SESAC refuses to offer carve-out rights to radio stations for musical works obtained directly from its affiliates. As to the first point, plaintiff alleges, "SESAC requires its affiliates that directly license to 'notify SESAC in writing within 10 days of the license being granted and also provide a copy of the license. Royalties that are otherwise payable will not be paid to performances that are direct licensed.'" (Compl. at 20.) Far from uniformly precluding direct licensing, this provision merely demonstrates that SESAC is unwilling to pay royalties to an affiliate that chooses not to use its services. SESAC clearly has a legitimate business interest

---

[12] Of course, plaintiff alleges that SESAC is only able to offer its affiliates supracompetitive royalties because of its monopolistic conduct, but even if SESAC's ability to pay supracompetitive royalties stems from unlawful conduct, plaintiff has still failed to show that the unlawful conduct was the result of concerted action. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 n. 10 (3d Cir. 2012) (noting that §1 of Sherman Act requires concerted action while §2 does not).

in maintaining a viable business model, one that would be undermined if affiliates were able to directly license while simultaneously collecting a royalty payment from SESAC. As to the second point, even if SESAC's refusal to offer carve-out rights to radio stations violated the Sherman Act, plaintiff fails to plead that SESAC and its affiliates agreed on those terms. Rather, the complaint indicates that SESAC unilaterally chose not to offer carve-out rights and, without any allegations of an agreement on those terms, the court is unable to conclude that SESAC's carve-out policies are the product of an agreement with its affiliates. In sum, plaintiff fails to plead, in more than conclusory legal terms, the existence of a hub-and-spoke conspiracy.

## COUNT III: SHERMAN ACT §2 (MONOPOLOZATION)

Defendant SESAC moves to dismiss Count III of the complaint on the grounds that plaintiff failed to plead exclusionary conduct or harm to competition. Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. §2. Monopolistic power is not itself prohibited by the terms of the Sherman Act, only the procurement or maintenance of monopoly power through what is commonly referred to as anticompetitive conduct.[13] *LePage's Inc. v. 3M*, 324 F.3d 141, 152 (3d Cir. 2003). Therefore, to state a claim for relief under §2, a plaintiff must allege, pursuant to the standard set forth in *Twombly*, "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or

---

[13] The term "anticompetitive conduct" is loosely coined as an umbrella term for any conduct that harms the competitive process itself (not simply competitors) and is therefore not conducive to concise definition. *LePage's Inc. v. 3M*, 324 F.3d 141, 152 (3d Cir. 2003) ("'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties.") (quoting *Caribbean Broad Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998)).

maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 306-07 (3d Cir. 2007). The court will address each of defendant's arguments in turn. As a preliminary matter, however, the court must address the issue of market definition.

## I.       Market Definition and Monopoly Power

As noted above, a §2 claim requires a party to allege that the defendant possesses monopoly power. Monopoly power is defined as "the power to control prices or exclude competition." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966). A party may satisfy its obligation to plead monopoly power directly, by alleging that the defendant can raise prices without the fear of competitors raising output and driving down prices, or indirectly, by showing that the defendant possesses "a dominant share in a relevant market, and that significant 'entry barriers' protect that market.'" *Broadcom Corp.*, 501 F.3d at 307. Therefore, a party need only plead a relevant market if the complaint relies on circumstantial evidence of monopoly power. *Id.*

The parties discuss the relevant market at length throughout their briefs. Plaintiff's position is that the relevant market "is licenses to the copyrighted musical compositions and performances in SESAC's repertory" because, as plaintiff repeatedly suggests, defendant has procured a critical mass of must-have works that radio stations cannot avoid playing.[14] (Compl. at 1, 15-17.) As such, plaintiff argues, its music licenses are not readily interchangeable or substitutable with other repertories, such as the licenses that ASCAP and BMI offer. (Compl. at 16.) Defendant acknowledges the feasibility of this market definition

---

[14] Plaintiff also defines the relevant geographic market as the United States. (Compl. at 17.) Because the geographic market is not in dispute, however, the court does not address it here.

but notes, "[t]his highly artificial definition allows RMLC to allege that SESAC has 100% market share . . . but at the cost of foreclosing any allegation that SESAC's market power, if any, flows from anything wrongful that SESAC does." (Def. Brief at 25.)

Despite the parties' compelling definitions of the relevant market, the court need not settle the issue at this stage because plaintiff directly alleges sufficient facts from which the court can make a plausible inference that defendant possesses monopoly power. For example, plaintiff pleads, "SESAC has profitably and sustainably maintained exorbitant prices that are far greater than those charged by ASCAP and BMI, and has done so without suffering a loss of sales." (Compl. at 16.) Furthermore, the complaint alleges that SESAC has raised prices from 8% to 20% each year since 2009 without any contemporaneous increase in the size or popularity of its repertory. (Compl. at 24.) These allegations directly allege monopoly power, so plaintiff has met its burden as to this element.

## II.       Exclusionary Conduct

Monopoly power is not itself unlawful under the Sherman Act. Rather, monopoly power is only unlawful when it has been acquired or maintained by exclusionary conduct "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Broadcom Corp.*, 501 F.3d at 306-07. "Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits." *Id.* The Third Circuit has concisely described anticompetitive conduct as follows:

> Broadly speaking, a firm engages in anticompetitive conduct when it attempts "to exclude rivals on some basis other than efficiency. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) (internal quotation marks omitted), or when it competes "on some basis other than the merits," *LePage's*, 324 F.3d at 147. "Conduct that impairs the opportunities of rivals and either does not further competition on

the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive." *Broadcom*, 501 F.3d at 308. The line between anticompetitive conduct and vigorous competition is sometimes blurry, but distinguishing between the two is critical, because the Sherman Act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *McQuillan*, 506 U.S. at 458, 113 S.Ct. 884; *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 429-30 (2d Cir. 1945).

*West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 108-09 (3d Cir. 2010).

Defendant insists that plaintiff's exclusionary conduct allegations are without merit. First, defendant contends that it has not harmed competition because the only excluded parties are its affiliates, who are suppliers not direct competitors. (Def. Brief at 26.) Defendant's argument appears to rest on the assumption that sequential entities in a supply chain can never be potential direct competitors. Second, even if the court finds that SESAC's affiliates are potential competitors, SESAC argues, it has not *excluded* them because "RMLC does not allege that SESAC somehow *forces* its affiliates to grant SESAC licensing authority." (Def. Brief at 26.) Rather, SESAC's affiliates voluntarily choose to affiliate with SESAC because it offers higher royalties than they could otherwise obtain through direct licensing or with another PRO.

Defendant's first argument strains credibility. SESAC's affiliates are both actual suppliers and potential competitors, and defendant fails to convince the court that, in the absence of its allegedly monopolistic conduct, SESAC's affiliates would not compete with SESAC via direct licensing. In fact, plaintiff's complaint alleges that the only reason SESAC's affiliates do not directly license is because SESAC's monopolistic conduct allows it to charge supracompetitive prices for its blanket license, which it shares with its affiliates. Moreover, defendant's argument completely ignores ASCAP and BMI as potential competitors. Both of these PROs provide the music industry similar services as SESAC, and plaintiff adequately

alleges that they could compete for SESAC's affiliates in the absence of defendant's allegedly anticompetitive conduct. As such, defendant's argument is without merit.

As to defendant's second argument, the court acknowledges that defendant's conduct is not exclusionary in the sense that SESAC contractually forces its affiliates to utilize its services or threatens with legal sanctions those who contemplate taking their business elsewhere. To be sure, SESAC utilizes a carrot rather than a stick approach to retaining affiliates. According to the complaint, SESAC offers its affiliates higher profits, and that retention strategy appears to be highly successful. (Compl. at 2, 18.) By all accounts, SESAC's affiliates appear to be more than satisfied with SESAC's allegedly "exclusionary conduct." Plaintiff acknowledges that less than one percent of its affiliates have ever left. (Compl. at 14, 17.) However, the litmus test for exclusionary conduct is not the financial well-being of competitors. Rather, this element focuses solely on the *competitive process*, not on *competitors*. Moreover, as noted above, SESAC's argument once again ignores the possibility that ASCAP and BMI could compete with SESAC in the absence of its allegedly monopolistic conduct.

The complaint cogently portrays how SESAC allegedly obtained and preserves its monopoly power through exclusionary conduct, not "growth or development as a consequence of a superior product, business acumen, or historic accident." *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 306-07 (3d Cir. 2007). Plaintiff alleges that SESAC excludes competitors by obtaining a critical mass of must-have works, selling them exclusively in the blanket license format, discouraging direct licensing by refusing to offer carve-out rights and obscuring the works in its repertory. The court believes that plaintiff has sufficiently pleaded that these licensing practices constitute exclusionary conduct when practiced by a

monopolist such as SESAC. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (*de facto* exclusive dealing as cognizable cause of action); *U.S. v. Dentsply Intern., Inc.*, 399 F.3d 181, 193 (3d Cir. 2005) (same). Moreover, the court believes that plaintiff has sufficiently pleaded that SESAC's lack of transparency exacerbates the exclusionary nature of its conduct by forcing  radio stations to purchase the SESAC license even if they do not plan to perform the songs in SESAC's repertory for fear that they may unwittingly air copyrighted content.

It is true, as defendant points out, that the terms of SESAC's contracts with its affiliates do not expressly exclude direct licensing. As a practical reality, however, the complaint contains sufficient allegations that SESAC has taken advantage of its position as the only non-regulated PRO by paying its affiliates supracompetitive profits and refusing to offer radio stations carve-out rights for copyrights obtained directly from its affiliates. Even in the absence of explicit contractual language, plaintiff's allegations establish that SESAC has effectively forged exclusive dealing relationships with its affiliates. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) (transactions that were "technically only a series of independent sales" could be exclusive dealing); *U.S. v. Dentsply Intern., Inc.*, 399 F.3d 181, 193 (3d Cir. 2005) (circumstances surrounding transactions and independent conduct of monopolist can constitute exclusive dealing arrangement as effectively as an explicit agreement).

As a last resort, SESAC argues that copyright law, by definition, establishes a legal monopoly to artistic works. (Def. Brief, at 26.) Plaintiff, however, does not allege that SESAC violated the Sherman Act merely by obtaining the rights to copyrighted works, nor could it. Such a position would clearly espouse an untenable reading of the Sherman Act. *Walker*

*Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965). The Supreme Court has said:

> A patent by its very nature is affected with a public interest. It is an exception to the general rule against monopolies and to the right to access to a free and open market. The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope.

*Id.* (quotation omitted).

Instead, plaintiff alleges that SESAC violated the Sherman Act by procuring a critical mass of must-have works, licensing those works exclusively in blanket license format, creating *de facto* exclusive dealing contracts and obscuring the list of works in its repertory. Therefore, defendant's argument is inapposite.

The hallmark of anticompetitive conduct is harm to competition, but the danger of anticompetitive conduct is harm to the consumer. The most common characteristics of unlawful monopolies are price increases, output decreases, and a deterioration in quality and service, all of which the antitrust laws seek to minimize. *Babyage.com, Inc. v. Toys "R" Us, Inc.*, 558 F.Supp.2d 575, 583 (E.D.Pa. 2008). That is precisely what plaintiff has alleged here. SESAC's anticompetitive conduct has driven up the price of copyright licenses and deteriorated the quality of service insofar as customers only have the option of purchasing a blanket license. The court believes that plaintiff has alleged a plausible claim for which relief can be granted under §2 of the Sherman Act.

## CONCLUSION

In light of the foregoing, the court has concluded that plaintiff has failed to state a plausible claim for which relief can be granted under Count I (Price Fixing) and Count II (Group Boycott/Refusal to Deal). Therefore, Defendants' motion to dismiss, (Doc. No. 23),

will be **GRANTED IN PART AND DENIED IN PART**. It will be **GRANTED** as to Counts I and II and **DENIED** as to Count III. Because this error may be corrected, the court will **GRANT** plaintiff **LEAVE TO AMEND** the complaint.


**BY THE COURT:**

**/s/ C. Darnell Jones, II**

**_____**

**C. DARNELL JONES, II   J.**